## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LEE STEEL CORPORATION, | ) Case No. 15-45784 |
| | ) |
| Debtor. | ) |
| | ) Judge Marci B. McIvor |
| | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| TAYLOR INDUSTRIAL PROPERTIES, L.L.C. | ) Case No. 15-45785 |
| | ) |
| Debtor. | ) Judge Marci B. McIvor |
| | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| 4L VENTURES, LLC | ) Case No. 15-45788 |
| | ) |
| Debtor. | ) |
| | ) Judge Marci B. McIvor |
| | ) |
| | ) |

### FIRST DAY MOTION FOR AN ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN INTERIM POST-PETITION FINANCING AND GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105 AND 364(C); (B) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; (C) AUTHORIZING THE DEBTORS TO ENTER INTO AGREEMENTS WITH THE HUNTINGTON NATIONAL BANK; AND (D) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file

this motion (the "Motion"), under sections 105 and 364(c) of chapter 11 of title 11 of the United

States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and Rules 2002, 4001, 6004 and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of

the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules"), for the entry of an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A, and a final order (the "Final Order"). In support of this Motion, the Debtors respectfully represent:

## Jurisdiction and Venue

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue of the Debtors' chapter 11 cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

2.     On April 13, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing in possession of their property and are operating and managing their businesses as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.     No trustee, examiner, or official committee of unsecured creditors has yet to be formed or appointed in these chapter 11 cases.

4.     Debtor Lee Steel Corporation ("Lee Steel" or "Operating Debtor") is in the business of providing a full range of flat rolled steel, including hot rolled steel, cold rolled steel, and exposed coated products for automotive and other manufacturing industries. Lee Steel operates from special purpose facilities located in Romulus, Michigan and Wyoming, Michigan, which facilities Lee Steel leases from Debtor 4L Ventures, LLC ("4L") and Debtor Taylor Industrial Properties, L.L.C. ("Taylor Industrial"), respectively. Lee Steel's corporate headquarters are located in Novi, Michigan.

5.     Prior to the collapse in steel prices, Lee Steel was profitable and had annual revenues of approximately $100 million. The vast majority of Lee Steel's customers are Tier 1

and Tier 2 suppliers to the automotive industry operating in a "just in time" environment so that the customers must meet their customers' delivery requirements and, as such, cannot risk having their production delayed or interrupted. According to their audited financial statements, the Debtors' consolidated gross sales for the fiscal year ended September 30, 2014, were $116,602,378.

6.      In the ordinary course of their business operations, the Debtors directly employ approximately 65 individuals, including approximately 23 union employees.

7.      Detailed facts about the Debtors and the reasons for the commencement of their chapter 11 cases are set forth in the *Affidavit and Statement of Laura A. Marcero in Support of Chapter 11 Petitions and First Day Motions*, filed contemporaneously herewith.

8.      A motion for joint administration of the Debtors' chapter 11 cases for procedural purposes is being filed contemporaneously with this motion.

### Pre-Petition Loan Obligations

9.      On February 18, 2011, Lee Steel and Taylor Industrial entered into a Credit Agreement with Huntington National Bank (the "Pre-Petition Credit Agreement"), which initially provided a line of credit for Lee Steel and a term loan for Taylor Industrial. Huntington National Bank (the "Lender") specifically made the following loans and financial accommodations to the Operating Debtor and Taylor Industrial under the Pre-Petition Credit Agreement:

(i)      $32,000,000 revolving line of credit to Operating Debtor (the "Revolver") evidenced by a Revolving Credit Note dated September 18, 2012, as amended by the Sixteenth Amendment to Credit Agreement and Note Amendment dated January 17, 2014 (as amended, the "Revolver Note");

(ii)     $1,530,000 term loan to Taylor Industrial ("Term Loan A") evidenced by a Term Loan A Note dated April 18, 2011 (the "Term Loan A Note");

(iii)    $942,222 term loan to Taylor Industrial ("Term Loan B") evidenced by a Term Loan B Note dated April 18, 2011 (the "Term Loan B Note");

(iv)     $4,000,000 equipment line of credit to Operating Debtor (the "Equipment Line of Credit") evidenced by an Equipment Line of Credit Note dated August 5, 2011 (the "Equipment Line of Credit Note");

(v)      $12,900,000 equipment line of credit to Operating Debtor (the "Second Equipment Line of Credit") evidenced by a Second Equipment Line of Credit Note executed in April 2012, as amended by the Eighth Amendment to Credit Agreement and Note Amendment dated October 12, 2012 and the Eighteenth Amendment to Credit Agreement and Note Amendment dated April 21, 2014 (as amended, the "Second Equipment Line of Credit Note"); and

(vi)     $25,000 letter of credit for the benefit of Operating Debtor, payable to the Michigan Department of Environmental Quality (as amended, the "MDEQ Letter of Credit").

10.     Operating Debtor's and Taylor Industrial's obligations under the Pre-Petition Credit Agreement are guaranteed by the Operating Debtor, Taylor Industrial, 4L Ventures, and Mr. Taylor in a Guaranty agreement dated February 18, 2011, as amended by a Joinder Agreement dated October 30, 2012, and a Joinder Agreement dated October 30, 2013 (as amended, the "Lee Steel / Taylor Industrial Guaranty").

