| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| **LEE STEEL CORPORATION,** | ) Case No. 15-45784 |
| | ) |
| Debtor. | ) |
| | ) Judge Marci B. McIvor |
| | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| **TAYLOR INDUSTRIAL PROPERTIES, L.L.C.** | ) Case No. 15-45785 |
| | ) |
| Debtor. | ) Judge Marci B. McIvor |
| | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| **4L VENTURES, LLC** | ) Case No. 15-45788 |
| | ) |
| Debtor. | ) |
| | ) Judge Marci B. McIvor |
| | ) |
| | ) |

**AFFIDAVIT AND STATEMENT OF LAURA A. MARCERO IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

| | | |
|---|---|---|
| STATE OF MICHIGAN | ) | |
| | ) | ss. |
| COUNTY OF OAKLAND | ) | |

Laura A. Marcero, being duly sworn, deposes and states:

1.       I am the Chief Restructuring Officer of Lee Steel Corporation ("Lee Steel"),
Taylor Industrial Properties, LLC ("Taylor Industrial"), and 4L Ventures, LLC ("4L", and
together with Lee Steel and Taylor, collectively the "Debtors"). I am generally familiar with the
day-to-day operations, business affairs, and books and records of the Debtors.

{5428242:23}

2.     On April 13, 2015 (the "Petition Date"), the Debtors will file voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court") and will seek to have their cases jointly administered. I refer to the bankruptcy cases arising from the Debtors' petitions as the "Chapter 11 Case."

3.     In order to enable the Debtors to minimize the adverse effects of the Chapter 11 Case, the Debtors will request various types of relief in various "first-day" applications and motions (collectively, the "First Day Pleadings"). The First Day Pleadings seek relief aimed at, among other things, maintaining the customers of Lee Steel, maintaining vendor and supplier confidence necessary for Lee Steel to continue its operations, retaining employees, promoting an efficient restructuring, and maintaining the Debtors' going-concern value to enable the Debtors to maximize the values of their assets in what is anticipated to be a sale process. I believe the relief sought in the First Day Pleadings is crucial to achieving these goals.

4.     I submit this Affidavit in support of the First Day Pleadings. Any capitalized term not expressly defined herein has the meaning ascribed to that term in the relevant First Day Pleadings. All facts set forth in this Affidavit are based on my personal knowledge, upon information supplied to me by others at the Debtors, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtors' operations, financial condition and their present liquidity crisis. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

5.     Part I of this Affidavit describes the Debtors' businesses and the circumstances surrounding the commencement of the Chapter 11 Case. Part II sets forth the relevant facts in support of each of the First Day Motions.

## I. Background

### The Debtors' Business

6.      Lee Steel is in the business of providing a full range of flat rolled steel, including hot rolled steel, cold rolled steel, and exposed coated products for automotive and other manufacturing industries. Lee Steel operates from special purpose facilities located in Romulus, Michigan and Wyoming, Michigan, which facilities Lee Steel leases from Debtor 4L and Debtor Taylor Industrial, respectively. Lee Steel's corporate headquarters are located in Novi, Michigan.

7.      Prior to the collapse in steel prices Lee Steel was profitable and had annual revenues of approximately $100 million. The vast majority of Lee Steel's customers are Tier 1 and Tier 2 suppliers to the automotive industry operating in a "just in time" environment so that the customers must meet their customers' delivery requirements and, as such, cannot risk having their production delayed or interrupted. According to their audited financial statements, the Debtors' consolidated gross sales for the fiscal year ended September 30, 2014, were $116,602,378.

8.      In the ordinary course of their business operations, the Debtors directly employ approximately 65 individuals, including approximately 23 union employees.

### Ownership

9.      As of the Petition Date, the ownership interests in each of the Debtors are as follows:

- **Lee Steel** –
  - 88%    William Zachary Taylor Living Trust
  - 6%     Thomas E. Taylor
  - 6%     Scott Taylor

- **Taylor Industrial** – 100%   William Zachary Taylor Living Trust

- **4L** –          80%   William Zachary Taylor Living Trust
                     10%   Thomas E. Taylor
                     10%   Z. Scott Taylor

### Pre-Petition Loan Obligations

10.     On February 18, 2011, Lee Steel and Taylor Industrial entered into a Credit

Agreement with the Huntington National Bank ("Lender"), which provided a $25,000,000

revolving line of credit for Lee Steel and a $2,500,000 Term Loan for Taylor Industrial, and

which granted Lender security interests in all of the assets of Lee Steel and Taylor Industrial (the

"Credit Agreement").