11.     Additionally, Lender, 4L Ventures (as borrower), Operating Debtor, and Taylor Industrial (as guarantors) are parties to a Loan Agreement dated October 30, 2012, as amended by a First Amendment to Loan Agreement dated October 30, 2013 (as amended, the "4L Ventures Loan Agreement").

12.     Lender made the following loans and financial accommodations available to 4L Ventures under the 4L Ventures Loan Agreement:  (a) a $6,800,0000 construction loan (the "4L Ventures Construction Loan") evidenced by a Promissory Note (End Loan) dated June 1, 2014

(the "4L Ventures Construction Note"); (b) a $4,322,000 term loan (the "Draw-to Term Loan") evidenced by a Promissory Note (Draw-to Term Loan) dated June 1, 2014 (the "Draw-to Term Loan Note"); and a $376,786.58 letter of credit for the benefit of 4L Ventures, payable to the Michigan Department of Transportation (as amended, the "MDOT Letter of Credit").

13.     4L Ventures' obligations under and in connection with the 4L Ventures Loan Agreement are guaranteed by (1) Operating Debtor and Taylor Industrial in a Guaranty Agreement dated October 30, 2012; and (2) Mr. Taylor in an Amended and Restated Guaranty Agreement dated October 30, 2012. Theses guaranties are, collectively, the "4L Ventures Guaranties", and together with the Lee Steel / Taylor Industrial Guaranty, collectively, the "Guaranties."

14.     As of the Petition Date, Debtors owed an aggregate principal amount of $50,091,702.35 to Lender under the pre-petition loan documents, consisting of the following:

1. $24,581,533.99 under the Revolver;
2. $1,230,375.00 under Term Loan A;
3. $573,185.05 under Term Loan B;
4. $1,938,391.03 under the Equipment Line of Credit;
5. $11,364,285.70 under the Second Equipment Line of Credit;
6. $6,545,003.00 under the 4L Ventures Construction Loan;
7. $3,858,928.58 under the Draw-to Term Loan;

plus interest accrued and accruing thereon, together with $401,786.58 in contingent liabilities under the Letter of Credit Documents, all costs, fee, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, and as such term is more fully defined in the Amendment and Ratification Agreement, the "Pre-Petition Obligations").

15.     The Lender and the Debtors entered into pre-petition security agreements and mortgages that, along with the Pre-Petition Credit Agreement and 4L Ventures Loan Agreement,

granted Lender liens in all of the assets of Debtors to secure the Pre-Petition Obligations.[1]  The

Lender has first priority security interests in all the Debtors' assets and it perfected its security

interests by filing financing statements with the Michigan Department of State on February 18,

2011, August 9, 2011, and August 8, 2012, against Lee Steel; February 18, 2011, against Taylor

Industrial; and October 30, 2012, against 4L and by recording its mortgages.


### Debtors' Assets

16.     Pursuant to Local Rule 4001-2(a), the Debtors hereby list their assets as of

February 28, 2015, based upon the Debtors' internal records, their consolidated assets, at book

value, as follows:

Current assets:

| | |
|---|---|
| Cash | 973,104 |
| Accounts receivable | 12,216,110 |
| Inventory | 31,052,117 |
| Prepaid expenses | 578,405 |
| Total Current Assets: | 44,819,736 |

Fixed assets:

| | |
|---|---|
| Land | 18,843,046 |
| Machinery & equipment | 38,715,112 |
| Trucks & automobiles | 820,814 |
| Rail equipment | 721,007 |
| Leasehold improvements | 3,357,282 |
| Furniture & fixtures | 1,463,351 |
| Subtotal: | 63,560,610 |
| Less:  Accumulated Depreciation | (16,381,899) |
| Subtotal | 47,178,712 |
| Construction in Progress | 229,750 |
| Total net fixed assets | 47,408,462 |

Other assets:                                                                          -

---

[1] As more fully described in the Amendment and Ratification Agreement.

| | |
|---|---:|
| DTE substation | 425,000 |
| Total other assets | 425,000 |
| **Combined total assets** | **92,653,198** |

17.     Based upon an appraisal conducted by Hilco Valuation Services, effective as of January 8, 2015, the Debtors' equipment has a forced liquidation value of $13,663,750 and an orderly liquidation value of $14,875,500.  The EPS Equipment, which is included in the above values at $6,500,000 (FLV) and $6,750,000 (OLV), has an appraised orderly in place value of $12,300,000.  In other words, due to the significant costs to disassemble, remove and reinstall it elsewhere, the value of the EPS Equipment is substantially increased if it can be sold with the 4L building to a buyer desiring to continue to use the facility for steel processing.

18.     Due to the decrease in the market prices for steel, the Debtors' believe that the value of their inventory is approximately $3 - 5 million less than its book value reflected above and will be writing it down to market values.