11.     From February 2011 to December 2014 the obligations owed to Lender pursuant

to the Credit Agreement were increased pursuant to nineteen (19) Amendments to the Credit

Agreement to support Lee Steel's growing operations, equipment acquisitions, and the

construction of an Eco-Pickled Surface Coil Line ("EPS Equipment") at a new facility

constructed for the operation of the EPS equipment, as well as Lee Steel's other Detroit

operations, by 4L, in Romulus, Michigan.   On the Petition Date the principal portions of the

obligations of Lee Steel and Taylor Industrial to Lender were as follows:

| - | Line of Credit as of April 8, 2015 | $24,581,534.00 | |
|---|---|---|---|
| - | EPS Equipment Line | 11,210,715.00 | |
| - | Equipment Balancing Line | 1,897,149.00 | |
| - | Term Note A | 1,230,375.00 | |
| - | Term Note B | 573,185.05 | |
| - | MDOT Letter of Credit | 25,000.00 | (contingent) |
| | **Total:** | **$  39,517,958.05** | |

12.     4L has a mortgage and other obligations to Lender for the construction of the

Romulus, Michigan Facility which are guaranteed by, and cross-collateralized with, the assets of

Lee Steel and Taylor Industrial; and 4L has guaranteed the obligations of Lee Steel and Taylor

Industrial to Lender and its assets are collateral for their obligations to Lender.   4L has the

following obligations to Lender:

| | | |
|---|---|---|
| MDOT Letter of Credit | $ 376,786.58 | (contingent) |
| Term Loan (Note #26) | 6,545,003.00 | |
| Term Loan (Note #42) | 3,858,928.58 | |
| **Total:** | **$10,780,718.16** | |

13.    In summary, the Debtors owe Lender $50,298,676.21 which is secured by all of the assets of the Debtors.

14.    As of February 28, 2015, based upon the Debtors' internal records, their consolidated assets, at book value, are as follows:

Current assets:

| | |
|---|---|
| Cash | 973,104 |
| Accounts receivable | 12,216,110 |
| Inventory | 31,052,117 |
| Prepaid expenses | 578,405 |
| Total Current Assets: | 44,819,736 |

Fixed assets:

| | |
|---|---|
| Land | 18,843,046 |
| Machinery & equipment | 38,715,112 |
| Trucks & automobiles | 820,814 |
| Rail equipment | 721,007 |
| Leasehold improvements | 3,357,282 |
| Furniture & fixtures | 1,463,351 |
| Subtotal: | 63,560,610 |
| Less: Accumulated Depreciation | (16,381,899) |
| Subtotal | 47,178,712 |
| Construction in Progress | 229,750 |
| Total net fixed assets | 47,408,462 |

| | |
|---|---|
| Other assets: | - |
| DTE substation | 425,000 |
| Total other assets | 425,000 |

| | |
|---|---|
| **Combined total assets** | **92,653,198** |

15.    The liens and security interests granted to Lender in the Credit Agreement that encumber all of the Debtors' foregoing assets were perfected by financing statements filed with the Michigan Department of State on February 18, 2011, August 9, 2011, and August 8, 2012,

against Lee Steel; February 18, 2011, against Taylor Industrial; and October 30, 2012, against 4L.

16.     Based upon an appraisal conducted by Hilco Valuation Services, effective as of January 8, 2015, the Debtors' equipment has a forced liquidation value of $13,663,750 and an orderly liquidation value of $14,875,500. The EPS Equipment, which is included in the above values at $6,500,000 (FLV) and $6,750,000 (OLV), has an appraised orderly in place value of $12,300,000. In other words, due to the significant costs to disassemble, remove and reinstall it elsewhere, the value of the EPS Equipment is substantially increased if it can be sold with the 4L building to a buyer desiring to continue to use the facility for steel processing.

17.     Due to the decrease in the market prices for steel, which is discussed in detail below, the Debtors believe that the value of their inventory is approximately $3 to 5 million less than its book value reflected above and will be writing it down to market values.

18.     The liens and security interests of Lender encumber all of the foregoing assets of the Debtors.

**Circumstances Resulting in Chapter 11 Case**

19.     In the summer of 2012, the Debtors began construction of the Romulus facility and the EPS Equipment installation based upon a strategy that this new "green" technology pickling equipment would both enable Lee Steel to avoid the costs of outside steel pickling processing and provide an additional income stream as it could sell its eco-friendly state of the art pickling process service to others in the industry.

20.     In order to finance the construction of this new facility Lee Steel obtained an equipment line of credit for $12,900,000 and 4L borrowed $11,122,000 from Lender.

21.     However, due to unforeseen construction issues, the Debtors' construction of the Romulus facility was delayed frequently and the Debtors incurred cost over-runs of

{5428242:22}                                    6

approximately $4,000,000 on the project, which took over two (2) years and required significant cash from Lee Steel in addition to the funding provided by Lender.

22.     In September 2014, Lee Steel finally was able to vacate its former Detroit, Michigan facility and had relocated all of its equipment in the Taylor Industrial facility where it began operations.