### Relief Requested

19.     The Debtors do not have sufficient available sources of working capital, including cash collateral, to operate their businesses in the ordinary course of their business without the financing requested under this Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of their estates for the benefit of all creditors of the Debtors.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with Lender requested in the this Motion is vital to the preservation and maintenance of the going concern values of the Debtors and/or the Debtors' ability to conduct an orderly liquidation of their assets to maximize the value thereof.  Accordingly, the Debtors have

an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates in order to maximize the recovery to all creditors of the Debtors.

20.     The Debtors are unable to procure financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code, without the grant of liens on assets.  The Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by Lender pursuant to the Loan Documents.

21.     To induce Lender to provide debtor in possession financing in this matter, the Debtors have agreed, subject to Court approval of the Interim Order, to enter into an Amendment and Ratification Agreement (the "Post-Petition Amendment Agreement") in the form attached as Exhibit B to this Motion.

22.     The financing provided for in the Post-Petition Amendment Agreement, which consists of continuation of pre-petition line of credit advance rates of 85% of eligible accounts receivable and 65% of eligible inventory, provides for a static $4.6 million out-of-formula to address the write down of Lee Steel's inventory to market values, and provides another variable, Operational Out of Formula, which is set forth below and based upon the Budget to address the Debtors' cash burn.  As such, the financing proposed in the DIP Motion enables the Debtors to pay all administrative expenses generated from operations after the Petition Date as set forth in the Budget, plus provides for a 10% cumulative variance as the margin of error.  As set forth in the *Affidavit of Laura A. Marcero* attached as Exhibit C to this Motion, the Debtors need

financing in the amount of $6,051,446 before the Interim Order becomes a Final Order. This amount is necessary to operate the Debtors' businesses and to avoid immediate and irreparable harm. In summary, the Post-Petition Amendment Agreement provides as follows:

a. The maturity dates of each of the Revolver, Term Loan A, Term Loan B, the Equipment Line of Credit, the Second Equipment Line of Credit, the 4L Ventures Construction Loan, the Draw-to Term Loan, and each Pre-Petition Promissory Note are extended or reduced, as applicable, to the date that the Financing Period (August 28, 2015 or an Event of Default)[2] ends.

b. During the Financing Period, (i) all interest payments on the Loans must continue to be paid in accordance with the Loan Documents, (ii) all principal payments on the Loans are suspended, (iii) Lender, in its sole discretion, may advance funds to Operating Debtor under the Revolver solely in accordance with the Budget ("Budget Funding").

c. During the Financing Period, each Debtor agrees not to make or commit itself to make (i) any distribution to or for the benefit of its shareholders or members, or any payment of any kind to or for the benefit of the shareholder, except for as described in the Post-Petition Amendment Agreement.

d. The outstanding principal balance of all Obligations under the Revolver may not at any time exceed the lesser of (1) the Line Cap or (2) the Post-Petition Borrowing Base.

*"Line Cap"* means $30,000,000.

*"Post-Petition Borrowing Base"* means, as of any date, an amount equal to:

---

[2] Defined terms not otherwise defined shall have the same meanings ascribed to them in the Post-Petition Amendment Agreement.

(A)    85% of the value of Eligible Accounts (other than Eligible Mexican Accounts); plus

(B)    the lesser of (1) $1,500,000 and (2) 65% of the value of Eligible Mexican Accounts; plus

(C)    the lesser of: (1) $23,000,000, or (2) 65% of the value of Eligible Inventory; plus

(D)    $4,600,000; plus

(E)    the Operational Out of Formula; less

(F)    the MDOT LC Amount; less

(G)    the Borrowing Base Reserve established from time to time by the Lender.

*"Operational Out of Formula"* means the following amounts as of the following periods:

| Period | Operational Out of Formula for such Period |
|---|---|
| Week ended 4/19/15 | $966,134 |
| Week ended 4/26/15 | $396,026 |
| Week ended 5/3/15 | $279,557 |
| Week ended 5/10/15 | $0 |
| Week ended 5/17/15 | $38,352 |
| Week ended 5/24/15 | $877,319 |
| Week ended 5/31/15 | $1,317,663 |
| Week ended 6/7/15 | $1,473,029 |
| Week ended 6/14/15 | $1,320,195 |
| Week ended 6/21/15 | $1,872,561 |
| Week ended 6/28/15 | $1,631,443 |
| Week ended 7/5/15 | $1,967,070 |

e.  The retention of Laura Marcero of Huron Consulting Group ("Huron") to act as the Debtors' financial consultant and chief restructuring officer and, subject to the terms and conditions of a mutually acceptable engagement letter, the Lender consents to Huron's retention as the Debtors' investment banking firm.

f.  That the Debtors follow the Budget that is attached to the Motion as Exhibit D.

g. That the Debtors meet certain milestones, including the following: (i) entry of an order approving sale and bid procedures on or before July 13, 2015; (ii) conclusion of an auction of all or substantially all of the Debtors' assets on or before August 11, 2015; (iii) entry of an order approving the sale in form and substance acceptable to the lender on or before August 14, 2015; and (iv) consummation of the sale on or before August 28, 2015.

h. The Debtors are to provide weekly calculations of the post-petition borrowing base and actual cash flow reports for the Budget, together with actual to budget comparison on each Wednesday for the preceding week.

i. As collateral security for the Lender, the Debtors will grant, pledge, and assign to Lender, and also confirm, reaffirm, and restate the prior grants to the Lender, continuing security interests in and liens upon, the rights of setoff against, all of the Collateral.

j. Except as expressly set forth in the Post-Petition Amendment Agreement, all other terms of the Loan Documents remain in full force and effect.