23.     Potential customers of the EPS Equipment have been running quality trials since September 2014, because their end customers, frequently automotive companies, require parts to receive "PPAP" and other approvals before they can change processes or suppliers.  Although most customers have reported to Lee Steel that parts made using steel pickled on the EPS Equipment has been or will be approved, the volumes of outside pickling services being sold has been minimal, possibly due to the environmentally friendly process being more expensive than traditional processes and a reluctance to try new processes.

24.     Since inception, the EPS Equipment has only averaged outside sales of approximately $75,000 per month and, while Lee Steel is able to avoid the costs of having third parties pickle the steel it sells, the EPS Equipment pickling business from July 2014 through February 2015 generated losses of approximately $1.3 million.

25.     In addition to the significantly increased debt service and the losses generated by the EPS Equipment, market prices for steel dropped significantly in late 2014-between $90-120 per ton or 10% -20%.  This trend continued in the first quarter of 2015 with pricing deteriorating another 20%.

26.     While Lee Steel was able to maintain pricing through January 2015, because its customers' contracts are indexed or they purchase based upon current market pricing, Lee Steel's revenues dropped from $9,158,969 in January 2015 to $7,236,538 in February 2015 with similarly depressed pricing being projected for at least the next two quarters.

{5428242:22}                                        7

27.     The losses caused by the decline in top line revenue, combined with the excessive debt service attributable to the Romulus facility and the EPS Equipment, resulted in extreme cash flow issues and an inability to meet credit terms with suppliers, as well as obligations due under the Credit Agreement.

28.     Additionally, because of the decline in steel pricing, Lee Steel's ability to borrow on its line of credit, which is partially based upon an inventory formula, was further reduced.

29.     Although the Debtors attempted to negotiate an "out-of-court" restructuring based upon Lender providing out of formula funding and its majority stockholder contributing funding to enable Lee Steel to make a payment to unsecured creditors, certain major unsecured creditors did not agree to terms that were feasible given the Debtors' constrained projected cash flow and projected performance based upon market conditions existing currently in the steel industry.

30.     As a result of the foregoing cash flow and debt service issues, the Debtors defaulted under the Credit Agreement and on March 25, 2015, the Lender issued a Notice of Default and Demand for Payment, which resulted in the Debtors filing the Chapter 11 Case to maximize the value of their assets by operating in chapter 11 while seeking a going concern sale.

## II. First Day Motions

31.     Currently with the filing of the Chapter 11 Case, the Debtors will file a number of First Day Motions, each of which is described briefly below.  I have reviewed each of the First Day Motions (including the exhibits thereto) and I believe that the relief sought in each of the First Day Motions: (a) is necessary to enable the Debtors to operate in chapter 11 with a minimum of disruption; and (b) constitutes a critical element in maintaining the value of the Debtors' assets during the reorganization process.

**Debtors' Emergency Motion for Entry of Interim Order (I) Authorizing (a) Use of Cash Collateral Pursuant to 11 U.S.C. §363, (b) Secured Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364(c) and (d), and (c) Granting of Security Interests, Superpriority Claims, and Adequate Protection, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c) (the "DIP Motion")**

32.     The Debtors do not have sufficient available sources of working capital, including cash collateral, to operate their businesses in the ordinary course of their business without the financing requested under the DIP Motion.     The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of their estates for the benefit of all creditors of the Debtors. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with Lender requested in the DIP Motion is vital to the preservation and maintenance of the going concern values of the Debtors and/or the Debtors' ability to conduct an orderly liquidation of their assets to maximize the value thereof. Accordingly, the Debtors have an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates in order to maximize the recovery to all creditors of the Debtors.

33.     The Debtors are unable to procure financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code, without the grant of liens on assets.

34.     The Debtors have prepared and delivered to Lender an initial Budget which I have thoroughly reviewed and believe fairly and adequately projects the debtors' financial performance for the period covered by the Budget. The Budget shows that, absent a market recovery in steel prices, the Debtors will operate at a loss and a cash flow deficit of approximately $2 million from the Petition date through September 2015.

35.     The Debtors have requested from the Lender, and Lender is willing to extend, certain loans, advances and other financial accommodations on the terms and conditions set forth in the DIP Motion and the Amendment and Ratification Agreement attached thereto, between Debtors, Mr. Zachary Taylor and Lender (the "<u>Post-Petition Amendment Agreement</u>"). The financing provided for in the Post-Petition Amendment Agreement, which consists of a continuation of pre-petition line of credit advances at the same advance rates of 85% of eligible accounts receivable and 65% of eligible inventory, provides for a static $4.6 million out-of-formula to address the write-down of Lee Steel's inventory set discussed above to market values, and provides another operational out-of-formula based upon the Budget to address the Debtors' cash burn. As such, the financing proposed in the DIP Motion enables the debtors to pay all administrative expenses generated from their operations after the Petition Date as set forth in the Budget, plus provides a 10% cumulative variance as a margin for error.