23. To procure the necessary financing to continue operations, the Debtors and the Lender have agreed that the Interim Order shall provide as follows:

A. <u>Payment of Prepetition Debt</u>. The Debtors are authorized to pay Lender in respect of the Pre-Petition Obligations[3] in accordance with the Post-Petition Amendment Agreement.

B. <u>Payments and Application of Payments</u>. The Debtors are authorized and directed to make all payments and transfers of estate property to Lender as and when such payments and transfers are received, and which payments and transfers, subject to Section 26 of the Interim Order, shall not be avoidable or recoverable from Lender under Section 547, 548, 550, 553 or any other Section of the Bankruptcy Code, or any other

---

[3] Terms not otherwise defined shall have the meanings ascribed to them in the proposed Interim Order attached hereto as <u>Exhibit A</u>.

claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law or otherwise. Subject to the terms of the Post-Petition Amendment Agreement and the Interim Order, all proceeds of the Collateral received by Lender, and any other amounts or payments received by Lender in respect of the Pre-Petition Collateral, shall be applied or deemed to be applied in accordance with the Post-Petition Amendment Agreement and the Interim Order first to the Post-Petition Obligations, until such Post-Petition Obligations are indefeasibly paid in full and completely satisfied, and then to the Pre-Petition Obligations; provided, however, that to the extent there is a shortfall on the Revolver, the shortfall will be deemed a Pre-Petition Obligation. Without limiting the generality of the foregoing, the Debtors are authorized, without further order of this Court, to pay or reimburse Lender for all present and future costs and expenses, including, without limitation, all professional fees, consultant fees and legal fees and expenses paid or incurred by Lender in connection with the financing transactions as provided in the Interim Order and the Post-Petition Amendment Agreement, all of which shall be and are included as part of the principal amount of the Obligations and secured by the Collateral.

C.     Continuation of Prepetition Procedures.   All pre-petition practices and procedures for the payment and collection of proceeds of the Collateral, the turnover of cash, the delivery of property to Lender and the funding pursuant to the Pre-Petition Loan Documents, including any lockbox or blocked depository bank account arrangements, are approved and may continue without interruption after the commencement of the Cases.

D.     Post-Petition Lien Grant.   To secure the prompt payment and performance of any and all Post-Petition Obligations of Debtors to Lender of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, Lender shall have, effective as of the Petition Date, valid and perfected first priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors' Estates may have in all of Debtors' post-petition assets except for avoidance

actions brought under Section 542, 545, 547, 548, 549, or 550 of the Bankruptcy Code (collectively with the Pre-Petition Collateral, the "Collateral"), subject to certain claims entitled to priority, including the Permitted Liens and Claims (as defined below). In accordance with Sections 552(b) and 361 of the Bankruptcy Code, the value, if any, in any of the Collateral, in excess of the amount of Obligations secured by such Collateral after satisfaction of the Post-Petition Obligations of Debtors to Lender, shall constitute additional security for the repayment of the Pre-Petition Obligations and adequate protection for the use by Debtors, and the diminution in the value, of the Collateral, including through the use of cash collateral, existing on the Petition Date.

  E. <u>Lien Priority</u>. The pre-petition and post-petition liens and security interests of Lender granted under the Loan Documents and the Interim Order shall be and shall continue to be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with Section 363, 364 or any other Section of the Bankruptcy Code or other applicable law; provided, however, that Lender's liens on and security interests in the Collateral shall be subject only to (a) the Permitted Encumbrances, and (b) the Carve Out Expenses (as defined below) solely to the extent provided for in Sections 14, 15, 16, and 17 of the Interim Order and described in subparagraphs I, J, and K below (the foregoing clauses (a) and (b) are collectively referred to herein as the "<u>Permitted Liens and Claims</u>"). The liens granted in favor of Lender pursuant to the Interim Order shall not prime any valid, perfected, existing, non-avoidable liens on the Pre-Petition Collateral that are at all times senior in priority to the liens of Lender in the Pre-Petition Collateral securing the Pre-Petition Obligations.

  F. <u>Post-Petition Lien Perfection</u>. The Interim Order is sufficient and conclusive evidence of the priority, perfection and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act

and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with any financial institution(s) holding a depository account consisting of Collateral (a "Perfection Act"). Notwithstanding the foregoing, if Lender shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, Lender is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or required by Lender, which act or acts shall be deemed to have been accomplished as of the date and time of entry of the Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. Lender may choose to file, record or present a certified copy of the Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of the Interim Order in accordance with applicable law. Should Lender so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of the Interim Order.