36.     The terms of the Post-Petition Amendment Agreement and this Order are fair, just and reasonable under the circumstances; are, in my opinion, ordinary and appropriate for secured financing to debtors-in-possession; reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties; and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the Post-Petition Amendment Agreement and the proposed order approving the DIP Motion have been negotiated in good faith and at

arms' length by and among the Debtors, on one hand, and Lender, on the other hand, with all parties being represented by counsel.

37.    The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (a) minimize disruption to the Debtors' businesses and on-going operations, (b) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (c) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

**First Day Motion of the Debtors for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "Joint Administration Motion")**

38.    The Joint Administration Motion seeks relief pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Michigan for the entry of an order authorizing the joint administration of the affiliated Debtors' related chapter 11 cases for procedural purposes only.

39.    The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in the cases will affect all of the Debtors. With three affiliated debtors, each with its own case dockets, I believe the failure to administer these cases jointly would result in numerous duplicative pleadings filed for each issue and served upon separate service lists. Such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Court.

40.    Joint administration of the Bankruptcy Case will permit the Court to use a single general docket for each of the Debtors' cases and to combine notices to creditors and other

parties in interest of each of the Debtors' respective estates. Joint administration also will protect parties in interest by ensuring that such parties in interest in each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in all of these cases.

41. The rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights. Each creditor and party in interest will maintain whatever rights it has against the particular estate in which it allegedly has a claim or right. Indeed, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration. The relief sought by the Joint Administration Motion will also relieve the Court of the burden of entering duplicative orders and keeping duplicative files. Supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee also will be simplified.

**First Day Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services Pending Determination of Adequate Assurance of Payment for Future Utility Services and (II) Establishing Procedures for Determining Requests for Additional Assurance (the "Utilities Motion")**

42. As set forth in the Utilities Motion, utility companies used by the Debtors ("Utility Companies") provide the Debtors with an aggregate total of approximately $115,000 in utility services each month. A summary of average monthly utility payments made by the Debtors to the Utility Companies is listed on Exhibit B of the Utilities Motion. The Debtors estimate that their postpetition use of the Utility Companies' services will remain at approximately the same levels, although seasonal effects and variations in the prices of such services will, of course, result in variations in the Debtors' average monthly utility expenses. As of the Petition Date, approximately $10,579.40 is due and owing to the Utility Companies for prepetition utility services. Certain of the Utility Companies hold security deposits in the

amounts set forth on Exhibit B of the Utilities Motion. As described in the Utilities Motion, the Debtors are prepared to provide more than adequate assurance in order to promote confidence in the Debtors' ability and intent to pay for its postpetition utility services.

43.      The Utilities Motion seeks the entry of an order: (a) determining that the Debtors' ability to make future payments to the Utility Companies, together with other security discussed herein, constitutes adequate assurance of payment for future utility services pursuant to sections 366(b) and (c) of the Bankruptcy Code; and (b) providing that, if after the 20-day period prescribed by section 366(b) of the Bankruptcy Code, a Utility Company asserts that it has not received adequate assurance of payment from a respective Debtor as contemplated by section 366(c) of the Bankruptcy Code, that such Utility Company provide the Debtors, and their undersigned counsel, a written notice of its intent to discontinue services, absent a court order to the contrary, after the passage of ten days without cure of any deficiency.

44.      As set forth in the Utilities Motion, the Debtors propose to provide as adequate assurance of payment (the "Adequate Assurance Deposit") to each of the Utility Companies, a cash deposit equal to one-month's service based on the average monthly bill of each Utility Company. Additionally, the Debtors' proposed debtor in possession financing budget[1] provides for the Adequate Assurance Deposits. The average monthly bill of each Utility Company is listed in the "Average Monthly Payment" column set forth on Exhibit B to the Utilities Motion along with the proposed deposit amount. The Debtors will provide an Adequate Assurance Deposit to each Utility Company that requests such security, provided, however, that: (a) such request is made in writing and served on: (i) the Debtors, 45525 Grand River Avenue, Novi, MI 48374 (Attn: Laura A. Marcero, CRO) and counsel to the Debtors, McDonald Hopkins PLC, 39533 Woodward Ave., Suite 318, Bloomfield Hills, MI 48304 (Attn: Stephen M. Gross) no

later than 20 days after the Petition Date (the "Request Deadline"); (b) such requesting Utility Company does *not* already hold a deposit equal to or greater than the Adequate Assurance Deposit (which existing deposit will be deemed to be the Adequate Assurance Deposit); (c) such requesting Utility Company is not currently paid in advance for its services; and (d) such requesting Utility Company does not apply the Adequate Assurance Deposit to any prepetition amounts owed. A Utility Company's request for, and acceptance of, an Adequate Assurance Deposit will be deemed an acknowledgment and admission from the Utility Company that the Adequate Assurance Deposit is the form of adequate assurance acceptable to it, within the meaning of section 366 of the Bankruptcy Code. Similarly, any Utility Company that does not request an Adequate Assurance Deposit by the Request Deadline will be deemed to have adequate assurance that is satisfactory to it within the meaning of section 366 of the Bankruptcy Code.