G. <u>Nullifying Pre-Petition Restrictions to Post-Petition Financing</u>. Notwithstanding anything to the contrary contained in any pre-petition agreement, contract, lease, document, note or instrument to which any Debtor is a party or under which any Debtor is obligated, any provision that restricts, limits or impairs in any way any Debtor from granting Lender security interests in or liens upon any of the Collateral (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party) under the Loan

Documents or the Interim Order, or otherwise entering into and complying with all of the terms, conditions and provisions hereof and in the Loan Documents, shall not (a) be effective and/or enforceable against any such Debtor(s) and/or Lender, or (b) adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to Lender pursuant to the Interim Order or the Loan Documents to the maximum extent permitted under the Bankruptcy Code and other applicable law.

      H.    Superpriority Administrative Expense. For all Post-Petition Obligations now existing or hereafter arising pursuant to the Interim Order, the Post-Petition Amendment Agreement or otherwise, Lender is granted an allowed superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtors, whether now in existence or hereafter incurred by Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726 or 1114 of the Bankruptcy Code (the "Superpriority Claim"), provided, however, the Superpriority Claim is subject only to the Permitted Liens and Claims as and to the extent expressly set forth in the Interim Order.

      I.    Carve Out Expenses. Upon the declaration by Lender of the occurrence of an Event of Default (as defined below), Lender's liens, claims and security interests in the Collateral, and Lender's Superpriority Claim, shall be subject only to the right of payment of the following expenses (the "Carve Out Expenses"):

      (i)    statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6);

      (ii)    fees payable to the Clerk of this Court; and

      (iii)    subject to the terms and conditions of the Interim Order, the unpaid and outstanding reasonable fees and expenses actually incurred on or after the Petition

Date, and approved by a final order of the Court pursuant to Sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "Allowed Professional Fees"), by attorneys, accountants and other professionals retained by the Debtors and any Committee(s) under Section 327 or 1103(a) of the Bankruptcy Code (collectively, the "Professionals"), less the amount of any retainers, if any, then held by such Professionals, in a cumulative, aggregate sum not to exceed $483,000, subject to a 10% cumulative variance (the "Professional Fee Carve Out").

J.    Excluded Professional Fees.  Notwithstanding anything to the contrary in the Interim Order, neither the Professional Fee Carve Out nor the proceeds of any loans, letters of credit or Collateral can be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following: (a) an assertion or joinder in (but excluding any investigation into) any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of the Obligations or Lender's liens on and security interests in the Collateral, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or Lender's liens on and security interests in the Collateral, or (iii) preventing, hindering or delaying Lender's assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of the Interim Order, (b) a request to use the Cash Collateral (as such term is defined in Section 363 of the Bankruptcy Code) without the prior written consent of Lender in accordance with the terms and conditions of the Interim Order, (c) a request for authorization to obtain Debtor-in-Possession financing or other financial accommodations pursuant to Section 364(c) or Section 364(d) of the Bankruptcy Code, other than from Lender, without the prior written consent of Lender, (d) the commencement or prosecution of any action or

proceeding of any claims, causes of action or defenses against Lender or any of its officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from Lender under Chapter 5 of the Bankruptcy Code, or (e) any act which has or could have the effect of materially and adversely modifying or compromising the rights and remedies of Lender, or which is contrary, in a manner that is material and adverse to Lender, to any term or condition set forth in or acknowledged by the Post-Petition Amendment Agreement or the Interim Order and which results in the occurrence of an Event of Default under the Post-Petition Amendment Agreement or the Interim Order.

K. <u>Payment of Carve Out Expenses</u>. Until an Event of Default occurs, Debtors shall be permitted to pay Allowed Professional Fees of the Professionals in accordance with the Budget. After an Event of Default, payment of Carve Out Expenses, including the Professional Fee Carve Out shall be governed by Section 14 of the Interim Order, and the amount of any payment by Lender of the Professional Fee Carve Out or the other Carve Out Expenses (if any) shall be added to and made a part of the Obligations, secured by the Collateral, and entitle Lender to all of the rights, claims, liens, priorities and protections under the Interim Order, the Loan Documents, the Bankruptcy Code or applicable law. Payment of any Carve Out Expenses, whether by or on behalf of Lender, shall not reduce the Obligations, and shall not subordinate any of Lender's liens and security interests in the Collateral or Lender's Superpriority Claim to any junior pre-petition or post-petition lien, interest or claim in favor of any other party. Except as otherwise provided herein with respect to the Professional Fee Carve Out and the other Carve Out Expenses, Lender is not, under any circumstance, responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Case under any chapter of the Bankruptcy Code, and nothing in the Interim Order shall be construed to obligate Lender in any way, to pay compensation to or to reimburse expenses of any Professional, or to ensure that the

Debtors have sufficient funds to pay such compensation or reimbursement.

L. _Authorization to Use Cash Collateral_. Subject to the terms and conditions of the Interim Order, and the Post-Petition Amendment Agreement, and in accordance with the Budget, Debtors are authorized to use the Cash Collateral (as defined in Section 363 of the Bankruptcy Code) subject to the pre-petition liens and security interests granted to the Lender until the end of the Financing Period (as defined in the Post-Petition Amendment Agreement). Nothing in the Interim Order authorizes the disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or any Debtor's use of Cash Collateral or other proceeds resulting therefrom, except as permitted in the Interim Order, the Post-Petition Amendment Agreement and in accordance with the Budget.