45. As set forth in the Utilities Motion, the Debtors believe that a one month security deposit is a reasonable proposal and should provide the Utility Companies adequate assurance of the Debtors' intent to pay the Utility Companies for services as they become due. Relief similar to that requested in the Utilities Motion relating to procedures for adequate assurance of payment has been granted in other chapter 11 cases, including cases filed in this District as cited in the Utilities Motion.[2]

46. Moreover, the relief sought in the Utilities Motion will provide the Debtors with certainty that the proposed adequate assurance of payment is "satisfactory" to the Utility Companies.

---

[1] Filed as an exhibit to the DIP Motion.

[2] Copies of these unreported orders are available upon request to the Debtors' counsel.

47.    By the relief sought in the Utilities Motion, the Debtors seek to avoid the concern that twenty days after the Petition Date, the Debtors will be informed that the proposed adequate assurance is not satisfactory, coupled with an imminent threat to discontinue utility service. I also believe that granting the relief requested will not prejudice the rights of the Utility Companies under section 366 of the Bankruptcy Code.

**First Day Motion of the Debtors for and Order Authorizing the Continued Use of Their Prepetition Cash Management Systems, Bank Accounts and Business Forms (the "Cash Management Motion")**

48.    The Operating Instructions and Reporting Requirements for Chapter 11 Cases promulgated by the Office of the United States Trustee for the Districts of Ohio and Michigan require that the Debtors close their prepetition bank accounts and open new debtor in possession bank accounts.

49.    To avoid any disruptions to the normal operations of their business and to preserve "business as usual," pursuant to the Cash Management Motion, the Debtors are seeking authority to continue using their cash management systems ("Cash Management Systems") and bank accounts ("Bank Accounts"). Maintaining the Cash Management Systems and Bank Accounts will best serve the Debtors' estates, vendors and employees. The benefit to the Debtors' estates will be considerable because it will assist in accomplishing the transition to operation under chapter 11 without the costs and disruptions associated with closing and opening multiple bank accounts.

50.    The Debtors maintain the following accounts at Lender related to Lee Steel's operations (collectively, the "Lee Accounts"):

     i.     Huntington Account No. ending 4635 (the "Deposit Account") – Used for daily deposits, payments on revolving line of credit with Lender, funding of controlled disbursements account for checks, vendor wire payments sent, customer wire payments received, payment of principal and interest to loans

monthly, funding of payroll to Lee Steel's payroll provider, Yoursource, on a weekly basis.

ii.     Huntington Account No. ending 5786 (the "AP Account") - Account used for writing Lee Steel checks weekly. Allows for positive pay control, daily clearing checks are funded by General Account and daily sweep to zero balance.

iii.    Huntington Account No. ending 8889 (the "Mexico Account") - Checking account set up for Mexico operations.

51.     The Deposit Account serves to receive all cash, check, and wire deposit activity for Lee Steel. Payments sent to Lee Steel are deposited daily into this account. The Deposit Account serves as the source of funds for the AP Account, which is funded on an as needed basis depending on the respective payments being made on any given date.

52.     The AP Account is the Lee Steel's account upon which all non-payroll business expenses are paid and from which checks are drawn against or wires or ACH transfers transmitted from. Funds are transferred by wire from the Deposit Account to the AP Accounts as needed.

53.     To the extent there are any excess funds in the AP Account, they are transferred back to the Deposit Account on a daily basis.

54.     The Debtors also maintain Huntington Account No. ending 4651 (the "Taylor Account") at Lender related to Taylor. The Taylor Account is used for Taylor's receipt of rent payments and payment of utilities, and loan repayments to Lender.

55.     The Debtors also maintain Huntington Account No. ending 4651 (the "4L Account") at Lender related to 4L's operations. The 4L Account is used for 4L's receipt of rent payments and payment of utilities, and loan repayments to Secured Lender.

56.     The Debtors' Cash Management Systems constitute customary and essential business practices. The Cash Management Systems are similar to those commonly employed by

corporate enterprises of comparable size and complexity. The Debtors' Cash Management Systems will benefit the Debtors' estates by allowing the Debtors the ability to (a) control and monitor corporate funds, (b) ensure cash availability and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely accurate account balances and presentment information.