M. _Replacement Liens_. As adequate protection for the diminution in value of its interests in the Pre-Petition Collateral (including Cash Collateral) on account of the Debtors' use of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out-Expenses, Lender is granted pursuant to Sections 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "Replacement Lien"). The Replacement Lien is junior and subordinate only to the Carve Out Expenses and the liens and security interests granted to Lender in the Collateral securing the Post-Petition Obligations and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

N. _Section 507(b) Priority Claim_. As adequate protection for the diminution in value of its interests in the Pre-Petition Collateral (including Cash Collateral) on account of the Debtors' use of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out Expenses, the Lender is granted as and to the extent provided by Section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any

successor cases (the "Adequate Protection Superpriority Claim"). The Adequate Protection Superpriority Claim is junior only to the Carve Out Expenses and shall otherwise have priority over all administrative expense claims and unsecured claims against Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.

O.   Other Adequate Protection. As further adequate protection, Debtors are authorized to provide adequate protection to Lender in the form of: (a) payment of interest due on the Pre-Petition Obligations as set forth in the Post-Petition Amendment Agreement, and (b) ongoing payment of the fees, costs and expenses, including, without limitation, reasonable legal and other professionals' fees and expenses, of the Lender as required under the Post-Petition Amendment Agreement. Such payments shall be fully earned as of the date hereof and shall be payable on the first business day of each month, provided, that, the first of such payments shall be made on the entry date of the Interim Order.

P.   Events of Default. The occurrence of any Event of the Default under the Post-Petition Amendment Agreement shall constitute an Event of Default under the Interim Order.

Q.   Rights and Remedies Upon Event of Default. Upon the occurrence of and during the continuance of an Event of Default, (a) the Debtors' authority to use cash collateral shall terminate and their authority to engage in post-petition financing pursuant to the Interim Order shall terminate, (b) the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in the Interim Order and the Post-Petition Amendment Agreement, and (c) Lender shall be entitled to take any act or exercise any right or remedy as provided in the Interim Order or Post-Petition Amendment Agreement, including, without limitation, declaring all Obligations immediately due and payable, accelerating the Obligations and ceasing to extend loans or provide or arrange for letter of credit accommodations on behalf of Debtors. Lender shall have no

obligation to lend or advance any additional funds to or on behalf of Debtors, or provide any other financial accommodations to Debtors, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

R.    Expiration of Commitment.  Upon the expiration of Operating Debtor's authority to borrow and obtain other credit accommodations from Lender pursuant to the terms of the Interim Order and Post-Petition Amendment Agreement (except if such authority shall be extended with the prior written consent of Lender, which consent shall not be implied or construed from any action, inaction or acquiescence by Lender) all of the Obligations shall immediately become due and payable.

S.    Relief from Automatic Stay.  The automatic stay provisions of Section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are modified and vacated without further notice, application or order of the Court to the extent necessary to permit Lender to perform any act authorized or permitted under or by virtue of the Interim Order or the Loan Documents.  In addition, and without limiting the foregoing, upon the occurrence of an Event of Default and after providing five (5) business days prior written notice (the "Enforcement Notice") to counsel for the Debtors, counsel for the Committee (if appointed), and the U.S. Trustee, Lender shall be entitled to take any action and exercise all rights and remedies provided to it by the Interim Order, the Loan Documents or applicable law as Lender may deem appropriate in its sole discretion to, among other things, proceed against and realize upon the Collateral or any other assets or properties of Debtors' Estates upon which Lender has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all Obligations.

T.    Objections to Pre-Petition Obligations.  Any action, claim or defense (hereinafter, an "Objection") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction,

disgorgement or claim of any kind: (a) the existence, validity or amount of the Pre-Petition Obligations or (b) the extent, legality, validity, perfection or enforceability of Lender's pre-petition liens and security interests in the Pre-Petition Collateral shall be filed with the Court (x) by any Committee, and any other party in interest (other than the Debtors), with requisite standing, within sixty (60) calendar days from the date of appointment of the Committee by the U.S. Trustee, or (y) in the event no Committee is appointed within the thirty (30) days following the Petition Date, within seventy-five (75) calendar days from the date of entry of the Interim Order. If any such Objection is timely filed and successfully pursued, nothing in the Interim Order shall prevent the Court from granting appropriate relief with respect to the Pre-Petition Obligations or Lender's liens on the Pre-Petition Collateral. If no Objection is timely filed, or if an Objection is timely filed but denied, (a) the Pre-Petition Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and Lender's pre-petition liens on and security interest in the Pre-Petition Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes and of first and senior priority, subject to only the Permitted Liens and Claims, and (b) Lender's and its participants, agents, officers, directors, employees, attorneys, professionals, successors, and assigns shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Pre-Petition Loan Documents and shall not be subject to any further objection or challenge by any party at any time. Nothing contained in the Section 25 of the interim Order or otherwise shall or shall be deemed or construed to impair, prejudice or waive any rights, claims or protections afforded to Lender in connection with all post-petition loans and letter of credit accommodations and other financial and credit accommodations provided by Lender to Debtors in reliance on Section 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of the Interim Order and the Post-Petition Amendment Agreement.