57.     Given the Debtors' corporate and financial structure, it would be difficult for the Debtors to establish entirely new systems of Bank Accounts and a new Cash Management Systems. Thus, under the circumstances, maintaining the Debtors' Cash Management Systems is in the best interests of the Debtor's estate and creditors.[3]

58.     The Cash Management Motion seeks authority for the Debtors to continue using their Bank Accounts. To protect against the inadvertent payment of prepetition claims, on the Petition Date, the Debtors will advise Debtor's Lender that checks issued prior to the Petition Date should not be honored, except as otherwise ordered by the Court.

59.     As set forth in the Cash Management Motion, the Debtors will be subject to substantial administrative burdens and expenses if they are required to close existing Bank Accounts, open new accounts, and create entirely new Cash Management Systems for issuing checks and paying postpetition obligations. Accordingly, to avoid these burdens and expenses, the Debtors are requesting authority to continue utilizing their Bank Accounts.

60.     As set forth in the Cash Management Motion, the Debtors use their Business Forms in the ordinary course of their business. By virtue of the nature and scope of the business in which the Debtors are engaged and the large number of suppliers and vendors with whom the Debtors have business relationships, it is essential for the Debtors to continue using their

---

[3]As a matter of course, the Debtors will continue to maintain records regarding all transfers of cash, so that all transactions can be recorded and traced.

{5428242:22}                                             17

Business Forms without alteration or change. To prevent unnecessary delay, confusion, and accrual of further expense to their estates, the Debtors are requesting that the Court waive any requirement of adding a "Debtor in Possession" legend or number to their Business Forms.

61.     Pursuant to the Cash Management Motion, the Debtors are also seeking relief from the United States Trustee Guidelines (the "Trustee Guidelines") to the extent that they require the Debtors to make all disbursements by check. In particular, the Trustee Guidelines require that each receipt and disbursement of estate funds be made by check with a notation representing the reason for the disbursement.

62.     Considering the nature of the Debtors' operations, it is oftentimes necessary for the Debtors to conduct transactions by debit, wire, ACH payment or other similar methods. In addition, a number of the Debtors' receipts are received by wire transfer. To deny the Debtors the opportunity to conduct transactions by debit, wire, ACH payment or other similar methods would interfere with and unnecessarily disrupt the Debtors' business operations, as well a create additional costs to the Debtors.

**First Day Motion for an Order (A) Authorizing the Debtors (I) To Pay Certain Prepetition Employee Obligations and Related Claims and (II) to Continue to Provide Employee Benefits in the Ordinary Course of Business, and (B) Granting Other Related Relief (the "Wages Motion")**

63.     As set forth in the Wages Motion, the Debtors request that this Court enter an order, pursuant to sections 105(a), 363(b) and 507(a)(4) and (a)(5) of the Bankruptcy Code, authorizing, but not directing, Lee Steel to continue to pay or otherwise honor the Employee Obligations and Employee Benefits that accrued before the Petition Date and to continue paying or otherwise honoring the Employee Obligations and Employee Benefits in the ordinary course of the Debtors' businesses.

64. In the ordinary course of business, the Debtors pay and honor certain amounts to their Employees (collectively, the "Employee Obligations") for, among other things: (i) Employees' wages, salaries, and other compensation, (ii) federal and state withholding taxes and other amounts withheld or deducted, and (iii) vacation pay.

65. The Debtors pay wages and other compensation to their Employees on a weekly basis. The Debtors' aggregate gross payroll for all Employees, including state and federal employment taxes, paid on a weekly basis including wages, salaries, and other forms of compensation (the "Weekly Wages") averages approximately $78,000 per pay period. For purposes of administration and distribution of payroll, the Debtors utilize Yoursource Management Group as its payroll servicing provider for its Employees (the "Payroll Provider"). The Debtors remit gross payroll amounts, which includes the employee portion of all federal and state withholding taxes, employer's share of federal, state and local taxes, as well as voluntary and non-voluntary Employee deductions, to the Payroll Provider on a weekly basis for the Weekly Wages.

66. Lee Steel's pay period for its Employees begins on Monday through Sunday of each week. Salaried Employees are paid for each week's wages on Friday of that week. Hourly Employees are paid one week in arrears. As of April 13, 2015, the Debtors owe approximately $24,500[4] to Employees on account of accrued, but unpaid wages, salaries, and other compensation (collectively, the "Unpaid Wages and Salaries"). The Debtors' fund the entirety of each payroll to the Payroll Provider on the Thursday prior to each pay day.

67. In the ordinary course of its business operations, Lee Steel also provides its Employees with a number of benefits including without limitation: (i) medical, dental, and

---

[4] This amount does not take into account deductions for any federal or state taxes, or other voluntary or non-voluntary employee deductions required by law.

vision benefits, (ii) workers' compensation benefits, (iii) vacation pay, and (v) other miscellaneous benefits (collectively, the "Employee Benefits").