U.    Debtors' Waivers.  At all times during the Cases, and whether or not an Event of Default has occurred, the Debtors irrevocably waive any right that they may have to seek authority (a) to use Cash Collateral of Lender under Section 363 of the Bankruptcy Code provided that, Debtors may seek to sue cash collateral pursuant to section 363 of the Bankruptcy Code that (i) either indefeasibly repays in full all Obligations owing by the Debtors to Lender on terms and conditions acceptable to Lender, (b) to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or 364(d) of the Bankruptcy Code, other than from Lender in accordance with the terms hereof; provided, that, Debtors may seek to obtain financing pursuant to Section 364(c) of the Bankruptcy Code that either (i) indefeasibly repays in full all Obligations owing by Debtors to Lender on terms and conditions acceptable to the Lender or (ii) is junior and subordinate in all respects to the liens, claims and right of payment of Lender in respect of all Obligations and is otherwise on terms and conditions acceptable to Lender, or  (c) to challenge the application of any payments authorized by the Interim Order as pursuant to Section 506(b) of the Bankruptcy Code, or (d) to seek relief under the Bankruptcy Code, including without limitation, under Section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of Lender as provided in the Interim Order and the Loan Documents or Lender's exercise of such rights or remedies; provided, however, that Lender may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by Lender.

V.    Section 506(c) Claims.  No costs or expenses of administration which have or may be incurred in the Cases at any time shall be charged against Lender, its claims or the Collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior written consent of Lender, and no such consent shall be implied from any other action, inaction or acquiescence by Lender.

W.    Collateral Rights.  Until all of the Obligations shall have been indefeasibly

paid and satisfied in full: (a) no other party shall foreclose or otherwise seek to enforce any junior lien or claim in any Collateral; and (b) upon and after the occurrence of an Event of Default, and subject to Lender obtaining relief from the automatic stay as provided for herein, in connection with a liquidation of any of the Collateral, Lender (or any of its employees, agents, consultants, contractors or other professionals) shall have the right, at the sole cost and expense of Debtors, to: (x) enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by Debtors and (y) use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their businesses. Lender will be responsible for the payment of any applicable fees, rentals, royalties or other amounts due such lessor, licensor or owner of such property for the period of time that Lender actually uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals or other amounts due for any period prior to the date that Lender actually occupies or uses such assets or properties).

  X. <u>Release</u>. Upon the earlier of (a) the entry of a final financing order approving the Motion or (b) the entry of an Order extending the Interim Financing Period beyond thirty (30) calendar days after the date of the Interim Order, and in each instance, subject to Section 25 of the Interim Order, in consideration of Lender making post-petition loans, advances and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the Post-Petition Amendment Agreement and the Interim Order, each Debtor, on behalf of itself and its successors and assigns, (collectively, the "<u>Releasors</u>"), shall, forever release, discharge and acquit Lender and its participants, officers, directors, agents, attorneys and predecessors-in-interest (collectively, the "<u>Releasees</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender

liability" claims or defenses, that Releasors had, have or hereafter can or may have against Releasees as of the date hereof, in respect of events that occurred on or prior to the date hereof with respect to the Debtors, the Pre-Petition Obligations, the Loan Documents and any loans, letter of credit accommodations or other financial accommodations made by Lender to Debtors pursuant to the Loan Documents. In addition, upon the earlier of (x) the repayment of all Obligations owed to Lender by Debtors and termination of the rights and obligations arising under the Loan Documents (which payment and termination shall be on terms and conditions acceptable to Lender) and (y) the confirmation of a plan of reorganization or liquidation of any Debtors' Chapter 11 Cases, Lender shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the Loan Documents or the applicable financing order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve Out Expenses), on terms and conditions acceptable to Lender.

     Y.    <u>No Modification or Stay of the Interim Order</u>. Notwithstanding (a) any stay, modification, amendment, supplement, vacating, revocation or reversal of the Interim Order, the Loan Documents or any term hereunder or thereunder, (b) the failure to obtain a final financing order pursuant to Bankruptcy Rule 4001(c)(2), or (c) the dismissal or conversion of one or more of the Cases (each, a "<u>Subject Event</u>"), (x) the acts taken by Lender in accordance with the Interim Order, and (y) the Post-Petition Obligations incurred or arising prior to Lender's actual receipt of written notice from Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be governed in all respects by the original provisions of the Interim Order, and the acts taken by Lender in accordance with the Interim Order, and the liens granted to Lender in the Collateral, and all other rights, remedies, privileges, and benefits in favor of Lender pursuant to the Interim Order and the Loan Documents shall remain valid and in full

force and effect pursuant to Section 364(e) of the Bankruptcy Code. For purposes of the Interim Order, the term "appeal", as used in Section 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating the Interim Order by the Court or any other tribunal.

Z.      **Power to Waive Rights; Duties to Third Parties.** Lender shall have the right to waive any of the terms, rights and remedies provided or acknowledged in the Interim Order in respect of Lender (the "Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s). Any waiver by Lender of any Lender Rights shall not be or constitute a continuing waiver. Any delay in or failure to exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, subject Lender to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to Lender.