68.     Lee Steel offers its Employees medical, dental, and vision insurance (the "Health Benefits"). The medical insurance is offered through United Health Care, the dental insurance is offered through Assurant, and the vision insurance is offered through NVA. The Health Benefits consist of general medical coverage for emergency and routine medical care, as well as pharmaceutical coverage, and basic dental and vision services. Lee Steel pays approximately $43,000 on a monthly basis to maintain the Health Benefits plan.

69.     Lee Steel also maintains workers compensation insurance for all their Employees which is through, and administered by Travelers (the "Agency"). Lee Steel pays monthly premiums (the "Funded Premium") to the Agency to participate in the workers compensation insurance. The Debtors' annual Funded Premium paid to the Agency is approximately $64,054. Of the Debtors' premium due for its annual policy in effect from November 1, 2014 through November 1, 2015, $21,350.12 is unpaid. The Debtors' next payment to the Agency, in the amount of approximately $5,337.53, is due by May 1, 2015.

70.     It is critical that Lee Steel continues its workers' compensation insurance because coverage is required. If workers' compensation coverage is not maintained as required: (a) Lee Steel would have to acquire self-insured status, leading to much higher coverage cost, (b) the Employees could bring lawsuits for damages, and (c) Lee Steel's officers could be subject to criminal liability.

71.     Lee Steel provides Employees with paid vacation. Vacation accruals are based on years of service. Employees, who have been employed with Lee Steel for one year but less than three years, will receive one week of vacation with pay. Employees with: (i) three to ten years of service receive two weeks of vacation with pay; (ii) ten to twenty years of service receive three

weeks of vacation with pay; and (iii) twenty years or more receive four weeks of vacation with pay. An Employee with three weeks vacation may take one week of pay in lieu of vacation time off, and an Employee with four weeks vacation may take two weeks of pay in lieu of vacation.

72.       At this juncture, the Debtors cannot afford the risk of substantial damage to their businesses that would inevitably result from a decline in their Employees' morale, or worse, a decline in their Employee ranks as Employees seek other opportunities they believe will provide better assurances of regular payment of wages, salaries and benefits. It is my belief that, due to the specialized nature of the Debtors' businesses and its small but highly-skilled workforce, Employees of an equivalent level of skill and knowledge would be difficult and costly for the Debtors to find and integrate into their operations in an efficient manner.

**First Day Motion for an Order Pursuant to 11 U.S.C. §§ 105(A) and 541 Authorizing the Debtors to Pay Prepetition Trust Fund Taxes and Granting Related Relief (the "Trust Fund Motion")**

73.       As set forth in the Trust Fund Motion, the Debtors pay taxes to various taxing authorities in the ordinary course of business. As of the Petition Date, the Debtors believe that certain taxes relating to the prepetition period will remain unpaid. In some instances, the Debtors will have collected certain "trust fund" taxes for the benefit of taxing authorities, which taxes do not properly constitute property of the Debtors' estates. Accordingly, the Debtors will seek authority to pay all such taxes in the ordinary course of business.

74.       In the ordinary course of their businesses, Lee Steel withholds certain trust fund taxes (collectively, the "Employee Trust Fund Taxes") from its employees' wages and hold them for a period of time before remitting them to the appropriate taxing authorities (the "Taxing Authorities"). The Employee Trust Fund Taxes include, but are not limited to, FICA taxes, Medicare taxes, and various federal, state and local income taxes. Lee Steel hereby seeks authority to pay the Employee Trust Fund Taxes collected prior to the Petition Date but not yet

remitted by Lee Steel to the applicable Taxing Authorities. Lee Steel estimates the weekly amount of Employee Trust Fund Taxes at approximately $19,000. Lee Steel estimates that the aggregate prepetition amount for unpaid Employee Trust Fund Taxes, as of the Petition Date, is approximately $8,000.

75.     In the ordinary course of its business, Lee Steel incurs commercial activity taxes that are owed to certain Taxing Authorities (the "CAT Taxes," and together with the Employee Trust Fund Taxes, the "Trust Fund Taxes"). Lee Steel estimates that its quarterly aggregate CAT Tax liability is approximately $10,000. As of the Petition Date, Lee Steel estimates that it has incurred approximately $10,000 in CAT Tax liability which has not yet required to be remitted to the Taxing Authorities.

76.     Because the Trust Fund Taxes do not constitute property of the Debtors' estates, these amounts are not available to the Debtors' creditors. Therefore, immediate payment of the Trust Fund Taxes to the appropriate Taxing Authorities will not adversely affect the Debtors' estates or their creditors.

77.     In addition, many state and local taxing authorities impose personal liability on officers and directors of entities responsible for collecting trust fund taxes when such taxes are collected without being remitted to the appropriate taxing authorities. Thus, if any of the Trust Fund Taxes remain unpaid, the Debtors' officers and directors may be subject to lawsuits or even criminal prosecution. Such proceedings would constitute a significant distraction for the officers and directors at a time when they should be focused on the Debtors' efforts to stabilize their postpetition business operations and develop and implement a successful reorganization strategy.

**Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. . §§ 105(a), 363, 364, 503(b), 1107(a), AND 1108 and Bankr. P. 6003 and 6004, and Local Rule 4001-4 (A) Authorizing the Debtors to Honor Certain Prepetition Obligations Owed to Certain Critical Vendors and (II) Continue Prepetition Practices with Certain Vendors and (B) Authorizing All Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers (the "<u>Critical Vendor Motion</u>")**

78.      By the Critical Vendor Motion, the Debtors respectfully request the entry of an order authorizing, but not directing, the Debtors, in their business judgment and sole discretion, to (a) pay the Critical Vendor Claims in an aggregate amount not to exceed $1,084,012 (the "<u>Critical Vendor Cap</u>") and (b) continue during the postpetition period their prepetition practices with the Critical Vendors.

79.      Debtors were able to distinguish, from the several hundreds of vendors from whom Lee Steel purchases materials, a small group of vendors that the Debtors deem to be Critical Vendors.  These Critical Vendors provide goods to Lee Steel that are essential to its business operations.  In determining the identification of the Critical Vendors, the Debtors evaluated the following criteria:  (a) whether the vendor in question is a sole source provider; (b) whether Lee Steel receives advantageous pricing or other terms from a vendor such that replacing the vendor postpetition would result in significantly higher costs to Lee Steel; (c) whether quality requirements, customer specifications, or other specifications prevent Lee Steel from obtaining products or services from alternative sources within a reasonable timeframe, given the anticipated length of operations; (d) whether, if a vendor is not a sole source provider, Lee Steel has sufficient product inventory or in-house capabilities to continue operations while a replacement vendor is found and put in place; (e) whether a vendor is otherwise contractually obligated to continue to provide goods or services to Lee Steel; and (f) whether a vendor is likely to refuse to ship product or provide services to Lee Steel postpetition if its prepetition balances are not paid.

80.     Based on the foregoing considerations, the Debtors believe that the entities identified as Critical Vendors for the reasons set forth on Exhibit B supply goods that are critical to Lee Steel's operations and its business could not continue to operate without access to such goods. Certain of the Critical Vendors have claims for materials provided and other goods provided to Lee Steel (the "Goods") that were received by Lee Steel before the Petition Date.[5] The Debtors estimate that, as of the Petition Date, the total outstanding amount owed to the Critical Vendors is approximately $1,100,000 (the "Critical Vendor Claims").

81.     If the Debtors are unable to honor these obligations, the Debtors face the real possibility that the Critical Vendors may refuse to continue to deliver Goods to Lee Steel - Goods essential to the operation of Lee Steel's business and critical to maintaining the going-concern value of the Debtors' businesses and assets while they evaluate their strategic options.

82.     The Debtors propose to condition the payment of the Critical Vendor Claims on the agreement of the individual Critical Vendor to continue supplying Goods to Lee Steel on terms that are identical or more favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Critical Vendor and Lee Steel in the six months prior to the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and the Critical Vendor. The Debtors reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

83.     I believe that payment of the Critical Vendor Claims is vital to the Debtors' continued operations and the value of the Debtors' businesses and assets because the Critical Vendors are the only source from which Lee Steel can procure the Goods within a timeframe that

---

[5] These Goods may include both those Goods that were received by the Debtors within the twenty day period prior to the Petition Date, which are entitled to priority status under section 503(b)(9) of the Bankruptcy Code, and those Goods that were received by the Debtors prior to the twenty day period before the Petition Date, which are not entitled to priority status under section 503(b)(9) of the Bankruptcy Code.

would permit Lee Steel to avoid interruptions, delays, or shutdowns in operations, and the failure to pay the Critical Vendor Claims would, in the Debtors' business judgment, result in the Critical Vendors refusing to provide goods to Lee Steel postpetition.    Any interruption, delay, or shutdown in Lee Steel's operations resulting from a refusal by Critical Vendors to ship Goods would have disastrous effects on the Debtors' businesses and dire repercussions for Lee Steel's customers given the "just in time" nature of the automotive supply industry and its relationships with its customers would be irreparably harmed—both consequences which are likely to undermine the Debtors' ability to maximize the value of their business and assets while they evaluate their strategic options.

[<strong><em>Remainder of Page Intentionally Left Blank; Signature Page Follow</em></strong>]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief. Further affiant sayeth naught.

_____
Chief Restructuring Officer

Subscribed and sworn to
before me this 13th day of
April 2015.

_____

DIANA J. NANCE
Notary Public, State of Michigan
County of Wayne
My Commission Expires Feb. 10, 2016
Acting in the County of Oakland