AA.     **Disposition of Collateral.** Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by Lender) and an order of the Court, except for sales of Debtors' inventory in the ordinary course of their business. Debtors shall remit to Lender, or cause to be remitted to Lender, all proceeds of the Collateral for application by Lender to the Obligations, in such order and manner as Lender may determine in its discretion, in accordance with the terms of the Interim Order, the Loan Documents and the Budget.

BB.     **Inventory.** Debtors shall not, without the consent of Lender, (a) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under any applicable provision of Section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise.

CC.   Reservation of Rights.   The terms, conditions and provisions of the Interim Order are in addition to and without prejudice to the rights of Lender to pursue any and all rights and remedies under the Bankruptcy Code, the Loan Documents or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estate.

DD.   Binding Effect.

(i)     The provisions of the Interim Order and the Loan Documents, the Post-Petition Obligations, Superpriority Claim and any and all rights, remedies, privileges and benefits in favor of Lender provided or acknowledged in the Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of the Interim Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, including without limitation any order which may be entered confirming any plan of reorganization, converting one or more of the Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Cases.

(ii)     Any order dismissing one or more of the Cases under Section 1112 or otherwise shall be deemed to provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claim and Lender's liens on and security interests in the Collateral shall continue in full force and effect notwithstanding such dismissal until the Obligations are indefeasibly paid and satisfied in full, and (ii) the Court shall retain jurisdiction, notwithstanding such

dismissal, for the purposes of enforcing the Superpriority Claim and liens in the EE. Collateral.

(i)     In the event the Court modifies any of the provisions of the Interim Order or the Loan Documents following a final hearing, (i) such modifications shall not affect the rights or priorities of Lender pursuant to the Interim Order with respect to the Collateral or any portion of the Obligations which arises or is incurred or is advanced prior to such modifications, and (ii) the Interim Order shall remain in full force and effect except as specifically amended or modified at such final hearing.

(ii)    The Interim Order shall be binding upon Debtors, all parties in interest in the Cases and their respective successors and assigns, including any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor.  The Interim Order shall also inure to the benefit of Lender, Debtors and their respective successors and assigns.

FF.     Restrictions on Cash Collateral Use, Additional Financing, Plan Treatment.  All post-petition advances and other financial accommodations under the Post-Petition Amendment Agreement are made by Lender in reliance on the Interim Order and there shall not at any time be entered in the Cases, or in any subsequently converted case under chapter 7 of the Bankruptcy Code, any order (other than a final financing order by the Court) which (a) authorizes the use of cash collateral of Debtors in which Lender has an interest, or the sale, lease, or other disposition of property of any Debtor's Estate in which Lender has a lien or security interest, except as expressly permitted hereunder, or (b) authorizes under Section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which Lender holds a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to Lender herein; unless, in each instance (x) Lender

shall have given its express prior written consent with respect thereto, no such consent being implied from any other action, inaction or acquiescence by Lender, or (y) such other order requires that all Obligations shall first be indefeasibly paid and satisfied in full in accordance with the terms of Loan Documents, including, without limitation, all debts and obligations of Debtors to Lender which arise or result from the obligations, loans, security interests and liens authorized herein, on terms and conditions acceptable to Lender. The security interests and liens granted to or for the benefit of Lender hereunder and the rights of Lender pursuant to the Interim Order and the Loan Documents with respect to the Obligations and the Collateral are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or liquidation of Debtors and, if the Obligations shall not be repaid in full upon confirmation thereof, shall continue after confirmation and consummation of any such plan.

GG. <u>Limited Borrowing</u>. Notwithstanding anything else to the contrary in the Interim Order, the Debtors may not borrow more than $6,051,446 before the Interim Order becomes a Final Order, which amount is necessary to avoid immediate and irreparable harm.

### Notice

25. Notice of this Motion has been given to (i) the Office of the United States Trustee, (ii) counsel for The Huntington National Bank, (iii) those creditors identified on the Debtors' list submitted pursuant to Bankruptcy Rule 1007(d), and, in light of the fact that no trustee, examiner, or creditors' committee has been appointed or formed in these chapter 11 cases, the Debtors submit that no further notice is necessary or required.

### No Prior Request

26. No prior request for the relief sought in this Motion has been made to this Court or any other court.

## Conclusion

WHEREFORE, the Debtors respectfully request that the Court enter an Interim Order substantially in the form attached hereto as Exhibit A and grant such other and further relief as the Court may deem proper.

Respectfully submitted,

s/ Stephen M. Gross
Stephen M. Gross (P35410)
Jayson B. Ruff (P69893)
Joshua A. Gadharf (P76860)
McDONALD HOPKINS LLC
39533 Woodward Avenue
Suite 318
Bloomfield Hills, MI 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075
E-mail: sgross@mcdonaldhopkins.com
jruff@mcdonaldhopkins.com
jgadharf@mcdonaldhopkins.com

and

Manju Gupta (OH Bar No. 0076452)
McDONALD HOPKINS LLC
600 Superior Avenue, E., Suite 2100
Cleveland, OH 44114
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
E-mail: mgupta@mcdonaldhopkins.com

PROPOSED COUNSEL FOR THE DEBTORS
AND DEBTORS IN POSSESSION

Dated: April 13, 2015