## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **LEE STEEL CORPORATION. _et al._**[1] | ) | **Case No. 15-45784-mbm** |
| | ) | |
| Debtors. | ) | |
| | ) | **Judge  Marci B. McIvor** |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 363 AND 365, BANKRUPTCY RULES 2002 AND 6004, AND LOCAL RULES 6004-1 AND 9014-1 (A) ESTABLISHING BIDDING PROCEDURES FOR THE AUCTION SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND TRANSFERRING LIENS TO PROCEEDS; (B) SCHEDULING AN AUCTION AND A SALE HEARING TO CONSIDER APPROVAL OF SALE; (C) ESTABLISHING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; (D) APPROVING THE FORM OF ASSET PURCHASE AGREEMENT, FORM AND MANNER OF THE AUCTION NOTICE, THE FORM OF THE NOTICE TO NON-DEBTOR CO-PARTIES TO EXECUTORY CONTRACTS, AND THE NOTICE OF THE SALE HEARING**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby move the Court for entry of an order, substantially in the form attached hereto as Exhibit A, pursuant to sections 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9014-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") (A) authorizing Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 363 and 365, Bankruptcy Rules 2002 and 6004, and Local Rules 6004-1 and 9014-1 (a) Establishing Bidding Procedures for the Auction Sale of Substantially all of Debtors' Assets Free and Clear of Liens,

---

[1] Debtors include Lee Steel Corporation, Case No. 15-45784-mbm; Taylor Industrial Properties, L.L.C., Case No. 15-45785-mbm, and 4L Ventures, LLC, Case No. 15-45788-mbm.

Claims and Encumbrances and Transferring Liens to Proceeds; (B) Scheduling an Auction and a Sale Hearing to Consider Approval of Sale; (C) Establishing Procedures for the Assumption and Assignment of Executory Contracts; (D) Approving the Form of Asset Purchase Agreement, Form and Manner of the Auction Notice, the Form of the Notice to Non-Debtor Co-parties to Executory Contracts, and the Notice of the Sale Hearing (the "Motion").

In support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.     The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these proceedings and the Motion in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, and Local Rules 6004-1 and 9014-1.

## BACKGROUND

3.     On April 13, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their property and are operating and managing their businesses as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.     An official committee of unsecured creditors has been appointed in these chapter 11 cases (the "UCC").

5.     Debtor Lee Steel Corporation ("Lee Steel") is in the business of providing a full range of flat rolled steel, including hot rolled steel, cold rolled steel, and exposed coated products for automotive and other manufacturing industries.  Lee Steel operates from special purpose facilities located in Romulus, Michigan (the "Romulus Facility") and Wyoming, Michigan (the "Wyoming Facility"), which facilities Lee Steel leases from Debtor 4L Ventures, LLC and

Debtor Taylor Industrial Properties, L.L.C., respectively. Lee Steel's corporate headquarters are located in Novi, Michigan.

6.     Prior to the collapse in steel prices, Lee Steel was profitable and had annual revenues of approximately $100 million. The vast majority of Lee Steel's customers are Tier 1 and Tier 2 suppliers to the automotive industry operating in a "just in time" environment so that the customers must meet their customers' delivery requirements and, as such, cannot risk having their production delayed or interrupted. According to their audited financial statements, the Debtors' consolidated gross sales for the fiscal year ended September 30, 2014, were $116,602,378.

7.     In the ordinary course of their business operations, the Debtors directly employ approximately 65 individuals, including approximately 23 union employees.

8.     Detailed facts about the Debtors and the reasons for the commencement of their chapter 11 cases are set forth in the Affidavit and Statement of Laura A. Marcero in Support of Chapter 11 Petitions and First Day Motions.

## Post-Petition Financing

9.     On April 15, 2015, this Court entered a certain *Order Authorizing Debtors to Obtain Interim post-petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§105 and 364(c); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. §362; (C) Authorizing Debtors to Enter Into Agreements with the Huntington National Bank; and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* [Docket #48] (the "Financing Order").

10.     Pursuant the Financing Order, the Court found that on the Petition Date the Debtors were indebted to the Huntington National Bank ("Lender") in the principal amount of

$50,091,702.35 pursuant to the Pre-Petition loan documents (as defined in the Financing Order),[2] plus costs, fees, expenses and interest (the "<u>Pre-Petition Obligations</u>"), which were secured by all of the Debtors' assets on the Petition Date.

11. Also pursuant to the Financing Order, the Debtors are authorized to engage, and is engaging, in post-petition financing transactions with Lender pursuant to the Pre-Petition Loan Documents, which post-petition loans are secured by perfected first priority liens in all of Debtors' post-petition assets, and are entitled to superpriority administrative status under section 364(c)(1) of the Bankruptcy Code.

12. Pursuant to the Financing Order, the Debtors are authorized to, and are, using cash collateral securing the Pre-Petition Obligations and, as adequate protection for such use of cash collateral, Lender has been granted replacement liens in all of Debtors' post-petition assets and an adequate protection superpriority claim pursuant to section 507(b) of the Bankruptcy Code.

13. Pursuant to the Financing Order, it is an Event of Default if the Debtors fail to meet the following milestones set forth in the Amendment and Ratification Agreement between Lender and Debtors:

(a) Entry of an order approving sale and bid procedures on or before July 13, 2015;

(b) Conclusion of an auction of all or substantially all of the Debtors' assets on or before August 11, 2015;

(c) Entry of an order approving the sale in form and substance acceptable to the Lender on or before August 14, 2015; and

---

[2] All terms not otherwise defined shall have the same meaning ascribed to them as in the Financing Order.

(d)     Consummation of the sale on or before August 28, 2015.

**Events Leading to the Sale**

14.     Since the Petition Date, the Debtors have received many unsolicited expressions of interest from potential strategic and financial buyers interested in purchasing substantially all of their assets on a going concern basis, as well as equipment dealers and liquidators interested in acquiring all of their assets.

15.     The Debtors, utilizing the support of Huron Transaction Advisory Services,  will immediately respond to this range of potential purchasers of the Debtors' assets on a going concern basis or otherwise, including both strategic and financial buyers, with initial marketing materials and non-disclosure agreements to begin due diligence.

16.     Debtors  believe that,  after consultation with the UCC and Lender it may enter into an asset purchase agreement substantially in the form of Exhibit B hereto (the "Proposed Purchase Agreement") for the sale of substantially all of Debtors' assets or substantially all of Debtors' assets relating to the Romulus Facility and/or the Wyoming Facility (the "Purchased Assets") prior to the Auction, as defined below, with an entity that will become the "stalking horse" bidder (the "Stalking Horse"), or a combination of entities with separate offers to purchase the Wyoming Facility and the Romulus Facility that would be combined to collectively become the Stalking Horse.

**Qualification as Stalking Horse and Approval of the**
**Purchase Agreement, Subject to Higher and Better Bids**

17.     In order to qualify to be the Stalking Horse, an offeror must be a Qualified Bidder, as defined below, and submit a purchase agreement substantially in the form of the Proposed Purchase Agreement, and containing the following pertinent provisions (the "Stalking

<u>Horse Purchase Agreement</u>"), which are generally acceptable to the Debtors, after consultation with Lender and the UCC:

A.   A cash purchase price for the Purchased Assets, including a cash payment for substantially all of Debtors' inventory, payable in full at closing and the assumption of certain contracts and leases and the assumption of certain liabilities.

B.   The Stalking Horse Purchase Agreement must be accompanied by an earnest money deposit equal to ten percent (10%) of the proposed cash pruchase price for the Purchased Assets to be held by Debtors' counsel pursuant to a mutually acceptable escrow agreement.  The deposit will be applied against the purchase price if the Stalking Horse is the successful purchaser of the Purchased Assets.  If the sale is not consummated on account of the Stalking Horse's failure to perform any of its obligations under the Stalking Horse Purchase Agreement, Debtors will retain the earnest money deposit.  If the Stalking Horse is not in breach of the Stalking Horse Purchase Agreement, it will be entitled to return of the deposit if (i) the Purchased Assets are sold to another purchaser and the sale closes; (ii) the sale is not consummated on account of Debtors' failure to perform under the Stalking Horse Purchase Agreement, or (iii) the sale is not consummated because certain conditions precedent in the Stalking Horse Purchase Agreement were not timely satisfied by Debtors.

C.   The Purchased Assets will include all tangible and intangible assets, personal property, and real property owned by Debtors that is used to

operate and conduct the Debtors' business operations as a whole or, alternatively, may consist of the assets used to operate and conduct Debtors' business operations from the Romulus Facility, or the Wyoming Facility individually, as well as assets located at the Debtors' leased offices in Novi, Michigan. Excluded assets will include certain executory contracts and unexpired leases that are not assumed and assigned to the Purchaser under section 365 of the Code; claims and causes of action against third parties arising under chapter 5 of the Code, bank accounts, cash, tax refunds; and life insurance policies, as well as the proceeds of all of the foregoing excluded assets.

D.      Closing will occur and conclude on or before August 28, 2015.

E.      The Stalking Horse will not assume any employee benefit programs, except, to the extent, if any, mandated by Lee Steel's collective bargaining agreement.

F.      Subject to Bankruptcy Court approval, Debtors may be obligated to pay a "break-up fee" of up to $500,000.00 to the Stalking Horse to compensate it for its documented reasonable out-of-pocket expenses in conjunction conducting due diligence and pursuing the purchase of Debtors' assets through the Auction the proposed sale (the "<u>Break-up Fee</u>"). The Break-up Fee is discussed in further detail below.

G.      The Stalking Horse must agree to be a Stand-By Bidder as set forth in paragraph 32 below, unless this provision is waived by Debtors, after

consultation with the UCC and Lender, in which case the requirements of paragraph 32 shall be waived for all Qualified Bidders.

H.    The Stalking Horse's obligations under the Stalking Horse Purchase Agreement may be subject only to limited contingencies, including (i) environmental due diligence; and (ii) financial due diligence, provided; however, these contingencies will be deemed waived if not exercised in writing within ten calendar (10) days prior to the Auction (as defined below).

18.    The terms and conditions of a Stalking Horse Purchase Agreement, which comply with the foregoing, is in the best interest of the Debtors, their creditors and their estates. Because the Debtors will engage in a thorough marketing and negotiation process before selecting, after consultation with the Lender and the UCC, a Stalking Horse, they believe that a Stalking Horse Purchase Agreement reflecting the terms and conditions set forth above and in the Proposed Purchase Agreement will reflect a fair and reasonable valuation of the Purchased Assets, will be the highest and best offer that can be secured prior to the Auction, and will result in higher values being achieved at the Auction.

19.    Debtors respectfully request entry of an Order in the form attached hereto as Exhibit A (the "Bidding Procedures Order") approving the form of the Proposed Purchase Agreement, substantially in the form attached hereto as Exhibit B subject to higher and better offers and for bidding purposes only.

<u>Sale Free and Clear of Liens, Claims and Interests</u>

20.    The Proposed Purchase Agreement provides for the sale of the Purchased Assets free and clear of all liens, claims and interests. Debtors assert that a sufficient basis exists to sell

the Purchased Assets free and clear of liens, claims and interests, pursuant to Section 363(f), and hereby request approval for the Auction process governing the sale (subject to the Sale Order) of substantially all of their assets outside the ordinary course of business pursuant to the procedures set forth herein.

21. Section 363 of the Bankruptcy Code authorizes a debtor to use, sell or lease property of the estate outside the ordinary course of business free and clear of any interest in such property. 11 U.S.C. § 363(f). Section 363(f) of the Bankruptcy Code authorizes the sale of property to be free and clear of interests in such property held by an entity if:

(1) [A]pplicable nonbankruptcy law permits a sale of such property free and clear of such interest;

(2) [S]uch entity consents;

(3) [S]uch interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) [S]uch interest is in bona fide dispute; or

(5) [S]uch entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*See*, *generally*, *In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir. 1996); *In re Gulf States Steel*, *Inc. of Alabama*, 285 B.R. 497, 506 (Bankr. N.D. Ala. 2002). The "interests" in property that assets may be sold "free of" include liens, claims and other encumbrances. *See Leckie Smokeless*, 99 F.3d at 581-582 (scope of 11 U.S.C. § 363(f) not limited to in rem interests); *In re Aneco Elect. Const.*, *Inc.*, 377 B.R. 338 (Bankr. M.D. Fla. 2006).

22. Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any one of the requirements enumerated therein will suffice to warrant the sale of the Purchased Assets free and clear of all interests, except with respect to any interests that are

liabilities to be assumed under the asset purchase agreement. *See Gulf States*, 285 B.R. at 506; C*iticorp Homeowners Servs., Inc. v. Elliot* (*In re Elliot*), 94 B.R. 343, 345 (E.D. Pa. 1988).

23.     Courts have also consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale takes free and clear from successor liability relating to the debtor's business. *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d at 585 (affirming the sale of debtors' assets free and clear of certain taxes); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); *see also*; *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction.").

24.     Section 363(b) of the Bankruptcy Code specifically authorizes asset sales outside the ordinary course of business. *See* 11 U.S.C. § 363(b)(1) ("[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate"). In approving the sale of assets outside the ordinary course of business and outside of a chapter 11 plan pursuant to section 363 of the Bankruptcy Code, courts, including those in the Sixth Circuit, have adopted the "sound business reason" test established by the Second Circuit in *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *see also Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986); *In re Nicole Energy Services, Inc.*, 385 B.R. 201, 230 (Bankr. S.D. Ohio 2008); *In re Jillian's Entertainment Holdings*, 327 B.R. 616, 617 (Bankr. W.D. Ky.

2005) (stating that the Lionel standard has been adopted by the vast majority of courts). The issue before the Lionel court was "to what extent chapter 11 permits a bankruptcy judge to authorize the sale of an important asset of the bankrupt's estate, out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization." *Lionel*, 722 F.2d at 1066.

25.     Several strong business reasons exist for selling the Purchased Assets at this time. First and foremost, an asset sale under the proposed procedures will be a going-concern sale that is designed to maximize the financial recovery to the Debtors' estates. The financing provided under the Financing Order expires on August 28, 2015, and Debtors do not believe they will be able to extend the financing. Accordingly, if the proposed asset sale does not close, Debtors will in all likelihood have no financing and Lee Steel's customers will be left the untenable position of relying on a supplier that cannot fund its ongoing operations. The resulting actual or imminent interruption to the respective customers' operations will likely justify the customers' resourcing of production to alternative production sources. In short, if a going-concern sale is not consummated, a forced sale liquidation and significant resulting loss of value to the estates will likely follow.

26.     The Lender and Debtors have approved the concept of a sale in the Financing Order.

27.     In addition, the incidental impact of Debtors' bankruptcy to interested stakeholders will be minimized by the proposed asset sale. For example, many executory contracts will be assumed; some, if not all, of Debtors' facilities will continue to operate; and the Successful Bidder, as defined below, will hire certain of Debtors' current employees.

28.     In short, the proposed procedures for the asset sale, free of all liens, claims and interests, should be approved because Debtors have articulated sound business judgment reasons to support such a sale procedure, and because a going-concern sale will maximize the value and recovery to all major constituents.   The Debtors will also request in a separate Motion ("Sale Motion") that, at the Sale Hearing, this Court enter an Order (the "Sale Order") approving (i) a sale to the Stalking Horse, if applicable, pursuant to either the Stalking Horse Purchase Agreement, or to the highest and best Successful Bid pursuant to the Successful Bidder Purchase Agreement, as defined below; and (ii) the sale of the Purchased Assets free and clear of all liens, claims, encumbrances and interests pursuant to the Stalking Horse Purchase Agreement, if any, or pursuant to the Successful Bidder Purchase Agreement.

## The Sale and Auction Process

29.     Debtors desire to maximize the value for the Purchased Assets, and therefore desire to pursue the sale process through an auction to determine the highest and the best offer (the "Auction").   Debtors further believe that the process will be enhanced if they can obtain a Stalking Horse prior to the Auction, because the ability to receive the Break-Up Fee, as defined below, will induce prospective bidders to pursue a sale more quickly and the resulting Stalking Horse Purchase Agreement will establish a floor minimum bid at the Auction.   Accordingly, the following procedures (the "Bidding Procedures") are proposed with the objective of promoting active bidding that will result in the highest and best offer.   At the same time, the Bidding Procedures reflect Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Purchased Assets by financially-capable, motivated bidders who are likely to close a transaction.

30.    In accordance with Fed. R. Bank. P. 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction.  Debtors believe that good cause exists to expose the Purchased Assets to sale at a public auction as this will enable Debtors to obtain the highest and the best offers for the Purchased Assets, thereby maximizing the value of their estates.

31.    Debtors assert that the following Bidding Procedures are appropriate for this transaction, and requests entry of an order substantially in the form of the Order attached hereto as Exhibit A approving the procedures set forth herein:

A.    Bidders desiring to bid (the "Potential Bidders") on the Purchased Assets, whether as a Stalking Horse, or at the Auction, must execute a confidentiality agreement prior to being provided due diligence material or access to the data room.

B.    "Qualified Bidder" means a Potential Bidder that demonstrates to the satisfaction of Debtors that it possesses the financial capability, business plan and management structure to effect the acquisition of and operation of Debtors' assets as a going-concern, and who would agree to assume and pay when due the Debtors' obligation pursuant to their respective "trade agreements" with "critical vendors" without modification of any essential terms.

C.    The Debtors will designate an employee or other representative to coordinate all reasonable requests for information and due diligence access from all Qualified Bidders.  Debtors' shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined

below). Debtors are not responsible for, and will bear no liability with respect to, the accuracy of any information obtained by any Qualified Bidder in connection with the sale of the Purchased Assets.

D.     The Debtors will consider only Qualified Bids from Qualified Bidders.  To be a "Qualified Bid", the bid must (unless waived by Debtors, after consultation with Lender and the UCC ) among other things:

   (i)     be submitted to Debtors' counsel, Stephen M. Gross, Esquire, McDonald Hopkins PLC, 39533 Woodward Ave., Suite 318, Bloomfield Hills, Michigan 48304; and/or email: sgross@mcdonaldhopkins.com and Laura A. Marcero, CRO of the Debtors, Huron Consulting Services, LLC 900 Wilshire Drive, Suite 270, Troy, Michigan 48084, and Jamie Lisac, Huron Consulting Services, LLC 500 W. Van Buren Street, Chicago, Illinois 60607 by no later than 5:00 p.m. (prevailing Eastern time) on the day that is August 3, 2015 prior to the Auction (the "Bid Deadline");

   (ii)     be accompanied:  (A) by a duly executed asset purchase agreement that is marked to reflect variations from either the Stalking Horse Purchase Agreement (if applicable) or the Proposed Purchase Agreement attached as Exhibit B; (B) a letter stating that the bidder's offer is irrevocable until the conclusion of the Sale Hearing and acknowledging and agreeing to be bound by the Stand-by Provision (as defined in paragraph 32 below); (C) written evidence of a commitment for financing for the full amount of the proposed purchase price (without contingencies) or other evidence of the Bidder's ability to consummate the transaction satisfactory to Debtors, after consultation with Lender and the UCC; and (D)   an earnest money cash deposit at least equal to ten percent (10%) of the cash portion of the purchase price, which deposit shall not be subject to any liens or encumbrances created in favor of any person or entity, and which shall be applied to the purchase price if the Qualified Bidder becomes a Successful Bidder (as defined below) or forfeited to Debtors if the Qualified Bidder defaults under the Qualified Bidder's proposed Purchase Agreement or Stalking Horse Purchase Agreement.  In any event, due to the Stand-By Bidder provision in paragraph 32, deposits will not be returned until five (5) days after the sale(s) closes;

(iii)    be on terms no less favorable (and no more burdensome or conditional) to Debtors than the terms of the Stalking Horse Purchase Agreement, if any, with a purchase price satisfying subparagraph (vii) below;

(iv)    not include any contingencies relating to due diligence, financing, environmental or labor issues, Customer contracts, or any other material conditions precedent to the bidder's obligation to close, that exist as of the Auction, and that are not otherwise contained in the Stalking Horse Purchase Agreement, if any;

(v)    designate the executory contracts and unexpired leases that the bidder may request Debtors to assume and assign to the Qualified Bidder and any other assets of Debtors that are subject to the bid;

(vi)    be made by one or more bidders, each of which can demonstrate that, individually or in the aggregate, it is (or they are) financially able to consummate the transaction contemplated by such bid(s) on the terms contemplated therein; and

(vii)    be for an aggregate purchase price at least equal to the purchase price reflected in the Stalking Horse Purchase Agreement, if any, plus $600,000.00 (the Break-up Fee plus the minimum $100,000 Incremental Bid Amount, as defined below) whether submitted by one Qualified Bidder or a combination of two Qualified Bidders individually bidding on the Romulus Facility and the Wyoming Facility respectively.

E.    If one or more Qualified Bids (other than that of the Stalking Horse, if any) have been received by the Bid Deadline, Debtors' shall conduct an auction (the "Auction") with respect to the Purchased Assets. The Auction shall commence at 9:00 Eastern Time on August 11, 2015, at the offices of McDonald Hopkins PLC, counsel to the Debtors. Unless otherwise agreed by Debtors, the Lender and the UCC, the Sale Hearing must occur on or before August 14, 2015, pursuant to the Financing Order.

F.   If there is a Stalking Horse, and in the event that Debtors' do not receive a Qualified Bid from another Qualified Bidder by the Bid Deadline, Debtors shall proceed with the sale to the Stalking Horse under the terms and conditions of the Stalking Horse Purchase Agreement, and subject to the approval of the Bankruptcy Court at the Sale Hearing and shall not conduct the Auction.  In the event that there is no Stalking Horse, and none of the Qualified Bids are acceptable to Debtors, after consultation with Lender, and the UCC, Debtors may terminate the Auction prior to bidding.

G.   Only the Stalking Horse, if any, and those Qualified Bidders who submitted Qualified Bids will be allowed to participate in the Auction. Debtors shall notify all Qualified Bidders who have submitted Qualified Bids of their status as Qualified Bidders, as well as the terms of the Stalking Horse Purchase Agreement, if any.

H.   Debtors may conduct the Auction in the manner they determine will result in the highest, best or otherwise financially superior offer.

I.   Bidding at the Auction will commence with the highest Qualified Bid or, in the event of Qualified Bids having been submitted on a facility by facility basis for the Romulus Facility, or the Wyoming Facility, the highest combination of Qualified Bids together constituting agreements to acquire all of the Purchased Assets, determined by Debtors, after consultation with the UCC and Lender, which shall serve as the lead bid (the "Baseline Bid"), and will continue in increments of $100,000.00 or a

multiple thereof (the "Incremental Bid Amount"); provided however, if bidding for individual facilities occurs, bids on each facility will be in increments of $50,000.00; further provided, that if there is a Stalking Horse, then the first overbid or the combined bids for the Debtors' facilities on a facility by facility basis must aggregate to $600,000.00 more than the bid in the Stalking Horse Purchase Agreement. Qualified Bidders that have submitted a Qualified Bid, including the Stalking Horse, may submit bids at the Auction, and may increase or modify bids in accordance with the Incremental Bid Amount to make their bid more favorable to Debtors. Bidding will continue until such time as the Qualified Bidder(s) with the highest and best offer or combination of offers for the purchase of the Purchased Assets (the "Successful Bid") is determined by Debtors, in consultation with Lender and the UCC (the "Successful Bidder"). However, if there is no Stalking Horse, or the Stalking Horse has not waived all contingencies in the Stalking Horse Purchase Agreement, Debtors reserve the right to terminate the Auction at the conclusion of bidding if the offers from the Qualified Bidders are not acceptable to Debtors, after consultation with the UCC and the Lender. Debtors shall announce at the Auction the Successful Bidder and the Qualified Bidder that submitted the next highest or otherwise best Qualified Bids (the "Second Highest Bidder").

J.    At the conclusion of the Auction and prior to the Sale Hearing, the Successful Bidder and Debtors may enter into a purchase agreement

reflecting the Successful Bid(s) (the "Successful Bidder Purchase Agreement"), which shall be subject to Bankruptcy Court approval at the Sale Hearing.

K.  For the purpose of determining the Successful Bidder, the full amount of the Break-Up Fee potentially payable to the Stalking Horse Bidder shall be added to any overbid submitted by the Stalking Horse.

L.  Debtors either shall seek approval of the Stalking Horse Purchase Agreement, if there are no other Qualified Bids, or shall seek approval of the Successful Bidder Purchase Agreement from the Bankruptcy Court at the Sale Hearing.

32.  Following the Sale Hearing, if the Successful Bidder fails to consummate the approved Sale, the Second Highest Bidder shall be deemed to be the Successful Bidder and the Debtors' shall be authorized to consummate the sale with the Second Highest Bidder without further order of the Bankruptcy Court, and such Second Highest Bidder shall be required to consummate the Sale on the terms of the Second Highest Bidder's most recent bid (the "Stand-by Provision"). The Stand-By Provision can be waived by Debtors, after consultation with the UCC and Lender.

33.  The Debtors respectfully request that this Court approve the Bidding Procedures to be employed in connection with the proposed sale by entering the Bidding Procedures Order attached as Exhibit A.

34.  The Stalking Horse, if one is approved by Debtors, after consultation with the Lender and the UCC, will have expended, and likely will continue to expend, considerable time,

money and attention in the pursuit of the sale on a greatly expedited basis, and will engage in extensive arm's length, good faith negotiations.

35.     In recognition of the time, energy and resources expended by the Stalking Horse and the substantial contribution of the Stalking Horse to Debtors' cases by serving as the initial bidder and establishing a baseline purchase price, Debtors seek authorization to pay the Stalking Horse a fee to compensate it for its out-of-pocket costs incurred in bringing its offer to fruition (the "Break-up Fee").

36.     The Break-up Fee is the amount of the Stalking Horse's documented out-of-pocket costs incurred in due diligence, negotiation and other items, including professional fees, incurred with pursuing the acquisition of the Purchased Assets up to a maximum of $500,000.00. The Break-up Fee is only payable to the Stalking Horse if (i) the Stalking Horse has waived the conditions to closing set forth in the Stalking Horse Purchase Agreement in the time period provided for in the Bidding Procedures Order; and (ii) a person submitting a Qualified Bid over the Baseline Bid is the Successful Bidder, consummates the transaction pursuant to the Successful Bidder Purchase Agreement, and pays the Purchase Price required under the Successful Bidder Purchase Agreement. Thus, the Break-up Fee will be paid only if the Stalking Horse has waived all contingencies, and is ready to proceed to Closing, and a sale to another Successful Bidder is consummated, which by definition will be for an amount at least $600,000.00 higher than the Baseline Bid. Accordingly, even if Debtors are obligated to pay the Break-up Fee, Debtors' estates will be better off than if the Stalking Horse's transaction was consummated, because the winning bid will exceed the Break-up Fee plus the price in the Stalking Horse Purchase Agreement by at least $100,000.00.

37.     Further, the Break-up Fee is reasonably related to the risk, effort and expenses of the Stalking Horse.  See *In re Integrated Resources, Inc.* 147 B.R. 650, 662-63 (S.D.N.Y 1992) (break up fee "should be reasonable related to the risk, effort, and expenses of the prospective purchaser.").  The Stalking Horse will have already spent significant resources interacting with the Debtors' employees and assembling the information that other prospective purchasers need to assess the viability of a transaction with Debtors.  Any Qualified Bidder will benefit from the preparation for sale and the assistance provided to Debtors to assemble relevant information.  *See Id.* at 659-60 ("break up fee appropriate when initial bidder's efforts' "placed the estate property in a sales configuration mode").

38.     Accordingly, Debtors respectfully request that the Court specifically approve the Break-up Fee in the Bidding Procedures Order.

## Form and Manner of Notice of Auction

39.     Pursuant to Fed. R. Bankr. P. 2002, Debtors request that they be authorized to serve notice of the Bidding Procedures, Auction and Sale Hearing, by mailing a copy of the Auction and Sale Notice which is attached hereto as <u>Exhibit C</u>, by first class mail, to the following (collectively, the "<u>Notice Parties</u>"): (a) all creditors asserting a security interest in and/or lien against Debtors' assets; (b) the Office of the United States Trustee; (c) each member of the UCC, or its counsel if one appointed; (d) counsel for Zachary Taylor; (e) counsel for Lender; (f) all parties to the contracts and leases which Debtors intend to assume and assign and/or reject in conjunction with the sale; (g) all applicable federal and state taxing authorities; (h) all parties who have requested notice in the case; and (i)  all parties who have previously expressed an interest in acquiring the Purchased Assets.

40.     The Auction and Sale Notice sufficiently describes the terms and conditions of the sale and the Bidding Procedures. *See Delaware & Hudson Railway*, 124 B.R. 169, 180 (Del. 1991) (the disclosures in sale notice do not need to include the functional equivalent of a disclosure statement).

41.     The Auction and Sale Notice will provide that any objections to the Sale Motion must be filed with the Bankruptcy Court and served on the attorney for Debtors, McDonald Hopkins PLC c/o Stephen M. Gross, 39533 Woodward Ave., Suite 318, Bloomfield Hills, Michigan 48304 by a date to be set by the Bankruptcy Court (the "Objection Deadline"). Debtors further propose, pursuant to Fed. R. Bank. P. 9014, that objections (if any) to the sale, must: (a) be in writing; (b) set forth the nature of the objector's claims against or interests in Debtors' estates and the basis for the objection and the specific grounds therefor; (c) comply with the Bankruptcy Rules and the Local Bankruptcy Rules and Orders of this Court; (d) be filed with the Clerk of the Bankruptcy Court on or before the Objection Deadline; and (e) be actually received by: (i) counsel for Debtors; (ii) counsel to Lender; (iii) the Office of the United States Trustee; (iv) UCC; and (v) counsel for Zachary Taylor by the Objection Deadline.

42.     Debtors submit that the foregoing notice is reasonably calculated to provide timely and adequate notice to Debtors, creditors-in-interest, constituencies, those persons most interested in the case, and those persons potentially interested in bidding on the Purchased Assets, and accordingly, Debtors submit that such notice constitutes good and sufficient notice under the circumstances and that no further notice need be given.

43.     Debtors respectfully request that this Court approve the form and manner of the notice of the Auction and Sale Hearing in substantially the form attached hereto as Exhibit C (the "Auction and Sale Notice").

44.     Debtors have contracts that are necessary to the successful operation of Debtors' Business.  Conversely, Debtors may have contracts associated with the Business or their assets that may interfere with the sale or are deemed detrimental to their estates, and upon sale of the Purchased Assets will no longer be beneficial to Debtors.

45.     Within three (3) business days of the Bid Procedures Order, Debtors will provide all Qualified Bidders with a list and a copy of all contracts and leases related to the Purchased Assets, along with proposed cure amounts owing on each contract and lease (the "Cure Schedule").  All Qualified Bidders must provide with their Qualified Bids to Debtors a list of the contracts and leases that it would like Debtors to assume and assign to the Qualified Bidder (the "Assumed Contracts and Assumed Leases") (together, the "Contract Lists").

46.     Debtors are requesting that the following procedures be approved by the Bankruptcy Court for the assumption and assignment of Assumed Contracts and Assumed Lease ("Assumption and Assignment Procedures"):

    A.     Three (3) business days after the entry of the Bidding Procedures Order, Debtors shall serve on the counterparties to the contracts on the Contract Lists a notice (the "Assumption and Assignment Notice") in the form attached as Exhibit D containing the following information:

        (i)     Debtors' intent to assume and assign the Assumed Contracts and Assumed Leases to the Stalking Horse or a Successful Bidder;

        (ii)     The Cure Schedule (as supplemented pursuant to the procedure described below);

        (iii)     The cure amount Debtors propose to pay to each counterparty in compliance with the key requirements of Section 365 of the Bankruptcy Code (the "Pre-Petition Cure Amount");

(iv) That the counterparties to the Assumed Contracts and Assumed Leases shall file and serve any objections to the assumption and assignment of the Assumed Contracts and Assumed Leases or the Pre-Petition Cure Amount on or before the Assumption/Assignment Objection Deadline, as described below; and

(v) That for each Assumed Contract and Assumed Lease for which an objection is timely received, a hearing will be held at the Sale Hearing, or such other date as the Court may designate, upon twenty-four (24) hours' telephonic, electronic or facsimile notice to the objecting party; provided, however, that if the Assumed Contracts and Assumed Leases that are the subject of objections are assumed and assigned prior to the time of the hearing, the cure amount asserted by the objecting party or such other amount as may be agreed to by the parties or fixed by the Court, will be held in a segregated account by the Successful Bidder or Debtors pending further order of the Court or mutual agreement of the parties.

B. The counterparties to the Assumed Contracts and Assumed Leases shall file any objections to the assumption and assignment of the Assumed Contracts and Assumed Leases or the Pre-Petition Cure Amount at least three (3) business days prior to the Auction (the "Assumption/Assignment Objection Deadline") and shall serve such objection so that the objection is actually received by: (i) counsel for Debtors; (ii) counsel to the Stalking Horse, if any; (iii) the Office of the United States Trustee; (iv) counsel for the UCC, if any; (v) counsel for Lender; and (vi) counsel for Zachary Taylor by the Assumption/Assignment Objection Deadline. Any and all objections must state with detail: the grounds for the objection; if the objecting party proposes an alternative cure amount and the amount thereof; and the basis for the calculation of the proposed alternative amount;

C.     Any party who fails to object by the Assumption/Assignment Objection Deadline shall be forever barred from objecting to the assumption and assignment of its respective executory contract or unexpired lease;

D.     Debtors will make cure payments within thirty (30) days after the date of the closing of the sale of the Purchased Assets and any letters of credit associated with any assumed contract or assumed lease will be replaced by a new letter of credit provided by the Successful Bidder; and

E.     Debtors may file one or more supplemental list or lists of Assumed Contracts and Assumed Leases (the "Supplemental List"), if necessary. Debtors' shall serve to the counterparties to the Assumed Contracts and Assumed Leases on the Supplemental List a supplemental Assumption and Assignment Notice substantially in the form and containing the information described above. The counterparties to contracts and leases on the Supplemental List shall have five (5) calendar days to file an objection in accordance with the requirements outlined above and serve upon the parties described above.

47.    Debtors propose the following procedure for rejection of contracts:

A.     Promptly after both the receipt of the Contract Lists from the Successful Bidder and Closing, Debtors will notify each counter-party to a contract that will be rejected of such rejection (the "Rejection Notice"). Notice shall be effective upon mailing. Objections, if any, to the rejection (an "Objection") must be filed and served on counsel for Debtors, Lender,

and the UCC within fourteen (14) days after the Rejection Notice was mailed (the "Rejected Contract Deadline");

B.      Upon receipt of a timely Objection, Debtors may request that the Bankruptcy Court set a hearing on the Objection. If the Bankruptcy Court authorizes the rejection, the rejection shall be deemed to have been effective upon the date the sale of the Purchased Assets is closed, unless otherwise determined by the Bankruptcy Court;

C.      Any party who fails to object by the Rejected Contract Deadline shall be barred from objecting to the rejection of the contract. In such instances, rejections of executory contracts or unexpired leases will be effective upon notice to the party that its contract or unexpired leases has been rejected.

48.      Debtors submit that the foregoing procedures and notices are reasonably calculated to provide the appropriate parties with timely and adequate notice and opportunities to object to Debtors' proposed assignment and assumption of the Assumed Contracts and Assumed Leases and/or rejection of certain contracts. Debtors further submit that such notice constitutes good and sufficient notice under the circumstances with respect to the assumption and assignment of the Assigned Contracts and Assumed Leases and/or the rejection of certain contracts as proposed in this Motion, and that no further notice need be given.

## Summary of Proposed Dates and Key Events

49.      Subject to Bankruptcy Court approval, Debtors propose to establish the following timetable:

| *Proposed Date* | *Proposed Event* |
| --- | --- |
| Prior to May 22, 2015 | Entry of bid Procedures Order |

| | |
|---|---|
| May, 26 2015 | Publish Notice |
| May 26, 2015 | Serve Sale Notice |
| May 26, 2015 | Serve Assumption Notice |
| | |
| August 8, 2015 | Deadline for Qualified Bids |
| August 25, 2015 | Deadline for Objections to Sale |
| August 7, 2015 | Deadline for Objections to Assumptions |
| | |
| August 11, 2015 at 9:00 a.m. | Auction. |
| August 12, 2015 | Sale Hearing |

These dates are subject to approval of the Bankruptcy Court and may be changed in subsequent orders entered by the Court. Additionally, Debtors reserve the right to request that these dates be revised.

### Waiver of Fed. R. Bank. P. 6004(g) and 6006(d)

50. Given the August 28, 2015, expiration of the (i) Financing Order, time is of the essence in completing this transaction. Further, the notice contemplated in this Motion is calculated to give reasonable notice to all affected parties. Accordingly, Debtors assert that cause exists to waive the requirements of Fed. R. Bankr. P. 6004(g) and 6006(d), and Debtors request that the Order approving the sale (as well as the assumption and assignment of the Assumed Contracts and Assumed Leases) provide that it shall be effective immediately and that the 10-day stay shall not apply to the sale transaction (and the assumption and assignment of the Assumed Contract and Assumed Leases.)

### Notice

51. No trustee or examiner has been appointed in this chapter 11 case.

52. A complete copy of this Motion has been served by first class mail, hand delivery, facsimile, or overnight mail upon (i) all creditors asserting a security interest in and/or lien against Debtors' assets; (ii) the Office of the United States Trustee; (iii) counsel to the UCC; or the members of the committee (iv) counsel for Lender; (v) counsel for Zachary Taylor;

(vi) counsel for each of the Customers; (vii) all non-debtor parties to executory contracts and (viii) all parties who have requested notice in the case

## No Prior Relief Requested

53.     No prior request for the relief sought in this Motion has been made to this or any other court.

DEBTORS REQUEST that this Court enter the Bidding Procedures Order attached as Exhibit A:

A.     Approving the form of the Proposed Purchase Agreement for bidding purposes only, and the sale to a Stalking Horse prior to the Auction and pursuant to a purchase agreement in a form substantially the same as the Proposed Purchase Agreement, subject to higher and better offers;

B.     Approving the Bidding Procedures;

C.     Approving the Break-up Fee;

D.     Scheduling the Sale Hearing; and

E.     Approving the form and manner of the Auction and Sale Notice.

F.     Approving the Assumption and Assignment Procedures; and

D.     Approving the form and manner of Assumption and Assignment Notice.


Respectfully submitted,


/s/ Stephen M. Gross
Stephen M. Gross (P35410)
Jayson B. Ruff  (P69893)
Joshua A. Gadharf (P76860)
McDONALD HOPKINS PLC
39533 Woodward Avenue
Suite 318

Bloomfield Hills, MI  48304
Telephone: (248) 646-5070
Facsimile:  (248) 646-5075
E-mail: sgross@mcdonaldhopkins.com
        jruff@mcdonaldhopkins.com
        jgadharf@mcdonaldhopkins.com

and

Manju Gupta (0076452)
McDONALD HOPKINS LLC
600 Superior Avenue, E., Suite 2100
Cleveland, OH 44114
Telephone:     (216) 348-5400
Facsimile:     (216) 348-5474
E-mail:mgupta@mcdonaldhopkins.com

PROPOSED COUNSEL FOR THE DEBTORS
AND DEBTORS IN POSSESSION

Dated: May 1, 2015

# Exhibit A

Proposed Order

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **LEE STEEL CORPORATION.** *et al.*[1] | ) | **Case No. 15-45784-mbm** |
| | ) | |
| Debtors. | ) | |
| | ) | **Judge  Marci B. McIvor** |
| | ) | |

**ORDER (A) ESTABLISHING BIDDING PROCEDURES FOR THE AUCTION SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES AND TRANSFERRING LIENS TO PROCEEDS; (B) SCHEDULING AN AUCTION AND A SALE HEARING TO CONSIDER APPROVAL OF SALE; (C) ESTABLISHING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS; (D) APPROVING THE FORM OF ASSET PURCHASE AGREEMENT, FORM AND MANNER OF THE AUCTION NOTICE, THE FORM OF THE NOTICE TO NON-DEBTOR CO-PARTIES TO EXECUTORY CONTRACTS, AND THE NOTICE OF THE SALE HEARING**

This matter having come before the Court upon the *Debtors' Motion pursuant to sections 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004 and 9014 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") (a) Establishing Bidding Procedures for the Auction Sale of Substantially all of Debtors' Assets Free and Clear of Liens, Claims and Encumbrances and Transferring Liens to Proceeds; (b) Scheduling an Auction and a Sale Hearing to Consider Approval of Sale; (c) Establishing Procedures for the Assumption and Assignment of Executory Contracts; (d) Approving the Form of Asset Purchase Agreement, Form and Manner of the Auction Notice, the Form of the Notice to Non-debtor Co-parties to*

---

[1] Debtors include Lee Steel Corporation, Case No. 15-45784-mbm; Taylor Industrial Properties, L.L.C., Case No. 15-45785-mbm, and 4L Properties, LLC, Case No. 15-45788-mbm.

*Executory Contracts, and the Notice of the Sale Hearing*, filed at Docket # _____ (the "Motion").

After service of a Notice and Opportunity to Object Pursuant to L.B.R. 9014-1, there being no objection to the relief requested in the Motion, no further notice or hearing on Debtors' requested relief being necessary or required; and the Court being fully advised in the premises;

## The Court finds that:

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is a "core" proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper pursuant to 28 U.S.C. §§1408 and 1409. The statutory bases for the requested relief are §§ 105(a), 363 and 1129 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* and FED. R. BANKR. P. 2002 and 6004. This is a "final" order within the meaning of 28 U.S.C. § 158(a). To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.

A.     Capitalized terms not otherwise defined herein shall have those meanings ascribed to them in the Motion.

B.     On April 15, 2015 [at Docket #48] this Court entered its *Interim Order (A) Authorizing Debtors to Obtain Interim Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. §362; (C) Authorizing Debtors to Enter into Agreements with the Huntington National Bank; and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* (the "<u>Financing Order</u>").

C.     The proposed procedures for the sale of the Purchased Assets are in accordance with the Financing Order.

D.     Pursuit of the proposed sale of the Purchased Assets as set forth in the Motion, is in the best interests of Debtors, their creditors and their estates. The Purchased Assets include all tangible and intangible assets and personal property owned by Debtors and used to operate and conduct the Debtors' business operations as a whole or, alternatively, may consist of the assets used to operate and conduct Debtors' business operations from the Romulus Facility, or the Wyoming Facility individually. Excluded Assets include all executory contracts and unexpired leases that are not assumed and assigned to the Purchaser under section 365 of the Code; certain claims and causes of action against third parties, including all causes of action arising under chapter 5 of the Code; bank accounts, cash and cash equivalents; tax refunds; and life insurance policies, as well as the proceeds of all of the foregoing Excluded Assets.

F.     Adequate and proper notice for request of the relief granted herein was given and no further notice is necessary.

G.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052, made applicable to this proceeding pursuant to FED. R. BANKR. P. 9014.

*NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED THAT:*

1.     The Motion is GRANTED to the extent of the relief contained herein, and all objections in connection with the relief contained herein are overruled.

## Bidding Procedures

2.     The Auction is scheduled for August 11, 2015 at 9:00 a.m. at the offices of McDonald Hopkins PLC,  39533 Woodward Ave., Suite 318,  Bloomfield Hills, Michigan, 483047 and the Sale Hearing is scheduled for August _____, 2015 at _____ a.m./p.m., or as soon thereafter as counsel may be heard, before this Court.  This Order is without prejudice to Debtors' rights to seek confirmation of a Plan of Reorganization.

3.      Within three (3) business day of the entry of this Order Debtors will begin contacting a broad range of potential purchasers of Debtors' assets on a going concern basis, including both strategic and financial buyers within and outside of the steel industry, as well as other parties expressing an interest in purchasing the Purchased Assets.

4.     The form of Proposed Purchase Agreement attached to the Motion as Exhibit A is approved for purposes of the Bidding Procedures only.

5.     In order to qualify to be the Stalking Horse, an offeror must be Qualified Bidder, and submit a purchase agreement substantially in the form of the Proposed Purchase Agreement, contain the following pertinent provisions (the "Stalking Horse Purchase Agreement"), and be acceptable to Debtors, after consultation with the Official Committee of Unsecured Creditors ("UCC"), and Lender:

A.  A cash purchase price for the Purchased Assets, including a cash payment for substantially all of Debtors' inventory, payable in full at closing, and the assumption of certain contracts and leases and the assumption of certain liabilities.

B.  The Stalking Horse Purchase Agreement must be accompanied by an earnest money deposit equal to ten percent (10%) of the cash portion of the purchase price to be held by Debtors' counsel or an escrow agent acceptable to the Debtors.  The deposit will be applied against the purchase price if the Stalking Horse is the successful purchaser of the Purchased Assets.  If the sale is not consummated on account of the Stalking Horse's failure to perform any of its obligations under the Stalking Horse Purchase Agreement, Debtors will retain the earnest money deposit.  If the Stalking Horse is not in breach of the Stalking Horse Purchase Agreement, it will be entitled to return of the deposit if (i) the Purchased Assets are sold to another purchaser and the sale closes (ii) the sale is not consummated on account of Debtors' failure to perform under the Stalking Horse Purchase Agreement, or (iii) the sale is not consummated because certain contingencies to closing in the Stalking Horse Purchase Agreement were not timely satisfied by Debtors or deemed waived.

C.  The Purchased Assets include all tangible and intangible assets and personal property owned by Debtors and used to operate and conduct the Debtors' business operations as a whole or, alternatively, may consist of

the assets used to operate and conduct Debtors' business operations from the Romulus Facility or the Wyoming Facility individually, as well as assets located at the Debtors' leased offices in Novi, Michigan. Excluded Assets will include certain executory contracts and unexpired leases that are not assumed and assigned to the Purchaser under section 365 of the Code; certain claims and causes of action against third parties, including all causes of action arising under chapter 5 of the Code; bank accounts, cash, cash equivalents; tax refunds; and life insurance policies, as well as the proceeds of all of the foregoing Excluded Assets.

D.      Closing will occur and conclude on or before August 28, 2015.

E.      The Stalking Horse will not assume any employee benefit programs, except those mandated by Debtors' collective bargaining agreements.

F.      Subject to Bankruptcy Court approval, Debtors may be obligated to pay a "break-up fee" of up to $500,000.00 to the Stalking Horse to compensate it for its documented reasonable out-of-pocket expenses in conjunction conducting due diligence and pursuing the purchase of Debtors' assets at the Auction (as defined below) with the proposed sale (the "Break-up Fee").

G.      The Stalking Horse must agree to be a Stand-By Bidder as set forth in paragraph 32 of the Motion, unless this provision is waived by Debtors, after consultation with the UCC and Lender, in which case the requirements of paragraph 32 of the Motion shall be waived for all Qualified Bidders.

H. The Stalking Horse's obligations under the Stalking Horse Purchase Agreement may be subject to certain contingencies, including (i) environmental due diligence, and (ii) financial due diligence, provided; however, these contingencies will be deemed waived if not exercised by written notice to Debtors ten (10) or more days prior to the Auction (as defined below).

6. Bidders desiring to bid (the "Potential Bidders") on the Purchased Assets, whether as a Stalking Horse, or at the Auction, must execute a confidentiality agreement reasonably acceptable to Debtors before being provided access to any information regarding Debtors.

7. A "Qualified Bidder" means a Potential Bidder that demonstrates to the reasonable satisfaction of Debtors, that it possesses the financial capability, business plan and management structure to close the acquisition of the Purchased Assets and continue operation of Debtors' assets as a going-concern, and who would agree to assume and pay when due all of the Debtors' obligations pursuant to the respective trade agreements between Debtors and their "critical vendors" without modification of any essential terms.

8. Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined below). Debtors are not responsible for, and will bear no liability with respect to, the accuracy of any information obtained by any Qualified Bidder in connection with the sale of the Purchased Assets.

9.     Debtors will consider only Qualified Bids from Qualified Bidders.  To be a "Qualified Bid", the bid must, unless waived by Debtors, after consultation with the Lender and the UCC,  among other things:

(i)     be submitted to Debtor's counsel, Stephen M. Gross, Esquire, McDonald Hopkins PLC, 39533 Woodward Ave., Suite 318, Bloomfield Hills  MI 48324; Laura A. Marcero, CRO of the Debtors, Huron Consulting Services, LLC 900 Wilshire Drive, Suite 270, Troy, Michigan 48084, and Jamie Lisac, Huron Consulting Services, LLC 500 W. Van Buren Street, Chicago, Illinois 60607 by no later than 5:00 p.m. (prevailing Eastern time) August 3, 2015 (the "Bid Deadline");

(ii)    be accompanied by   (A) a duly executed asset purchase agreement that is marked to reflect variations from either the Stalking Horse Purchase Agreement, if any, or the Proposed Purchase Agreement attached as Exhibit A to the Motion; (B) a letter stating that the bidder's offer is irrevocable until the conclusion of the Sale Hearing and acknowledging and agreeing to be bound by the Stand-by Provision as set forth in paragraph 32 of the Motion and paragraph 21 below; (C) written evidence of such bidder's commitment for financing for the full amount of the purchase price (without contingencies) or other evidence of such bidder's ability to consummate the transaction satisfactory to the Debtors, after consultation with Lender and the UCC; and (D) an earnest money cash deposit at least equal to ten percent (10%) of the cash portion of the purchase price, which deposit shall not be subject to any liens or encumbrances created in favor of any person or entity, and which shall be applied to the purchase price if the Qualified Bidder becomes a Successful Bidder (as defined below) and forfeited to Debtors if such Qualified Bidder defaults under the Qualified Bidder's proposed Purchase Agreement or Stalking Horse Purchase Agreement.  The deposit of the Second Highest Bidder (as defined below) shall otherwise be returned on or before the date that is five (5) business days after the closing of a sale to the Successful Bidder (as defined below), and all other deposits shall be returned to all other Qualified Bidders in accordance with paragraph 22 below;

(iii)    be, in the Debtors' sole discretion, after consultation with the Lender and the UCC, on terms no less favorable (and no more burdensome or conditional) to Debtors than the terms of Proposed Purchase Agreement or the Stalking Horse Purchase Agreement, if any with a purchase price satisfying subparagraph (vii) below;

(iv)    not include any contingencies relating to due diligence, financing, environmental or labor issues, customer or supplier contracts, or any other material conditions precedent to the bidder's obligation to close, that exist as of the Auction, and that are not contained in the Proposed Purchase Agreement or the Stalking Horse Purchase Agreement, if any;

(v)    designate the assets of Debtors subject to the Bid and the executory contracts and unexpired leases that the bidder will request Debtors to assume and assign to the Qualified Bidder accompanied by evidence of adequate assurance of future performance supplied by the Qualified Bidder as to any executory contracts which the Qualified Bidder designates for assumption and assignment.

(vi)    be made by one or more bidders, each of which can demonstrate to the satisfaction of Debtors, after consultation with Lender and the UCC that, individually or in the aggregate, it is (or they are) financially able to consummate the transaction contemplated by such bid(s) on the terms contemplated therein; and

(vii)    a bid for all of the Purchased Assets at all Facilities, or a combination of bids for the assets at individual facilities must aggregate to a purchase price at least equal to the purchase price reflected in the Stalking Horse Purchase Agreement, if any, plus $600,000.00.

10.    If one or more Qualified Bids (other than that of the Stalking Horse, if any) have been received by the Bid Deadline, Debtor shall conduct an auction (the "Auction") with respect to the Purchased Assets.  The Auction shall commence at 9:00 a.m. on August 11, 2015 at the offices of McDonald Hopkins PLC, counsel to Debtors.

11.     If there is a Stalking Horse, and in the event that Debtors do not receive another Qualified Bid by the Bid Deadline, Debtors shall proceed with the sale to the Stalking Horse under the terms and conditions of the Stalking Horse Purchase Agreement, subject to the approval of the Court at the Sale Hearing, and shall not conduct the Auction.  In the event that there is no Stalking Horse, and none of the Qualified Bids are acceptable to the Debtors, after consultation with Lender, and the UCC, Debtors may terminate the Auction prior to bidding.

12.     Only the Stalking Horse, if any, and those Qualified Bidders who submitted Qualified Bids will be allowed to participate in the Auction.

13.     Debtors, after consulting with the UCC and Lender, prior to the Auction, will determine in its business judgment whether a potential bidder is a Qualified Bidder (other than the Stalking Horse which shall be deemed a Qualified Bidder for all purposes) with a Qualified Bid, and shall notify each Qualified Bidder with a Qualified Bid of the time and place of the Auction, as well as the existence and terms of a Stalking Horse Purchase Agreement, if any.

14.     Each Qualified Bidder must appear in person at the Auction or through a duly authorized representative, unless alternative arrangements acceptable to the Debtors are made in advance with Debtors.

15.     Each Qualified Bidder, as a consequence of submitting a bid, shall be deemed to acknowledge (i) that it understands and is bound by the Bidding Procedures and the other terms of this Order, including the Stand-By Provision; (ii) that it had an opportunity to inspect and examine the Purchased Assets and the existing contracts and to review all pertinent documents and information with respect to such Purchased Assets before making its offer, and that each Qualified Bidder relied solely on that review and upon its own investigation and inspection in making its bid; (iii) that the Qualified Bidder is not relying upon any written or oral statements,

representations, promises, warranties or guarantees of any kind whether express or implied, by operation of law or otherwise, made by any person or party, including Debtors, Lender, the UCC, their respective agents or representatives regarding Debtors, their business or its assets, these Bidding Procedures or the completeness of any information provided in connection therewith; and (iv) that it submits its own bid of its own volition and with full knowledge of the potential consequences.

16.     The Debtors shall, in advance of the Auction provide the Lender, and the UCC with a detailed estimate of the financial impact on their estates of the executory contracts and leases to be assumed or rejected pursuant to the terms of each Qualified Bid, including the Stalking Horse Bid.

17.     Debtors may conduct the Auction in the manner they determine will result in the highest, best or otherwise financially superior offer.  Bidding at the Auction will commence with the highest Qualified Bid determined by Debtors, after consultation with the Lender and the UCC, which shall serve as the lead bid (the "Baseline Bid"), and will continue in increments of $100,000.00 or a multiple thereof (the "Incremental Bid Amount"), provided, however for bids on the assets of Debtor's individual facilities, the Incremental Bid Amount shall be in increments of $50,000 for each facility; further provided, that if there is a Stalking Horse, then the first overbid or the combined bids on Debtor's individual facilities on a facility by facility basis must be at least $600,000.00 greater than the bid contained in the Stalking Horse Purchase Agreement. Qualified Bidders that have submitted a Qualified Bid, including the Stalking Horse, may submit bids at the Auction, and may increase or modify bids in accordance with the Incremental Bid Amount to make their bid more favorable to Debtors.  Bidding will continue until such time as the Qualified Bidder with the highest and best offer for the purchase of the Purchased Assets (the

"Successful Bid") is determined by Debtors, in consultation with Lender, and the UCC (the "Successful Bidder"). However, if there is no Stalking Horse, or the Stalking Horse has not waived all contingencies in the Stalking Horse Purchase Agreement ten (10) business days prior to the Auction, Debtors reserve the right to terminate the Auction at the conclusion of bidding if the offers from the Qualified Bidders are not acceptable to Debtors, after consultation with the UCC, and Lender. Debtors shall announce at the Auction the Successful Bidder and the Qualified Bidder that submitted the next highest or otherwise best Qualified Bid (the "Second Highest Bidder").

18. At the conclusion of the Auction and prior to the Sale Hearing, the Successful Bidder and Debtors may enter into a purchase agreement reflecting the Successful Bid (the "Successful Bidder Purchase Agreement"), which shall be subject to Court approval at the Sale Hearing, and the Second Highest Bidder shall revise its Asset Purchase Agreement to reflect its most recent bid.

19. For the purpose of determining the Successful Bidder, the full amount of the Break–Up Fee (defined below) potentially payable to the Stalking Horse, if any, shall be added to any overbid submitted by the Stalking Horse.

20. Debtor either shall seek approval of the Stalking Horse Purchase Agreement, if any, if there are no other Qualified Bids, or shall seek approval of the Successful Bidder Purchase Agreement from the Court at the Sale Hearing.

21. Subject to Court approval in the Sale Order following the Sale Hearing, if such Successful Bidder fails to consummate the approved Sale, the Second Highest Bidder shall be deemed to be the Successful Bidder and Debtor shall be authorized to consummate the sale with the Second Highest Bidder without further order of the Bankruptcy Court, and such Second

Highest Bidder shall be required to consummate the Sale on the terms of the Second Highest Bidders' most recent bid (the "Stand-by Provision") as soon as practical. The Stand-by Provision can be waived by Debtor after consultation with the UCC, and Lender.

22. If a Qualified Bidder is not the Successful Bidder or the Second Highest Bidder as determined by the court at the Sale Hearing, the Qualified Bidder may elect to keep its offer open through ten (10) days after the Closing Date; otherwise the Deposit will be returned to the bidder within five (5) business days after the Auction. Subject to Court approval in the Sale Order, in the event the sale to the Successful Bidder is not consummated within the time established in the Successful Bidder Purchase Agreement and, in the event a sale to the Second Highest Bidder is not timely consummated, Debtor would have the right to accept the next Qualified Bid, and consummate the sale with the maker of the next Qualified Bid after consultation with Lender, and the UCC, and without further order of this Court. In the event that there is a Stalking Horse and it has waived all contingencies to closing ten (10) business days prior to the Auction; the Court approves the sale of a substantially all of the Purchased Assets to a person or persons other than the Stalking Horse and such sale is ultimately consummated (to a purchaser which is not an affiliate of the Stalking Horse); the purchaser having paid the purchase price required under the Successful Bidder Agreement; and the Stalking Horse is not in breach of the Stalking Horse Purchase Agreement; then Debtor shall pay to Stalking Horse from the sale proceeds only, in consideration of the reasonable expenses incurred by the Stalking Horse, in pursuing the transactions contemplated by the Stalking Horse Purchase Agreement, the Break-Up Fee in a sum equal to its documented reasonable out-of-pocket costs, including professional fees, incurred in due diligence, negotiation and other items, as determined by Debtor, Lender, and the Committee up to a maximum of $500,000.00 in immediately available funds. The Court shall

determine any disputes with respect to the reasonableness and payment of the Break-Up Fee. Said payment shall be made within five (5) business days after receipt of the sale proceeds and either consent by the Debtors, Lender, and the UCC or final order of the Court.

**Procedures for Assumption and Assignment of**
**Executory Contracts and Objection Deadline**

23.     Debtors will provide all Qualified Bidders with a list and a copy of all contracts and leases related to the Purchased Assets, along with proposed cure amounts owing on each contract and lease (the "Cure Schedule").   All Qualified Bidders must provide with their Qualified Bids to Debtors a list of the contracts and leases that it would like Debtors to assume and assign to the Qualified Bidder (the "Assumed Contracts and Assumed Leases") (together, the "Contract Lists").

24.     The following procedures are hereby approved for the assumption and assignment of Assumed Contracts and Assumed Leases ("Assumption and Assignment Procedures"):

    A.     Three (3) business days after the entry of the this Order, Debtors shall serve on the counterparties to the contracts on the Contract Lists a notice (the "Assumption and Assignment Notice") in the form attached as Exhibit C to the Motion, which is hereby approved, containing the following information:

        (i)     Debtors' intent to assume and assign the Assumed Contracts and Assumed Leases to the Stalking Horse or a Successful Bidder;

        (ii)     The Cure Schedule (as supplemented pursuant to the procedure described below);

(iii)    The cure amount Debtors propose to pay to each counterparty in compliance with the key requirements of Section 365 of the Bankruptcy Code (the "<u>Pre-Petition Cure Amount</u>");

(iv)    That the counterparties to the Assumed Contracts and Assumed Leases shall file and serve any objections to the assumption and assignment of the Assumed Contracts and Assumed Leases or the Pre-Petition Cure Amount on or before the Assumption/Assignment Objection Deadline, as described below; and

(v)    That for each Assumed Contract and Assumed Lease for which an objection is timely received, a hearing will be held at the Sale Hearing, or such other date as the Court may designate, upon twenty-four (24) hours' telephonic, electronic or facsimile notice to the objecting party; provided, however, that if the Assumed Contracts and Assumed Leases that are the subject of objections are assumed and assigned prior to the time of the hearing, the cure amount asserted by the objecting party or such other amount as may be agreed to by the parties or fixed by the Court, will be held in a segregated account by the Successful Bidder or Debtors pending further order of the Court or mutual agreement of the parties.

B.    The counterparties to the Assumed Contracts and Assumed Leases shall file any objections to the assumption and assignment of the Assumed Contracts and Assumed Leases or the Pre-Petition Cure Amount at least three business (3) days prior to the Auction (the "<u>Assumption/Assignment Objection Deadline</u>") and shall serve such objection so that the objection is actually received by: (i) counsel for Debtors; (ii) counsel to the Stalking Horse, if any; (iii) the Office of the United States Trustee; (iv) counsel for the UCC, if any; (v) counsel for Lender; and (vi) counsel for Zachary Taylor by the Assumption/Assignment Objection Deadline.  Any and all objections must state with detail: the grounds for the objection; if the objecting party proposes an alternative cure amount and the amount

thereof; and the basis for the calculation of the proposed alternative amount;

C.    Any party who fails to object by the Assumption/Assignment Objection Deadline shall be forever barred from objecting to the assumption and assignment of its respective executory contract or unexpired lease;

D.    Debtors will make cure payments within thirty (30) days after the date of the closing of the sale of the Purchased Assets and any letters of credit associated with any assumed contract or assumed lease will be replaced by a new letter of credit provided by the Successful Bidder; and

E.    Debtors may file one or more supplemental list or lists of Assumed Contracts and Assumed Leases (the "Supplemental List"), if necessary. Debtors' shall serve to the counterparties to the Assumed Contracts and Assumed Leases on the Supplemental List a supplemental Assumption and Assignment Notice substantially in the form and containing the information described above. The counterparties with contracts or leases on the Supplemental List shall have five (5) calendar days from service of the Supplemental List to file an objection in accordance with the requirements outlined above and serve upon the parties described above.

25.    The following procedure for rejection of contracts are hereby approved:

A.    Promptly after both the receipt of the Contract Lists from the Successful Bidder and Closing, Debtors will notify each counter-party to a contract that will be rejected of such rejection (the "Rejection Notice"). Notice

shall be effective upon mailing. Objections, if any, to the rejection (an "Objection") must be filed and served on counsel for Debtors, Lender, and the UCC within fourteen (14) days after the Rejection Notice was mailed (the "Rejected Contract Deadline");

B.     Upon receipt of a timely Objection, Debtors may request that the Bankruptcy Court set a hearing on the Objection. If the Bankruptcy Court authorizes the rejection, the rejection shall be deemed to have been effective upon the date the sale of the Purchased Assets is closed, unless otherwise determined by the Bankruptcy Court;

C.     Any party who fails to object by the Rejected Contract Deadline shall be barred from objecting to the rejection of the contract. In such instances, rejections of executory contracts or unexpired leases will be effective upon notice to the party that its contract or unexpired leases has been rejected.

**Notice of Auction and Sale Hearing**

26.     Within three (3) business days of the entry of this Order, Debtors shall give notice of the Bidding Procedures, and the Auction and Sale Hearing, by mailing a copy of the Auction and Sale Notice which is attached to the Motion as Exhibit B and is hereby approved, by first class mail, to the following (collectively, the "Notice Parties"):

(i)     The Office of the United States Trustee;

(ii)    Each member of the UCC or its counsel, if any;

(iii)   Counsel for Lender;

(iv)    All parties to contracts and leases with Debtor;

(v)     All applicable federal and state taxing authorities;

(vi)     All parties who have requested notice in the case; and

(vii)    All interested parties who executed confidentiality agreements in anticipation of a possible bid on the Purchased Assets.

(viii)   Counsel to Zachary Taylor

# Exhibit B

Form Purchase Agreement

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made as of _____ 2015, by and among _____ ("Buyer"); Lee Steel Corporation, a Michigan corporation ("Lee Steel"), Taylor Industrial Properties, LLC ("Taylor"), and 4L Ventures, LLC ("4L" and collectively with Taylor, the "Real Estate Sellers") (Lee Steel and the "Real Estate Sellers" are sometimes collectively referred to herein as the "Sellers").

WITNESSETH:

WHEREAS, Lee Steel is engaged in the business of providing a full range of flat rolled steel products, including hot and cold rolled steel and exposed coated products, as well as steel pickling services, from a facility in Romulus, Michigan leased from 4L (the "Romulus Facility") and a facility in Wyoming, Michigan leased from Taylor (the "Wyoming Facility" and together with the Romulus Facility, "Facilities") and operates its offices from a leased facility in Novi, Michigan.

WHEREAS, Lee Steel has filed a voluntary petition for relief in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"), commencing a case under chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 *et seq*. (the "Bankruptcy Code"), case number 15-45784 (the "Case");

WHEREAS, Sellers desire to sell, and Buyer desires to purchase, certain of the assets and rights of Sellers as set forth in this Agreement and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, in connection with the Case, Sellers have filed a motion with the Bankruptcy Court seeking the approval of the sale of Sellers' assets free and clear of all interests, liens, claims and encumbrances and the assumption and assignment of certain contracts and leases pursuant to the Bankruptcy Code; and

WHEREAS, Sellers and Buyer contemplate a closing of the transactions described above immediately following the entry of the Sale Order (as defined herein), which Sale Order shall not be subject to any stay, temporary restraining order or injunction as of the Closing Date (as defined herein).

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

# ARTICLE I

## PURCHASE AND SALE OF ASSETS

1.1     Acquired Assets.  Upon the terms and subject to the conditions set forth in this Agreement, Sellers shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase and acquire from Sellers, all Sellers' right, title and interest in, to and under all of the Acquired Assets (as hereinafter defined), free and clear of all liens, pledges, mortgages, security interests, Claims (as defined in Section 101(5) of the Bankruptcy Code), interests and encumbrances of any nature whatsoever (other than rights of owners of equipment leased pursuant to Assumed Contracts and Leases with respect to obligations accruing from and after the Closing Date (as hereinafter defined)), (collectively, "Liens"), and those expressly assumed by Buyer pursuant to this Agreement, at the Closing on the Closing Date (as such terms are defined in Section 5).  The term "Acquired Assets" means all of Sellers' rights, title and interests in, to and for the business and operations of Sellers as conducted by Sellers on the date of this Agreement (the "Business"), as well as the goodwill, operations as a going concern, assets, properties, interests and rights owned, leased, licensed or used by Sellers of every kind and wherever situated as of the Closing, excluding only the Excluded Assets (as defined in Section 1.2), but otherwise including, without limitation, the following:

(a)     all real property ownership interests, including title to the Facilities, together with all tenements, hereditaments, easements, rights of way, privileges and appurtenances to those interests and improvements on or to those interests (collectively, the "Real Estate");

(b)     all *(i)* tangible personal property, including, without limitation, all equipment, and machinery in all of its forms, wherever located, now or hereafter existing, including, without limitation, all accessions, additions, appurtenances and improvements to, parts, products and replacements of and documents and substitutes for the foregoing (collectively, the "Equipment"); and *(ii)* to the extent not covered by the definition of Equipment, all fixtures appurtenant to Leaseholds in all of their forms, wherever located, now or hereafter existing, including, without limitation, all accessions, additions, appurtenances and improvements to, parts, products and replacements of and documents and substitutes for the foregoing (collectively, the "Fixtures"); and *(iii)* finished goods, work in process, raw materials, goods in transit, goods at customer sites and other inventory, wherever located, now or hereafter existing (collectively, the "Inventory");

(c)     all right, title and interest of Sellers now or hereafter existing, in, to and under all of its respective executory contracts,  including  real estate leases, if any, listed on Schedule 1.1(c) attached hereto (the "Assumed Contracts and Leases"), which Schedule 1.1(c) may be amended and updated at the sole discretion of Buyer on or prior to noon E.D.T. on August 3, 2015 as each of the Assumed Contracts and Leases may have been amended or otherwise modified prior to the date of this Agreement, including,

without limitation, rights of Sellers to receive moneys due and to become due under or pursuant thereto;

(d)    all copyrights, uncopyrighted works, trademarks, trademark rights, trademark registrations, patents, including, without limitation, all reissues, divisions, continuations and extensions thereof, patent rights, unpatented inventions, service marks, logos, trade names, trade name rights, corporate names, computer software licenses, data, software, permits, trade secrets, know-how, protected models, designs, methods, concepts, plans, specifications, schematics, formulas, inventions, technology, processes and intellectual property rights and other proprietary rights, whether or not subject to statutory registration, together with applications and licenses for, and the goodwill of the Business relating to, any of the foregoing (collectively, the "Intellectual Property"), and Sellers' name and all trade names (and associated marks, logos and styles) used at any time by Sellers;

(e)    all other rights, assets and goodwill of Sellers, including, without limitation, all *(i)* permits, licenses, approvals, consents, permissions, notices, franchises, confirmations, endorsements, waivers, certifications, registrations, qualifications, clearances, variances or other authorization issued, granted, given or otherwise made available by or under the authority of any governmental authority or pursuant to any federal, state, local or foreign law or regulation (collectively, the "Permits"), *(ii)* the right to carry on the Business, *(iii)* books of account, general, financial, accounting and personnel records, files, invoices, product pricing lists, product purchase orders, tooling purchase orders, customer quotes, and customer's and supplier's lists, and *(iv)* causes of action, claims and demands of whatever nature (other than causes of action or claims pursuant to Section 547, 548 or 550 of the Bankruptcy Code as well as any other state law fraudulent transfer or similar avoidance transactions, claims arising from or in connection with the business and operation of Sellers and any claims against Sellers' officers, directors, members, employee, agents, representatives or professionals);

(f)    the right to receive all goods or services to be provided to Seller in connection with the Business at the facilities, including all deposits related thereto to open orders for goods and services with suppliers that remain unfulfilled as of the Closing Date, (the "Open Supplier Orders");

(g)    all accounts receivable of Sellers specifically related to the Business, including the products produced at the Facilities on or before the Closing Date and receivables from Employees,

(h)    all employee-related records, including occupational health and safety records, assessments and audits; industrial hygiene files; works compensation records; workers compensation claims files; and personnel employment and medical records (in each case, to the extent the transfer thereof is not prohibited by Law).

(i) all telephone numbers of Sellers, including 800 or other toll-free numbers, and web-sites related to the Business, which shall be assigned to Buyer as of the Closing

Date, Sellers shall take any and all reasonable actions that Purchaser deems appropriate in connection with said telephone numbers, and Sellers shall not use said phone numbers or web-sites after the Closing Date;

1.2     Excluded Assets.  Sellers will retain (and the Acquired Assets will not include) the following (collectively, the "Excluded Assets"):

(a)     all of Sellers' rights under this Agreement and all instruments and agreements to be executed and delivered by Sellers or Buyer pursuant to this Agreement (the "Sale Documents");

(b)     the Purchase Price payable to Sellers pursuant to Section 2.1;
the certificate of incorporation, minute books, stock books and other corporate records of Sellers having exclusively to do with the corporate organization and capitalization of Sellers;

(c)     all cash, security deposits, refunds, deposits and prepaid expenses of the Sellers and all vendor rebate accounts and prospective rebates, whether soft dollar or hard dollar;

(d)     all securities in which any of the Sellers have an interest;

(e)     all causes of action, claims and demands under chapter 5 of the Bankruptcy Code, claims against Sellers' officers, directors, members, employees, agents, representative or professional, and those listed and set forth on Schedule 2.1 attached hereto.

1.3     Conveyance of Acquired Assets.  The sale, transfer, conveyance, assignment and delivery of the Acquired Assets provided for in this Article 1 shall be made by the documentation described on Schedule 1.3 attached hereto which shall include all good and sufficient instruments of conveyance and transfer as shall be necessary to vest in Buyer as of the Closing Date title to the Acquired Assets being sold, transferred, conveyed, assigned and delivered hereunder.

1.4     Assumed Liabilities and Excluded Liabilities.  Buyer will not assume or become liable for the payment, performance or discharge of any liabilities or obligations of Sellers, except that upon the terms and subject to the conditions of this Agreement. At the Closing, Buyer will execute and deliver to Sellers an Assignment and Assumption Agreement, pursuant to which Buyer will, effective as of the Closing, assume, satisfy and perform only the Assumed Liabilities (as defined in Section 3.1).  Notwithstanding any provision of this Agreement or any instrument relating hereto to the contrary, Buyer will not accept, acquire, assume or become liable to pay, perform or discharge, and the Assumed Liabilities will not include, the Excluded Liabilities (as defined in Section 3.2).  Buyer will, however administer C.O.B.R.A. Benefits for Sellers' former employees entitled to C.O.B.R.A. Benefits.

## ARTICLE 2

## PURCHASE PRICE

2.1 <u>Purchase Price.</u>  Subject to the adjustments provided in Section 2.4, the purchase price (the "<u>Purchase Price</u>") for the Acquired Assets shall be [$_____], plus assumption of the Assumed Contracts and Leases and assumption of the Assumed Liabilities as provided in Section 3.  The Purchase Price shall be allocated among the Acquired Assets in accordance with Schedule 2.1 attached hereto (the "<u>Memorandum of Allocation</u>")**.**

2.2 <u>Earnest Money Deposit.</u>  Immediately upon execution of this Agreement, Buyer shall pay into escrow with  Sellers' counsel or other independent party mutually satisfactory to Buyer and Sellers (the "<u>Escrow Agent</u>") an earnest money deposit in the amount equal to ten percent (10%) of the Purchase Price (together with interest earned thereon, the "<u>Earnest Money Deposit</u>"), which deposit will be held and disbursed by the Escrow Agent pursuant to the terms of a Deposit and Inventory Escrow Agreement in a form reasonably satisfactory to Buyer and Sellers (the "<u>Deposit and Inventory Escrow Agreement</u>").  The parties agree that the Earnest Money Deposit shall be held in escrow and shall not become, or be considered, part of the bankruptcy estate of Sellers until it is released pursuant to this Agreement.  Upon consummation of the Closing, the Earnest Money Deposit shall be paid to Lender to be credited as partial payment of the Purchase Price, the conditions of Closing set forth in Article 10 are satisfied, *(ii)* Sellers shall have duly performed and complied with all of its obligations under the Sale Documents, and *(iii)* the transactions contemplated by the Sale Documents would otherwise have been consummated on or prior August 28, 2015 but for the breach by Buyer of any of their material obligations under this Agreement, but the Closing is not consummated as a result of Buyer's failure to perform its obligations hereunder, then the Earnest Money Deposit shall be forfeited and immediately paid to Lender for the account of Sellers or Sellers' estates.  If *(i)* the Bankruptcy Court does not enter the Sale Order by August 27, 2015, *(ii)* Sellers sell or agree to sell any of the Acquired Assets to any person or entity other than Buyer pursuant to the provisions of Article IV hereof or such other provisions as may be determined by the Bankruptcy Court, or *(iii)* the Closing is not consummated as a result of Sellers' failure to perform any of its material obligations hereunder or due to the failure to satisfy any of the conditions precedent set forth in Article 10 hereof, then the Earnest Money Deposit shall be immediately returned to Buyer and, if clause *(i)* is applicable, this Agreement shall terminate.

2.3 <u>Payment of Cash Purchase Price.</u>  The Purchase Price shall be payable as follows:

2.3.1 On the Closing Date, the Earnest Money Deposit shall be paid by the Escrow Agent to Lender and credited as partial payment of the Purchase Price.

2.3.2   On the Closing Date, Buyer shall pay an amount equal to the difference between the Purchase Price and the Earnest Money Deposit to Lender for the account of Sellers by wire transfer of immediately available funds.

## ARTICLE 3

### ASSUMPTION OF CERTAIN LIABILITIES

3.1   <u>Assumption of Certain Liabilities.</u>   Effective as of the Closing, Buyer shall assume and hereby agrees to perform and discharge (a) all of Sellers' executory obligations under the Assumed Contracts and Leases to the extent that (i) they accrued before the Petition Date, and/or (ii) they arise from activities occurring or required to be performed on or after the Closing Date; (b) the Seller's post-petition normal course accounts payable for materials or services other than professional fees; and (c) all liabilities set forth on Schedule 3.1. (collectively the "<u>Assumed Liabilities</u>").

3.2   <u>No Assumption of Other Liabilities.</u>   Except for the Assumed Liabilities expressly identified in Section 3.1, Buyer does not assume and shall not in any manner become responsible or liable for, and Sellers shall retain, all other debts, obligations or liabilities of Sellers of any nature whatsoever, whether known or unknown, fixed, contingent or otherwise, including, without limitation, any debts, obligations, or other liabilities directly or indirectly arising out of, or resulting from Sellers' ownership or use of the Acquired Assets prior to the Closing Date (collectively, the "<u>Excluded Liabilities</u>"), including the following:

(a)      any liability or obligation owed to any shareholders or members of any Seller,   as such or any other intercompany debt, liabilities or other obligations, including, without limitation, any accrued or declared dividends, distributions or other obligations;

(b)      any liability or obligation with respect to any debt;

(c)      any liability or obligation which arises out of, relates to or is otherwise attributable to any of the Excluded Assets, or arises out of or results from any income, sales, use or other tax or any expense arising from the distribution to, or ownership by Sellers of any of the Excluded Assets or associated with the realization of the benefits of any of the Excluded Assets;

(d)      any liability or obligation, other than the Assumed Liabilities, *(i)* which arises out of, relates to or results from any income, sales, use or other tax or any expense arising from or associated with the use or ownership of the Acquired Assets, or *(ii)* with respect to taxes related to the operation of the Business or Sellers' ownership of its assets;

(e)        any liability or obligation incurred on or after the Closing;

(f)        except for all post closing obligations under the Assumed Contracts and Leases as provided in Section 1.1(c) and 3.1, any liability or obligation *(i)* for breach or nonperformance of any contract, agreement, license, lease, instrument, document, note, bond, mortgage, indenture, guarantee, purchase order, letter of credit, undertaking, obligation, commitment, or other legally binding commitment or obligation, whether or not written (each, a "Contract") on or prior to the Closing, including, without limitation, the Assumed Contracts and Leases, *(ii)* under any Contract with any shareholder or member of any Seller or relating to any foreign exchange or similar transactions, or *(iii)* under any other Contract;

(g)        any liability or obligation under or in connection with any Benefit Plan (as defined in Section 6.16(c)(i));

(h)        any liability or obligation arising out of, relating to or otherwise attributable to a collective bargaining agreement or other understanding or agreement with any union or employee group other than Buyer's obligation to administer C.O.B.R.A. benefits as provided in Article 1.4.

(i)        any liability or obligation arising out of, relating to or otherwise attributable to any, action, judgment, verdict, ruling, decree or settlement that is pending, or completed on or prior to the Closing, including, without limitation, *(i)* litigation involving Sellers' trade creditors, and *(ii)* discrimination, sexual harassment claims and any other claims arising out of or otherwise related to the employment or termination of employment by Sellers;

(j)        any other liability or obligation not included in the Assumed Liabilities.

3.3    <u>Sellers to Perform Excluded Liabilities.</u>  Sellers will remain responsible for all Excluded Liabilities, subject to Sellers' rights under the Bankruptcy Code and other available defenses.

## ARTICLE 4

## ADDITIONAL COVENANTS OF PARTIES

4.1    <u>Bankruptcy Actions</u>.

4.1.1    Buyer and Sellers acknowledge that this Agreement is the result of negotiations for a transaction with Buyer who is prepared to pay the fair value of the Acquired

Assets. The parties also acknowledge that, under the Bankruptcy Code, Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest and best price possible of the Acquired Assets, including, but not limited to, giving notice of the transaction contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the business of Sellers to responsible bidders subject to appropriate confidentiality agreements, entertaining higher and better offers from responsible bidders, and if necessary, conducting an auction.

4.1.2    To facilitate the foregoing, Sellers filed with the Bankruptcy Court a motion for entry of an order (the "Bidding Procedures Order"), which has been entered with the terms set forth in Section 4.1.3 below. Sellers have or will file with the Bankruptcy Court a motion for entry of an order (the "Sale Order"), which shall provide as set forth in Section 4.1.4 below.

4.1.3    Sellers agree to implement the terms of the Bidding Procedures Order and consummate the sale transaction described therein and pursuant to this Agreement as follows:

(a)    the time, date and location of the hearing to approve the sale (the "Sale Hearing") shall be no later than three (3) business days following the Auction described below;

(b)    the time and date of the Auction, to be held at the offices of Sellers' counsel in Bloomfield Hills, Michigan, or such other location as Sellers may designate, for consideration of qualifying higher or better offers that may be presented to Sellers (the "Auction"), shall be no later than August 11, 2015;;

(c)    the Break-Up Fee (as defined in Article 12) shall be in the amount defined in Article 12 and paid to Buyer in accordance with the terms of the Bidding Procedures Order and this Agreement;

(d)    the Sellers shall not entertain or accept any bid from another party at the Auction unless such bid:

(i)    is submitted to Sellers on or prior to the Bid Deadline (as defined in the Bidding Procedures Order and to be set by Sellers, but in no case to occur later than 5:00 p.m. prevailing eastern time on August 4, 2015), with a copy received by Buyer promptly thereafter,

(ii)    is accompanied (A) by a cash deposit equal to ten percent (10%) of the Purchase Price, which deposit shall not be subject to any liens or encumbrances created in favor of any Person, and (B) by a duly executed acquisition agreement that is marked to reflect variations from this Agreement,

(iii)    contains no covenant or representation or warranty that is less favorable or more burdensome or conditional to Sellers than as may be set forth in

this Agreement in the reasonable opinion of Sellers, Lender, and the Sellers' Unsecured Creditors Committee,

(iv)    contains no contingency relating to due diligence or financing, or any condition precedent to the bidder's obligation to close that is not otherwise contained in this Agreement,

(v)    designates the executory Contracts and unexpired leases that the bidder may request Sellers to assume and assign to the bidder and any other assets of Sellers that are subject to the bid,

(vi)    is made by one or more bidders, each of which can demonstrate to the satisfaction of Sellers, and that, individually or in the aggregate, it is (or they are) financially able to consummate the transaction contemplated by such bid(s) on the terms contemplated therein, and

(vii)    is for an aggregate purchase price at least equal to the Purchase Price plus US $650,000.00 (which amount is amount of the Break-Up Fee plus a minimum overbid of US $100,000.00).

(a bid which meets the foregoing requirements (i)—(vii) is hereinafter referred to as a "Qualified Bid" and the person making a Qualified Bid as a "Qualified Bidder");

(e)    Sellers agree and acknowledge that the transactions contemplated by this Agreement constitute a Qualified Bid of Buyer and that Buyer shall be deemed to be a Qualified Bidder and need not take any further steps to comply with the Bidding Procedures to become a Qualified Bidder and may participate in the Auction;

(f)    Sellers agree that if (i) Sellers do not receive a Qualified Bid (other than this Agreement); (ii) Buyer is not in breach hereof; and (iii) all contingencies to Closing contained herein have been satisfied or waived, Sellers will report the same to the Bankruptcy Court and will proceed with the Sale Hearing as soon as practicable, but in no event later than August 28, 2015 to sell the Acquired Assets to Buyer as provided hereunder;

(g)    Sellers agree that if, and only if, Sellers receive a Qualified Bid in addition to Buyer's Qualified Bid, Buyer is not in breach hereof and all contingencies to closing have been satisfied or waived, the Auction will occur at or prior to August 11, 2015 and such Auction shall be conducted in such a manner as to maximize the return to Sellers' estates (consistent with the Bidding Procedures), and Sellers shall establish reasonable procedures consistent with the Bidding Procedures ("Auction Procedures") at the commencement of the Auction for the conduct of the Auction so as to accomplish such goal, provided that the Auction Procedures shall, in any event, provide that: (A) at the commencement of the Auction, Sellers will determine based on the nature of the Qualified Bids (the "Baseline Bid") the bid to serve as the lead bid in the Auction, which bid will at the commencement of the Auction be announced to all Qualified Bidders participating at

the Auction; (B) participating bidders (including Buyer to the extent Buyer so chooses) will be permitted to increase their bids and to agree to modifications to their bids (consistent with the provisions of this Section 4.1.3(g)) in order to make their bids more favorable to Sellers, provided that, subject to the following clause (C), each bid for all the acquired assets shall exceed the preceding bid by US $100,000.00 or a multiple thereof and bids for the assets at the Romulus Facility or the Wyoming Facility individually shall be in increments of U.S. $50,000 or a multiple thereof; (C) solely for purposes of determining the successful bid, any overbid submitted by Buyer shall be deemed to include the full amount of the Break-Up Fee potentially payable; and (D) Sellers shall submit the successful bid to the Bankruptcy Court for approval;

(h)     Sellers agree that, if Buyer is not the proponent of the successful bid, Buyer's offer to purchase the Acquired Assets pursuant to this Agreement (without any modifications by Buyer at the Auction other than those modifications Buyer, in its sole discretion, elects to have apply) shall remain open until the later of the periods provided for in the Bid Procedures Order; or until either *(i)* Buyer notifies Sellers anytime after the Auction that it terminates its offer or *(ii)* 10 days after the date set for Closing, whichever occurs earlier, and thereupon in such case, Buyer's offer shall be deemed terminated without further action on the part of Sellers or Buyer, and, provided that Buyer is not in breach hereof, Sellers shall immediately return the Earnest Money Deposit and pay the Break-Up Fee to Buyer to the extent provided for in the Bid Procedures Order.

4.1.4     The Sale Order shall be an order by the Bankruptcy Court in form and substance reasonably satisfactory to Buyer, Sellers and Lender, providing for, among other things, *(i)* the approval of this Agreement and the transactions contemplated by this Agreement, *(ii)* the approval of the sale of the Acquired Assets to Buyer pursuant to Section 363(b) and (f) of the Bankruptcy Code free and clear of all Liens and does not require any consent, approval, authorization or order of, notice to or registration or filing with any governmental authority or other person (each, a "Consent"), *(iii)* findings that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code, *(iv)* the assumption by Sellers and assignment to Buyer pursuant to Section 365 of the Bankruptcy Code of the Assumed Contracts and Leases, notwithstanding any provisions that restrict the assignability of the Assumed Contracts and Leases, *(v)* that Sellers will be authorized and directed to execute, upon request by Buyer, one or more assignments in form, substance, and number reasonably acceptable to Buyer, as may be necessary to evidence the conveyance of the Acquired Assets to Buyer; and *(vii)* waiver of the ten (10) day stay periods in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

4.1.5     Following entry of the Bid Procedures Order, Sellers gave notice of the transactions contemplated by this Agreement and of the auction procedure described in the Bidding  Procedures Order to, among others, all persons and entities to whom Sellers sent notice of the fact that Sellers was seeking to sell some or all of its assets and to such other persons or entities and in such manner as the Bankruptcy Court shall direct or Sellers may otherwise reasonably deem necessary.  Sellers may provide potential bidders with a copy of this executed Agreement.

4.1.6    Sellers will provide Buyer and Buyer's counsel with copies of all motions, applications, and supporting papers prepared by Sellers (including forms of orders and notices to interested parties) relating in any way to Buyer or the transactions contemplated by this Agreement in advance of the service and filing thereof.    Sellers shall promptly give appropriate notice in accordance with Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure and any order of the Bankruptcy Court, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, order, hearings, or other proceedings relating to this Agreement or the transactions contemplated hereby.

4.2    Access Period.  From the date of this Agreement until the earlier of the Closing Date and the date on which this Agreement is terminated (the "Access Period"), Sellers shall:

(a)    provide Buyer and its representatives, lawyers, lenders, and consultants with reasonable access upon reasonable notice during normal business hours to the Acquired Assets, to senior management, operations and plant employees, and to financial information, books, business records and other information relating to the Acquired Assets and the Assumed Liabilities, as well as reasonable access during regular business hours to all plants, offices, facilities, properties, books, Contracts, commitments and records (including accountant's work papers) of or relating to Sellers, the Acquired Assets and the Business;

(b)    permit Buyer's environmental consultants to conduct testing and review of the Acquired Assets;

(c)    provide all necessary authorizations or consents reasonably required by Buyer to perform its governmental inquiries with respect to the Acquired Assets and the Assumed Liabilities; and

Buyer and its designees shall not damage the Acquired Assets or any other property and at all times shall use reasonable care in connection with the foregoing activities.  Buyer agrees to, and does hereby, hold Sellers and their officers, directors, shareholders, employees, agents and representatives harmless from and against any and all liabilities, claims, losses, obligations and/or damages arising from or relating to the acts or omissions of Buyer or its designees in connection with the foregoing activities.  Notwithstanding any provision in this Agreement to the contrary, the obligations of Buyer under this Section 4.2 shall survive the closing of the sale of the Acquired Assets and/or the termination of this Agreement.

4.3    Conduct of Business Pending Closing.  Sellers agree that from the date of this Agreement through the earlier to occur of *(i)* the Closing Date, and *(ii)* the date on which this Agreement is terminated, Sellers will:

(a)    Conduct of Business.  Use commercially reasonable efforts to conduct the Business in a manner consistent with the past practices of Sellers and Sellers will not engage in any transactions out of the ordinary course of business, in each and every case subject to Sellers' rights and responsibilities as debtors-in-possession under the Bankruptcy Code;

(b)      Representations and Warranties; Conditions.  Subject to Sellers' rights and  responsibilities as debtor in possession under the Bankruptcy Code, use commercially reasonable efforts, consistent with their  fiduciary duties under the Bankruptcy Code in connection with the Case, not to engage in any practice, take any action, fail to take any action or enter into any transaction that could reasonably be expected to *(i)* cause any of the representations and warranties of Sellers contained in this Agreement or any documents related thereto to be untrue, inaccurate or incorrect at any time, or *(ii)* result in any of the conditions set forth in Articles 10 and 11 not being satisfied on or prior to the due termination of this Agreement;

(c)      Sale of Assets; Liens.  Not *(i)* transfer any of the Acquired Assets, except Inventory sold in the ordinary course of business consistent with past practice, *(ii)* dispose of, or trade in, any of the Equipment or Fixtures, or *(iii)* create, incur, assume, or suffer to exist any Lien upon or with respect to any of the Acquired Assets other than any Lien granted in connection with Sellers' Credit facility with Lender or liens rising in the ordinary course of Sellers' businesses;

(b)      Compensation.  Without the prior, written consent of Buyer, not increase the amount of compensation of any of the directors, officers or employees of, or consultants to, Sellers, including, without limitation, base salaries and bonuses of all types, whether paid or accrued other than in the ordinary course consistent with past practice;

(c)      Maintenance of Relationships.  Use commercially reasonable efforts as it is able to exercise as a result of the commencement of the Case, and consistent with its rights, duties and obligations under the Bankruptcy Code and applicable federal bankruptcy law, to preserve its current relationships with its customers, suppliers, vendors and other entities with which it has significant business relationships and inform them regarding the transactions contemplated by this Agreement and Buyer's assuming the Assumed Liabilities.

## ARTICLE 5

## CLOSING

5.1      The Closing.      The consummation of the transactions contemplated in this Agreement (the "Closing") shall take place on or before August 28, 2015 (the "Closing Date") in the offices of Sellers' counsel in Detroit, Michigan or on such other date at such other location as is mutually agreed by the parties; *provided, however,* that in no event unless otherwise agreed in writing by Buyer, shall the Closing take place on a date which is after August 28, 2015.

.5.2      Closing.  The parties hereto agree that the Closing shall be deemed effective as of 12:01 a.m. on the Closing Date.

# ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers represent and warrant to Buyer as follows, which representations and warranties shall be true and correct as of the date hereof and true and correct as of the Closing but which shall not survive the Closing:

6.1 <u>Organization and Standing of Sellers.</u>  Lee Steel is a corporation duly organized and validly existing and in good standing under the laws of the State of Michigan, with full corporate power and authority to own its assets and to conduct its business.  Taylor and 4L are each limited liability companies duly organized and validly existing and in good standing under the laws of the State of Michigan, with full power and authority to won its assets and to conduct its business.   Upon the expiration of any applicable appeal period following the entry of the Sale Order, this Agreement will have been duly executed and delivered by each of the Sellers and shall constitute the legal, valid and binding obligations of each of the Sellers enforceable in accordance with its terms.  Upon expiration of any applicable appeal period following the entry of the Sale Order, Sellers will have full power and authority, corporate or otherwise, to enter into and deliver this Agreement and to execute and deliver all contemplated agreements and documents provided in this Agreement and perform the transactions contemplated herein.

6.2 <u>Acquired Assets.</u>  At the Closing, Sellers shall transfer to Buyer good and marketable title to all of the Acquired Assets, free and clear of all Liens.  Upon the expiration of any applicable appeal period following the entry of the Sale Order, Sellers shall have the right to freely assign all of its rights and interests in the Acquired Assets (including, without limitation, the Assumed Contracts and Leases) to Buyer free and clear of all Liens, except for the rights of the owners of the personal property leased by Sellers pursuant to the Assumed Contracts and Leases from and after the Closing Date.  Except for the Excluded Assets, the Acquired Assets constitute all the property and assets, real personal, mixed, tangible and intangible, including, without limitation, contract rights, pricing lists, product lists, bills of materials, that are used in the operations of the Business.

6.3 <u>Authorization; Binding Effect</u>.  The execution and delivery by Sellers of each of the Sale Documents to which a Seller is a party, the performance by Sellers of their obligations under such Sale Documents and the consummation of the transactions contemplated by the Sale Documents by Sellers have been duly authorized by all necessary corporate action on the part of each  Seller.  No other proceedings on the part of any Seller are necessary to approve and adopt the Sale Documents or to approve the consummation of the transactions contemplated by the Sale Documents, except for the approval of the Bankruptcy Court.  Each of the Sale Documents to which a Seller is or may become a party is, or, when executed and delivered in accordance with this Agreement will be, a legal, valid and binding obligation of such Sellers enforceable against such Sellers in accordance with its terms, except that such enforcement *(i)* may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and *(ii)* is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

6.4     Contravention.  Other than the entry of the Sale Order by the Bankruptcy Court, neither the execution, delivery and performance of the Sale Documents by Sellers nor the consummation of the transactions contemplated by the Sale Documents by Sellers will (with or without notice or lapse of time or both) (a) conflict with, violate or breach any provision of Lee Steel's articles of incorporation or by-laws or the articles of organization and Operating Agreements of the Real Estate Sellers;, (b) assuming the receipt of all required third-party consents and the Sale Order prior to the Closing, conflict with, violate or breach any law by which Sellers, the Business or any of the Acquired Assets may be bound or affected, (c) assuming the receipt of all of required third-party consents and the Sale Order prior to the Closing, conflict with, breach or result in a default under, result in the acceleration of, or give rise to a change in the terms of or a right of termination, cancellation, modification or acceleration or require any notice under, any Contract, (d) result in or require the creation or imposition of any Lien on any of the Acquired Assets or (e) otherwise result in a material adverse effect upon the condition, value or prospects of the Business, its operations or the Acquired Assets.

6.5     Consents.  Except for the Sale Order and the third-party consents set forth on Schedule 6.5 attached hereto ("Required Consents"), no consents are required on behalf of Sellers in connection with (a) the due execution and delivery by Sellers of the Sale Documents and the performance of Sellers' obligations thereunder, (b) the consummation of the transactions contemplated by the Sale Documents by Sellers, (c) the exercise by Buyer of its rights and remedies under the Sale Documents, and (d) the *(i)* conduct of the Business and *(ii)* ownership or use of the Acquired Assets, by Buyer immediately following the Closing Date.  As of the Closing Date, all of the Required Consents will have been obtained and will be in full force and effect.

6.6     Permits.  Schedule 6.7 attached hereto sets forth a correct and complete list and description of each material permit, license, approval, consent, permission, notice, franchise, confirmation, endorsement, waiver, certification, registration, qualification, clearance, variance or other authorization issued, granted, given or otherwise made available by or under the authority of any governmental authority or pursuant to any federal, state, local or foreign law necessary to entitle or permit Sellers to use its corporate name, to own, lease, operate and use the Acquired Assets, and to carry on and conduct the Business as it has historically been conducted (collectively, the "Required Permits").  Sellers own, hold or possess all Required Permits and all such Required Permits are validly held and are in full force and effect.  No Required Permit will be subject to suspension, modification, limitation, revocation, cancellation or non-renewal as a result of the consummation of the transactions contemplated by the Sale Documents.

6.7     Compliance with Laws.  Sellers, their operations, the Business and the Acquired Assets are materially in compliance with each Required Permit and each law applicable to each Seller, its operations, the Business or the Acquired Assets.  Neither Sellers nor any director, officer or employee of any Seller acting on behalf of any Seller has at any time made any bribes, kickback payments or other illegal payments.  Sellers is in compliance with all orders entered by the Bankruptcy Court in the Case.

6.8     Employment Matters.

(a)     Except as set forth in Schedule 6.10(a) attached hereto, with respect to Sellers or the transactions contemplated by the Sale Documents: *(i)* Sellers have not experienced any labor disputes, strikes, lockouts, sympathy strikes, primary or secondary boycotts, picketing, handbilling, concerted work slowdown or stoppage, or other similar labor or employment activity; nor has any labor organization attempted to organize any employee(s), made a demand for voluntary recognition, filed any representation petition with the National Labor Relations Board, or given Sellers notice of any election of a collective bargaining representative, and Sellers have not authorized any employer association or multi-employer organization to represent them in collective bargaining with any labor organization; nor, to Sellers' knowledge, has any such action been threatened; *(ii)* Sellers have been in compliance in all material respects with all laws, rules, regulations, and ordinances related to employment or termination of employment, employment practices, employment terms, conditions, and compensation, labor or employment relations, equal employment opportunities, and fair employment practices; *(iii)* no unfair labor practice charge or complaint has been filed or brought against Sellers before or by the National Labor Relations Board or similar governmental entity; nor, to Sellers' knowledge, threatened; *(iv)* there is no grievance arising under any collective bargaining agreement, employment agreement, or contractor agreement which reasonably would be expected to have a material adverse effect on the Business or Acquired Assets, nor are arbitration proceedings arising out of any such agreement pending; nor, to Sellers' knowledge, have any grievance(s) or arbitrations(s) been threatened; *(v)* there has been no investigation, claim, complaint, charge, action, or litigation before or by any federal, state or local court, administrative agency, governmental entity, or arbitration tribunal relating to employment, employment practices, terms, conditions, or compensation, employment termination, separation, or layoffs, employment discrimination or equal employment opportunity, fair employment practices, whistleblowing, retaliation, or employee safety or health; nor, to Sellers' knowledge, is any threatened.

(b)     With respect to Sellers, since January 1, 2015, Sellers have been in material compliance with and have not materially violated the terms and provisions of the Immigration Reform and Control Act of 1986, as amended, and all related regulations promulgated thereunder (the "Immigration Laws").  With respect to each of Sellers' employees, Sellers have supplied, or shall supply at the Closing Date, to Buyer, Form I-9 (Employment Eligibility Verification Form) and all other records, documents or other papers which are retained with the Form I-9 by Sellers pursuant to the Immigration Laws.  Since January 1, 2015, Sellers have not been warned, fined or otherwise penalized by reason of its failure to comply with the Immigration Laws, nor is any such proceeding pending or, to Sellers' knowledge, threatened.

(c)     There is no order, decree, or judgment of any kind in existence enjoining or restraining Sellers or any of its directors, officers, or employees (in their respective capacities as such) or requiring any of them to take or refrain from taking any action of any kind relative to Sellers, this Agreement, or any agreement, document, or instrument referred to herein, except prior judgments, which have been fully discharged.  No action or proceeding shall be pending or, to Sellers' knowledge, threatened by or before any court, administrative agency, or any other person seeking to restrain or prevent or declare illegal, or seeking damages in connection with, any of the transactions contemplated by this Agreement or any aspect thereof.

6.9     Leaseholds.

(a)    Schedules.    Schedule 6.10(a) sets forth a correct and complete list, legal description and location of all Leaseholds in which any Seller has an interest.

(b)    Leasehold Interests.    Sellers have a valid leasehold interest to all of the Leaseholds.  Each of the Leaseholds is the subject of a written lease agreement, and there are no oral terms inconsistent with the written terms thereof.  To the knowledge of Sellers, no work has been performed on, or materials supplied to any the Leaseholds within the applicable statutory period which would give rise to any mechanic's or materialmen's Liens for any amount in excess of $10,000.

(c)    No Restrictions.    Sellers enjoy peaceful and undisturbed possession of the Leaseholds.  No instrument of record, easement, license, use restriction, grant or applicable zoning, building or urban redevelopment law or other impediment of any kind prohibits, materially limits, impairs or interferes with, the use, operation, maintenance of, or access to the Leaseholds in a manner inconsistent with Sellers' past practice immediately prior to the Closing, and there are no recorded easements or encroachments by improvements on adjoining premises with respect to any of the Leaseholds that could reasonably be expected to materially affect the ability of Buyer to conduct the Business.

(d)    Condemnation and Eminent Domain.  There is no pending or, to the knowledge of Sellers, threatened condemnation or eminent domain proceeding with respect to any of the Leaseholds.

6.10    Equipment and Fixtures.  Schedule 6.11 sets forth a correct and complete list and description of all Equipment (with a value in excess of $50,000), and all Fixtures, in which Sellers have an interest, and Sellers have exclusive possession and control of all such Equipment and Fixtures.  All Equipment is in good operating condition order and repair (subject to normal wear and tear), and is suitable for the purposes for which it is to be used.

6.11    Insurance.  Sellers, all of the Acquired Assets and the Business are covered by valid and currently effective insurance policies or binders of insurance, including, without limitation, general liability insurance, property insurance, workers' compensation insurance and business interruption insurance, issued in favor of Sellers with reputable insurance companies and in such types and amounts and covering such risks as are consistent with customary practices and standards of companies engaged in business and operations substantially similar to those of Seller.  Sellers are not in default with respect to its obligations under any insurance policy maintained by any of them, and all premiums thereunder will be timely paid in full for all periods up to and through the Closing.

6.12    Environmental Matters.  Except as set forth on Schedule 6.12, to the knowledge of Sellers:

(a)    No Environmental Liability.

(i)    Sellers have no any actual, alleged or contingent liability or obligation:  (A) relating to the violation, or alleged violation, of any

Environmental Law (defined below) or Permit; (B) with respect to, or relating to, the generation, presence, disposal, Release (defined below), threatened Release, handling, transportation, treatment, storage, Cleanup (defined below) or contamination of or by any Hazardous Material (defined below) at any Relevant Property (defined below); or (C) with respect to, or relating to, the Cleanup of any Relevant Property (any such liability or obligation referred to in clauses (A), (B) and (C) being an "Environmental Liability").

(ii)     There are no Environmental Liabilities arising out of conditions or occurrences existing or occurring on or prior to the Closing for which Buyer, Sellers or one of its Affiliates will or may be responsible or liable.

(b)     Basis for Environmental Claims.

(i)     Sellers have not been identified or listed as a potentially responsible party or a responsible party under the federal Comprehensive Environmental Response, Compensation and Liability Act or any other Environmental Law, nor have Sellers received any information request from a governmental authority under any Environmental Law. No Relevant Property is listed or is proposed for listing on the federal National Priorities List or any other similar Law.

(ii)     There are no underground storage tanks, storing or previously storing Hazardous Materials at the Wyoming Facility or the Romulus Facility.

(c)     Notices. Sellers have not received any written communication from a governmental authority, third party or any citizens' group, employee or otherwise within the past five years, alleging *(i)* that Sellers have violated or is in violation of any Environmental Law or is liable for any Cleanup of Hazardous Materials or *(ii)* that Sellers have any Environmental Liability.

(d)     Environmental Reports. Sellers have delivered to Buyer or Buyer's representatives copies of all environmental reports prepared by third-party environmental engineers or consultants within the past five years on behalf of Sellers or any of their affiliates or which is in the possession or control of Sellers or any of their affiliates.

(e)     Filing of Reports. Sellers have timely filed all material reports, obtained all material consents and Permits and generated and maintained, and currently generates and maintains, all material consents, Permits, data, documentation and records required under applicable Environmental Laws.

(d)     Definitions. For purposes of this Section, Sellers shall refer to Sellers as well as any of its existing or former subsidiaries and affiliates, and the following terms shall have the definitions as follows:

(i)     "Cleanup" means all actions required to (a) cleanup, remove, treat or otherwise remediate Hazardous Materials present in the indoor or outdoor

environment, (b) prevent, pursuant to Law, the Release of Hazardous Materials so that they do not enter the environment, migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) perform pre-remedial studies and investigations and post-remedial monitoring and care, or (d) respond to any government directives, orders, requests for information or other documents in any way relating to cleanup, removal, treatment or remediation or potential cleanup, removal, treatment or remediation of Hazardous Materials in the indoor or outdoor environment.

(ii)    "Environmental Laws" means all applicable federal, state, local and foreign laws and regulations relating to pollution, human health, safety or protection of the environment, including, without limitation, laws relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, disposal, Cleanup, transport or handling of Hazardous Materials and all Laws with regard to record keeping, notification, disclosure and reporting requirements respecting Hazardous Materials and all similar laws and regulations.

(iii)    "Hazardous Materials" means any hazardous or toxic substance, waste, contaminant, pollutant, gas or material, including, without limitation, radioactive materials, oil, petroleum and petroleum products and constituents thereof, which are regulated under any Environmental Law, including, without limitation, any substance, waste or material which is (a) designated a "pollutant", "hazardous substance", "extremely hazardous substance" or "toxic chemical" under the Federal Water Pollution Control Act and/or the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, and/or the Emergency Planning and Community Right-To-Know Act, as amended, (b) designated or classified as a "hazardous waste" or "regulated substance" pursuant to the Resource Conservation Recovery Act (a/k/a Solid Waste Disposal Act), (c) designated or classified as a "hazardous material" under the Hazardous Material Transportation Act, as amended, (d) designated or classified as a "toxic substance" under the Toxic Substances Control Act, or (e) regulated in any way under the Environmental Laws of any jurisdiction where Sellers conducts the Business where any Leasehold or Relevant Property is located.

(iv)    "Release" means (a) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, dispersing, emitting, leaching or migrating into the indoor or outdoor environment, including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata, or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater, surface or subsurface strata or property and (b) the abandonment or discarding of barrels, tanks, containers or receptacles, whether or not sealed or closed, containing, or which formerly contained, Hazardous Materials.

(v)     "<u>Relevant Property</u>" means all sites, facilities, locations, and Leaseholds (a) presently or formerly owned, leased, used or operated by Sellers (whether or not such properties are currently owned, leased, used or operated by Sellers), (b) at which any Hazardous Material has been transported, disposed, treated, stored or Released by or on behalf of Sellers, or (c) that are directly adjacent to any sites, facilities, locations, or Leaseholds presently or formerly owned, leased, used or operated by Sellers.


6.13     <u>Employees; ERISA</u>.

(a)     <u>Schedule of Employees</u>.  Schedule 6.13(a) sets forth a correct and complete list and description of all of the employees of, and consultants and independent contractors to, Sellers and each employee's place of employment, compensation, bonuses, deferred or contingent compensation, pension, accrued vacation, accrued sick pay, severance, "golden parachute" and other like benefits and term of employment, in effect as of the date of this Agreement.  Since January 1, 2015, *(i)* none of the employees of Sellers have spent less than 75% of his or her active business hours on matters involving the Business..

(b)     <u>Employment Agreements</u>.  Except as set forth on Schedule 6.13(b), Sellers have not entered into and is not bound by any *(i)* employment, consulting or severance Contract with any of its directors, officers or employees, or *(ii)* collective bargaining agreements with its employees.

(c)     <u>Benefit Plans</u>.

(i)     Schedule 6.13(c)(i) sets forth a correct and complete list of any employee pension benefit plan covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Internal Revenue Code, as amended (the "<u>Code</u>"), and any bonus, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock purchase, stock option, stock purchase, restricted stock, stock appreciation rights, phantom stock, retirement, supplemental retirement, severance, termination, death benefit, retiree medical (OPEB) benefits to any current or former employee, officer, director or shareholder of each Seller (each, a "<u>Benefit Plan</u>").

(ii)     No Seller nor any entity which is part of a "Controlled Group" with Sellers have at any time during the immediate past six years maintained a plan that is subject to Title IV of ERISA or had any obligation (contingent or otherwise) with respect to any plan that is subject to Title IV of ERISA.  With respect to those plans listed on Schedule 6.19(c)(ii):  *(i)* no such plan has been terminated so as to subject, directly or indirectly, Sellers or any other entity who is part of a Controlled Group with Sellers to any liability or the imposition of any lien under Title IV of ERISA; *(ii)* no proceeding has been initiated or threatened

by any person (including the PBGC) to terminate any such plan; *(iii)* no condition or event currently exists or currently is expected to occur that could subject directly or indirectly, Sellers to any liability or the imposition of any lien under Title IV of ERISA, whether to the PBGC or to any other person or otherwise on account of the termination of any such plan; *(iv)* if any such plan were to be terminated as of the Closing Date, Sellers would not be subject, directly or indirectly, to any liability or the imposition of any lien under Title IV of ERISA; *(v)* no "reportable event" (as defined in §4043 of ERISA) has occurred with respect to any such plan; and *(vi)* no such plan which is subject to §302 of ERISA of §412 of the Code has incurred any "accumulated funding deficiency" (as defined in §302 of ERISA and §412 of the Code, respectively), whether or not waived.

(iii)     No Seller nor any other entity which is part of a Controlled Group with any  Seller contributes or has ever contributed or been required to contribute to a multiemployer plan as defined in Section 3(37) of ERISA.

(iv)     Schedule 6.16(c)(iv) sets forth the number of former employees of Sellers and dependents who qualify as a "qualified beneficiary" as defined in Code §4980B(g)(1), are actively receiving COBRA coverage (within the meaning of Code §4980B), or are eligible to elect to receive COBRA coverage (as set forth in Code §4980B(f)(5)) as of the date of this Agreement.  Such schedule shall also set forth the periods of coverage and applicable premium (within the meaning of §4980B(f)(4) of the Code) for each such former employee or dependent.  Such schedule will be updated as of the Closing Date.

(d)     <u>Workers' Compensation</u>.   There are no liabilities to any of Sellers' employees relating to workers' compensation benefits that are not fully insured against by third-party insurance carriers.

(e)     <u>WARN Act</u>.  Sellers have not, within the 90 days immediately prior to the Closing Date, in whole or in part taken any action or actions which would, independently of the transactions contemplated by the Sale Documents, result in a plant closing or mass layoff requiring notices  or other actions pursuant to the WARN Act, or any similar state or local law, regulation or ordinance.

6.14   <u>Warranties</u>.  Sellers have delivered to Buyer or Buyer's representatives correct and complete copies of all material oral and written warranties for products and services given by Sellers related to products made in the ordinary course of the Business apart from the warranties of merchantability under the Uniform Commercial Code included in Sellers' sales contracts.  No material claim for breach of any express or implied warranty with respect to any of Sellers' products or services has been made or, or to the knowledge of Sellers, is threatened. Sellers are not contemplating the recall of any products sold by it and there are no material defects in any such products.  The charges, accruals and reserves on the books of Sellers in respect of any and all warranties given by Sellers were calculated in a manner consistent with GAAP and are adequate.

6.15    No Material Misstatements or Omissions.    No representation or warranty contained in the Sale Documents or certificate or schedule furnished by Sellers in connection therewith, contained or will contain, as the case may be, any material misstatement of fact or omitted or will omit, as the case may be, to state a material fact or any fact necessary to make the statement contained therein not materially misleading.


# ARTICLE 7

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows, which representations and warranties shall be true and correct as of the date hereof and true and correct as of the Closing:

7.1    Buyer is a duly organized and validly existing _____in good standing under the laws of the State of_____.  Buyer has full power and authority to own and lease the Acquired Assets as such Acquired Assets are now owned and leased and to conduct its business as it is now being conducted.  As of the Closing Date, Buyer will be duly qualified as a foreign company in all jurisdictions where such qualification is required where the absence of such qualification would have an expected material adverse effect upon Buyer's ability to consummate the transactions contemplated hereby.

7.2    This Agreement has been duly executed and delivered by Buyer and constitutes the legal, valid and binding obligations of Buyer enforceable in accordance with its terms.  Buyer has full power and authority, or otherwise, to enter into and deliver this Agreement and to execute and deliver all contemplated agreements and documents provided in Agreement and perform the transactions contemplated therein.  Buyer is not required to obtain the consent, approval or waiver of any person not a party to this Agreement to consummate the transactions contemplated hereby.

7.3    Buyer has adequate financial resources to consummate the transactions contemplated hereby, including the payment of the Purchase Price.

7.4    There is no suit, action, litigation, investigation, claim, complaint or proceeding before any governmental authority in progress or, to the knowledge of Buyer, pending or threatened against or relating to Buyer, which, if determined adversely to Buyer, would, prevent Buyer from paying the Purchase Price to Sellers; enjoin, restrict or prohibit the transfer of all or any part of the Acquired Assets as contemplated by this Agreement; or prevent Buyer from fulfilling all of its obligations set out in this Agreement or arising from this Agreement, and Buyer has no knowledge of any existing ground on which any such action, suit, litigation or proceeding might be commenced with any reasonable likelihood of success.

7.5    Buyer has carried on all negotiations relating to this Agreement and the transactions contemplated in this Agreement directly and without the intervention on its behalf of

any other party in such manner as to give rise to any valid claim for a brokerage commission, finder's fee or other like payment.

7.6    Buyer acknowledges that Sellers have made no representations, warranties, statements or promises save and except as are contained herein with respect to the Acquired Assets and the Business, including as to title, description, fitness for purpose, merchantability, quantity, conditions or the quality of any matter or thing whatsoever, and any and all conditions and warranties expressed or implied by law do not apply to the sale of the Acquired Assets and are hereby waived by Buyer.  Buyer acknowledges that, except as qualified above, Buyer is purchasing the Acquired Assets on an "as is, where is" basis as of the Closing Date, and that Buyer will accept the Acquired Assets in their present state, condition and location.

## ARTICLE 8

## COVENANTS

8.1    <u>Further Actions.</u>  Upon the terms and subject to the conditions hereof, each of the parties hereto agrees to use its best efforts or take or cause to be taken all action and to do or cause to be done all things necessary, proper and advisable to consummate the transactions contemplated by this Agreement, the related agreements and other documents necessary to close this transaction, and shall use its best efforts to obtain all necessary waivers, consents and approvals and to effect all necessary registrations and filings.

8.2    <u>Press Releases.</u>  Except in connection with the Bidding Procedures Order or the Sales Order or as otherwise required by the Bankruptcy Court or permitted by this Agreement, no general public announcement or release as to any of the matters set forth herein may be made by Sellers or Buyer to any third party, including the news or other media, without consulting with each other and obtaining the prior written consent of each other (which consent shall not be unreasonably withheld) as to the identity of such third party and the timing and content of any such announcement or release.

8.3    <u>Retention of Records.</u>  Buyer hereby covenants that for a period of three (3) years following the Closing Date, Buyer will retain, at Buyer's sole expense, the books and records of Sellers relating to the operation of the Business prior to the Closing Date.  During such period, Buyer will afford to Sellers, its counsel and accountants, on prior written notice and during normal business hours, reasonable access to such books, records and other data, to the extent that such access may reasonably be required to facilitate the preparation by Sellers of such tax returns as they may be required to file with respect to Sellers and the investigation, litigation and final disposition of any claims which may be made against Sellers.

8.4    <u>Disclosure Schedules.</u>

8.4.1    <u>Updating of Disclosure Schedules.</u>  Sellers agree that during the period from the date of this Agreement through the earlier to occur of (x) the Closing Date and (y) the date on which this Agreement is terminated in accordance with the provisions of Section 12.2 hereof, Sellers will promptly notify Buyer of *(i)* any and all information, facts, events,

circumstances, issues or other matters that existed as of the date of this Agreement that should have been set forth or described in the schedules to this Agreement required or provided for under this Agreement as of the date of this Agreement, and *(ii)* any and all information, facts, events, circumstances, issues or other matters arising after the date of this Agreement which, if existing on the date of this Agreement, would have been required to be set forth or described in the schedules to this Agreement required or provided for under this Agreement, in each case, by delivery of appropriate updates to the Schedules attached to this Agreement setting forth such information, facts, events, circumstances, issues or other matters, in each case, no later than the later of two business days prior to the scheduled Closing Date (any such updates to the Schedules, or Sellers' schedules of assets, liabilities and executory contracts and statement of financial affairs as they may file in the Case, being referred to herein as "<u>Schedule Updates</u>") or the next business day after becoming aware of such matter.

    8.4.2 <u>Effect of Schedule Updates</u>. In the event that Sellers deliver any Schedule Updates to Buyer in accordance with the provisions of Section 8.4.1 above, then such Schedule Updates shall not be *(i)* deemed to be attached to this Agreement or become a part of this Agreement, or *(ii)* given effect for any purposes under this Agreement, unless such Schedule reflects the results of operation in the ordinary course consistent with past practice relating to such Schedule, or such Schedule Updates shall be accepted by Buyer in its reasonable discretion. In the event that the Schedule Updates are accepted by Buyer, then upon such acceptance, *(i)* such Schedule Updates shall be deemed to be attached to this Agreement and become a part of this Agreement, *(ii)* all references to the Schedules in this Agreement shall refer to the Schedules as updated by such Schedule Updates, and *(iii)* such Schedule Updates shall be given effect for all purposes under this Agreement, including, without limitation, for determining whether the conditions to Closing set forth in this Agreement have been satisfied. In the event Buyer does not accept any Schedule Update pursuant to this Section 8.4.2, Buyer shall notify Sellers in writing of such non-acceptance within two (2) business days after the delivery of such Schedule Update which notification shall be deemed a notice of termination hereunder, subject to any right to cure pursuant thereto.

## ARTICLE 9

## CLOSING DELIVERIES

At the Closing on the Closing Date:

    9.1 Sellers and Buyer, as applicable, shall execute and deliver the conveyance documents described in Section 1.3 hereof and the Memorandum of Allocation.

    9.2 Buyer shall pay the Cash Purchase Price as set forth in Section 2.3 of this Agreement.

    9.3 Sellers and Buyer shall execute and deliver any and all other documents, agreements, instruments and other writings and have taken all actions necessary to carry out the transactions contemplated in this Agreement, including (without limitation), as to Sellers, all actions set forth in and required by Article 10 hereof.

# ARTICLE 10

## BUYER'S CONDITIONS

The obligation of Buyer to purchase and pay for the Acquired Assets and consummate the transactions contemplated by the Sale Documents at Closing shall be subject to the satisfaction, prior to or concurrently with the Closing Date, of each of the following express conditions precedent, unless waived by Buyer in writing at or before the Closing, except where the conditions are expressly deemed to have been waived by the passage of time without Buyer giving notice to Sellers that such contingencies have not been satisfied as set forth below:

10.1    <u>Bankruptcy Order</u>.  The Sale Order shall have been entered by the Bankruptcy Court approving the sale of the Acquired Assets free and clear of all Liens by Sellers to Buyer in form and substance reasonably satisfactory to Buyer, which Sale Order complies in all material respects with the terms and provisions of Section 4.14 hereof.  Such Sale Order shall be in full force and effect as of the Closing Date without modification and shall not be subject to any stay, temporary restraining order or injunction.

10.2    <u>Accuracy of Representations and Performance of Obligations.</u>    Each of the representations and warranties of Sellers set forth in the Sale Documents shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date unless otherwise specified in such representation, and Sellers shall have complied in all material respects with all of the covenants set forth in the Sale Documents.  Notwithstanding the above, only with respect to the representations and warranties of Sellers set forth in Sections 6.6 – 6.18, inclusive, this condition shall be deemed satisfied and waived and shall no longer be applicable unless Buyer delivers written notice to Sellers by noon, E.D.T., ten calendar (10) days before the Auction that it is terminating this Agreement because of the failure of this condition related to Sections 6.6 – 6.18, inclusive.

10.3    <u>Closing Documents Delivered.</u>    Sellers shall have executed and delivered the documents, certificates, instruments and agreements and done the acts required of Sellers in connection with the Closing as described in this Agreement.

10.4    <u>Environmental Due Diligence.</u>  Buyer is reasonably satisfied with the results of its environmental due diligence of Sellers and the Acquired Assets, including that Sellers have not violated in any material respects any Environmental Laws or that any Hazardous Substances have been or are currently located at, in, under or about the Acquired Assets in a manner which (i) violates in any material respect any applicable Environmental Laws, or (ii) may require response, remedial, corrective action or cleanup of any kind under any applicable Environmental Laws.  Notwithstanding the above, unless Buyer delivers written notice to Sellers by noon E.D.T. on ten calendar (10) days before the Auction that it is terminating this Agreement because of the failure of this condition, this condition shall be deemed satisfied and waived and shall no longer be applicable.

10.5    <u>Financial Due Diligence.</u>  Buyer shall be reasonably satisfied with the results of tis due diligence investigation of the assets, finances and business of Sellers; provided, however,

that this condition shall be deemed waived if not exercised in writing by written notice delivered to Sellers no later than noon, eastern time, ten (10) days before the auction.

10.6    Closing Date.    In the event that the Closing does not occur by the date of August 28, 2015 (the "Non-Fulfillment Date") as a result of the non-fulfillment of one or more of the foregoing conditions in this Article 10, Buyer may, upon two (2) days' written notice to Sellers at any time after the Non-Fulfillment Date, terminate this Agreement without any further liability on the part of either of the parties.

10.7    No Material Adverse Change.    As of the Closing Date, no Material Adverse Change in the Acquired Assets shall have occurred from and after the date that is ten (10) days before the Auction. As used herein, "Material Adverse Change" shall be limited to changes in the Acquired Assets that materially impair the Buyer's ability to operate the Business as conducted by Sellers prior to Closing, but shall not include changes in the overall steel market or economy, or decreases in prices of steel used in the Business, nor any price reduction or concessions requested by Sellers' customers.

# ARTICLE 11

## SELLERS' CONDITIONS

The obligation of Sellers to sell and convey the Acquired Assets at the Closing shall be subject to the satisfaction, prior to or concurrently with the Closing Date, of each of the following express conditions precedent, unless waived by Sellers:

11.1    Bankruptcy Order.    The Sale Order shall have been entered by the Bankruptcy Court.

11.2    Accuracy of Representations and Performance of Obligations.    The representations and warranties of Buyer shall be true and correct in all material respects at the Closing Date, and Buyer shall have complied in all material respects with all of its covenants set forth in this Agreement.

11.3    Closing Documents Delivered.    Buyer shall have executed and delivered the documents, certificates, instruments and agreements and done the acts required of Buyer in connection with the Closing, as described in this Agreement.

11.4    No Prohibition.    No order, statute, rule, regulation, executive order, injunction, stay, decree or restraining order, shall have been enacted, entered, promulgated or enforced by any court or competent jurisdiction or governmental or regulatory authority or instrumentality that prohibits the consummation of the transactions contemplated hereby.

11.5    Closing Date.    In the event that the Closing does not occur by the Non-Fulfillment Date as a result of the non-fulfillment of one or more of the foregoing conditions in this Article 11, Sellers may, upon written notice to Buyer at any time after the Non-Fulfillment Date, terminate this Agreement without any further liability on the part of either of the parties unless

the non-fulfillment is caused by Buyer's breach of this Agreement in which case such termination shall not operate to release Buyer from claims for breach hereof.

## ARTICLE 12

## BREAK-UP FEE AND TERMINATION

12.1 <u>Break-Up Fee</u>. Sellers shall pay to Buyer a Break-up Fee equal to Buyer's documented out-of-pocket costs of up to $500,000 as provided in the Bidding Procedures Order. Sellers and Buyer acknowledge and agree that *(i)* the Break-up Fee shall be Buyer's liquidated damages and Buyer's sole and exclusive right and remedy; *(ii)* the full extent of Buyer's damages in the event the transactions contemplated by this Agreement are not consummated can not be accurately anticipated or determined, *(iii)* the amount of liquidated damages does not constitute a penalty, and *(iv)* the agreements contained in this Section 12.1 are an integral part of the transactions contemplated by this Agreement and that, without these agreements, Buyer would not enter into this Agreement.

12.2 <u>Termination</u>. The obligations of the parties to consummate the transactions contemplated by the Sale Documents may be terminated at any time prior to the Closing by:

(a) the mutual written consent of Sellers and Buyer;

(b) Sellers, if Buyer shall have breached in any material respect any of its representations, warranties, covenants or other agreements contained in the Sale Documents which breach is likely to have a material adverse effect on Sellers' rights and obligations under this Agreement.

(c) Buyer, if *(i)* the Closing shall not have occurred on or prior to the Non-Fulfillment Date, unless such failure to consummate the transactions contemplated by this Agreement is the result of a material breach of any Sale Document by Buyer.

(d) Buyer or Sellers if *(i)* any law shall have been enacted, adopted, issued or promulgated which prohibits the transactions contemplated by this Agreement, or *(ii)* any governmental authority shall have issued an order, decree or ruling or taken any other action, which permanently restrains, enjoins or otherwise prohibits the transactions contemplated by this Agreement, and such order, decree, ruling or other action shall have become final and non-appealable;

(e) Buyer or Sellers in the event that the consummation of the transactions contemplated by the Sale Documents is challenged by the United States Department of Justice or the United States Federal Trade Commission or any

other governmental authority, upon one party giving notice of termination to the other party;

(f)     Buyer if the Sale Order approving the transactions contemplated by this Agreement with Buyer, in form and substance satisfactory to Buyer, without modification, is not entered by the Bankruptcy Court on or prior to 5:00 pm Detroit Time on August 27, 2015, or the Sale Order is subject to a stay, temporary retraining order or injunction as of 5:00 pm Detroit time on August 28, 2015, *provided that* Buyer's right to terminate the Agreement under this Section shall expire and be deemed waived unless exercised by giving written notice thereof to Sellers within two (2) business days of the applicable date set forth in this Section;

(g)     Buyer, if Sellers *(i)* reject or file a motion to reject any of the Sale Documents in connection with the Case, *(ii)* convert or attempts to convert the Case into a chapter 7 proceeding or other liquidation proceeding prior to Closing, or *(iii)* file a plan of reorganization that excludes, prohibits or does not provide for the consummation of the transactions contemplated by this Agreement with Buyer; or

(h)     Buyer, if *(i)* Buyer is not selected as the winning bidder in the Auction or Sellers select any bidder or bidders (other than Buyer) as the winning bidder in the Auction subject to the provisions of the Bidding Procedures Order, including the standby provisions, to which Buyer acknowledges and is bound as a part of this Agreement.

(i)     Sellers, if the Closing shall not have occurred on or prior to the non-fulfillment date, unless such failure to consummate the transactions contemplated by the Agreement is the result of a material breach of any sale document by Sellers.

# ARTICLE 13

## MISCELLANEOUS

13.1     <u>Waiver.</u>  Any party hereto may (a) agree to extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto or (c) waive compliance with any of the agreements or conditions contained herein.  Any agreement on the part of the party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the authorized representative of such party.

13.2     <u>Remedies Cumulative.</u>  In the event of a breach by a party of its obligations under this Agreement, the other party shall be entitled to all remedies provided herein, by law or in equity, including, without limitation, the right to obtain an injunction to specifically enforce this Agreement.  Except as herein expressly limited, the remedies provided herein shall be

cumulative and shall not preclude the assertion by any party hereto of any other rights or the seeking of any other remedies against the other hereto.

     13.3   <u>Notices.</u> Any notices or other communications required or permitted hereunder or otherwise in connection herewith shall be in writing and shall be deemed to have been duly given when delivered in person or transmitted by facsimile transmission or on receipt (or refusal to receipt) after dispatch by express, registered or certified mail, postage prepaid, or nationally recognized overnight delivery service, addressed as follows.

     If to Sellers:

LEE STEEL CORPORATION
900 Wilshire Drive, Ste. 270
Troy, MI, 48084
Attn:  Laura A. Marcero
Phone:  (248) 244-2415
Email:  lmarcero@huronconsultinggroup.com

and

Jamie Lisac
Senior Director
550 W. Van Buren Street
Chicago, Illinois 60607
Phone (312) 235-8625
Email:  jlisac@huronconsultinggroup.com


     with a copy, which shall not constitute notice, to:

MCDONALD HOPKINS PLC
39533 Woodward Ave., Ste. 318
Bloomfield Hills, MI  48304
Attention: Stephen M. Gross, Esq.
Tel No.:  (248) 646-5070
Fax No.: (248) 646-5075
Email:  sgross@mcdonaldhopkins.com

     If to Buyer:

_____
_____
_____
_____

with a copy, which shall not constitute notice to:

_____
_____
_____
_____

or such other address as the person to whom notice is to be given has furnished in writing to the other parties.

13.4    Delivery of Notices.  After the Closing Date, each party shall promptly deliver to the other party any notices, correspondence and other documents relating to the Acquired Assets being conveyed hereunder and the Business, which are, from time to time, received by that party.

13.5    Entire Agreement; Binding Effect.  This Agreement (together with the Exhibits and Schedules hereto, and the other agreements, documents and instruments executed at the Closing) sets forth the entire integrated understanding and agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements whether written or verbal.  This Agreement may not be modified, amended or terminated except in a writing signed by all of the parties hereto.

13.6    Assignment.  No party to this Agreement shall have the right to assign any of its rights and obligations hereunder without the prior written consent of the other parties hereto.  To the extent that any such assignment occurs in accordance with the terms hereof, this Agreement and all provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

13.7    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original instrument, but all such counterparts together shall constitute the same instrument.

13.8    Governing Law and Rules of Construction.  This Agreement is being made in and shall be governed by and construed and enforced in accordance with the laws of the State of Michigan.  Notwithstanding the foregoing, the parties hereto agree that both parties have equally participated in the drafting of this Agreement and that if any term, condition or provision of this Agreement is deemed or construed to be ambiguous or vague, such ambiguity or vagueness shall not be construed in favor of or against any party to this Agreement.

13.9    Jurisdiction.  The Parties agree that the Bankruptcy Court shall have exclusive jurisdiction and venue over any disputes regarding this Agreement until the Case shall have been dismissed or closed, after which controversies  shall be resolved in any Court of competent jurisdiction.

13.10    Severability.  Should any terms, provision or clause hereof or of any other agreement or document which is required by this Agreement, be held to be invalid, such invalidity shall not affect or render invalid any other provisions or clauses hereof or thereof the

consideration or mutuality of which can be given effect without such invalid provision, and all of which shall remain in full force and effect. If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable under applicable law.

13.11  <u>Headings.</u>  The headings to the sections of this Agreement are inserted for convenience and reference only and are not intended to define or limit the substance of any section.

13.12  <u>Singular and Plural.</u>  Singular terms in this Agreement may be deemed to include plural, and plural terms to include the singular.

13.13  <u>Exhibits and Schedules.</u>  The exhibits and schedules referenced in this Agreement and attached hereto shall be deemed to be a part of this Agreement and are incorporated herein by this reference.

13.14  <u>No Third Party Rights.</u>  This Agreement and the other agreements entered into at the Closing are solely for the benefit of the parties hereto. No third person shall acquire any rights or claims by reason of or under this Agreement.

13.15  <u>Amendment.</u>  This Agreement may be amended only by a writing executed by the authorized representatives of Buyer and Sellers.

13.16  <u>Expenses.</u>  Except as otherwise expressly set forth herein, each of the parties hereto shall bear their own costs and expenses in connection with the transactions contemplated hereby.

# ARTICLE 14

# UC FORM 1027

1.5  <u>UC Form 1027.</u>  Buyer hereby acknowledges that it has received from Sellers a completed and executed UC Form 1027, Business Transferor's Notice to Transferee of Unemployment Tax Liability and Rate, at least two (2) business days prior to the execution of this Agreement.

*(balance of page intentionally left blank; signatures follow)*

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the date first above written.


SELLERS:

**.LEE STEEL CORPORATION**

By: _____

    Its: _____

**TAYLOR INDUSTRIAL PROPERTIES, LLC**

By: _____


    Its: _____

**4L VENTURES, LLC**

By: _____


    Its: _____

BUYER:

.


By: _____


    Its: _____

## SCHEDULES

| Schedule: | Description |
| --- | --- |
| **Schedule 1.1(c)** | **Assumed Contracts and Leases** |
| **Schedule 1.2** | **Excluded Assets** |
| **Schedule 1.3** | **Conveyance of Acquired Assets** |
| **Schedule 2.1** | **Memorandum of Allocation** |
| **Schedule 6.5** | **Required Consents** |
| **Schedule 6.6(a)** | **Balance Sheets** |
| **Schedule 6.6(b)** | **Other Financial Statements** |
| **Schedule 6.7** | **Permits** |
| **Schedule 6.10(a)** | **Labor Matters** |
| **Schedule 6.11** | **Equipment and Fixtures** |
| **Schedule 6.12** | **Inventory** |
| **Schedule 6.13** | **Material Contracts** |
| **Schedule 6.15** | **Environmental Matters** |
| **Schedule 6.16(a)** | **Schedule of Employees** |
| **Schedule 6.16(b)** | **Employee Agreements** |
| **Schedule 6.16(c)(i)** | **Benefit Plans** |
| **Schedule 6.16(c)(iv)** | **Benefits: Former Employers** |
| **Schedule 10.5** | **Customer Agreements** |

# SCHEDULE 1.1(c)
## ASSUMED CONTRACTS AND LEASES

**SCHEDULE 1.2**
**EXCLUDED ASSETS**

## SCHEDULE 1.3
## CONVEYANCE OF ACQUIRED ASSETS

The Buyer shall have received the following, each dated as of the Closing Date and in full force and effect as of the Closing Date, in form and substance reasonably satisfactory to the Buyer and its counsel:

(a)      One or more Bills of Sale, duly executed by the Sellers, in form and substance reasonably satisfactory to Buyer and Sellers, the forms of which shall be submitted by Buyer on or before such date that is two days prior to the scheduled hearing date for the Bankruptcy Court to consider entry of the Sale Order.

(b)      One or more Assignment and Assumption Agreements, duly executed by the Sellers, in form and substance reasonably satisfactory to Buyer and Sellers, the forms of which shall be submitted by Buyer on or before such date that is two days prior to the scheduled hearing date for the Bankruptcy Court to consider entry of the Sale Order.

(c)      One or more Intellectual Property Assignment Agreements, duly executed by the Sellers, in form and substance reasonably satisfactory to Buyer and Sellers, the forms of which shall be submitted by Buyer on or before such date that is two days prior to the scheduled hearing date for the Bankruptcy Court to consider entry of the Sale Order.

(d)      A certificate executed by the appropriate officers of Sellers certifying that: (i) all of the representations and warranties of Sellers set forth in the Sale Documents shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date; unless another date is specified in such representation; (ii) Sellers have performed and complied in all material respects with all of its covenants and other obligations set forth in the Sale Documents required to be performed or complied with by Sellers at or before the Closing.

(e)      All other instruments of transfer, duly executed by the Sellers as shall be reasonably necessary or appropriate, in the reasonable opinion of Buyer's counsel, to vest in the Buyer good and indefeasible title to the Acquired Assets and to permit the Buyer to conduct the Business without interruption.

**SCHEDULE 2.1**
**MEMORANDUM OF ALLOCATION**

**SCHEDULE 6.5**
**REQUIRED CONSENTS**

# SCHEDULE 6.6(a)
## BALANCE SHEETS

# SCHEDULE 6.6(b)
## OTHER FINANCIAL STATEMENTS

**SCHEDULE 6.7**
**PERMITS**

**SCHEDULE 6.10(a)**
**LABOR MATTERS**

## SCHEDULE 6.11
## EQUIPMENT AND FIXTURES

**SCHEDULE 6.12**
**INVENTORY**

{5473347:8}

**SCHEDULE 6.13**
**MATERIAL CONTRACTS**

**SCHEDULE 6.15**
**ENVIRONMENTAL MATTERS**

**SCHEDULE 6.16(a)**
**SCHEDULE OF EMPLOYEES**

**SCHEDULE 6.16(c)(i)**
**BENEFIT PLANS**

**SCHEDULE 6.16(c)(iv)**
**BENEFITS; FORMER EMPLOYEES**

**SCHEDULE 10.5**
**CUSTOMER AGREEMENTS**

DELIB:2740893.3\128303-00012

# **Exhibit C**

Auction and Sale Notice

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **LEE STEEL CORPORATION.** *et al.*[1] | ) | **Case No. 15-45784-mbm** |
| | ) | |
| **Debtors.** | ) | |
| | ) | **Judge  Marci B. McIvor** |
| | ) | |

## NOTICE OF AUCTION SALE OF
## SUBSTANTIALLY ALL OF DEBTORS' ASSETS

TO:     All Interested Parties

   **PLEASE  BE  ADVISED** that on May __, 2015, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed *Debtors' Motion For Entry of an Order Pursuant to 11 U.S.C. §§ 363 and 365, Bankruptcy Rules 2002 and 6004, and Local Rules 6004 and 9014 (a) Establishing Bidding procedures for the Auction Sale of Substantially all of Debtors' Assets Free and Clear of Liens, Claims and Encumbrances and Transferring Liens to Proceeds; (b) Scheduling an Auction and a Sale Hearing to Consider Approval of Sale; (c) Establishing Procedures for the Assumption and Assignment of Executory Contracts; (d) Approving the Form of Asset Purchase Agreement, Form and Manner of the Auction Notice, the Form of the Notice to Non-debtor Co-parties to Executory Contracts, and the Notice of the Sale Hearing*, filed at Docket # _____ (the "Motion").

   **PLEASE  BE  FURTHER  ADVISED** that all capitalized terms herein shall have the meanings set forth in the Motion unless indicated otherwise herein;

   **PLEASE  BE  FURTHER  ADVISED** that pursuant to the Motion, the Court entered an Order (the "Bidding Procedures Order") establishing  procedures for Debtor to sell, subject to approval by the Court at the Sale Hearing, substantially all of its assets, either as a whole or on a

---

1 Debtors include Lee Steel Corporation, Case No. 15-45784-mbm; Taylor Industrial Properties, L.L.C., Case No. 15-45785-mbm, and 4L Ventures, LLC, Case No. 15-45788-mbm.

{5477168:2}

facility by facility basis, free and clear of all liens, interests and encumbrances (the "Sale"), pursuant to certain procedures and approved a proposed form of Purchase Agreement attached as Exhibit A to the Motion (the "Proposed Purchase Agreement");

**PLEASE BE FURTHER ADVISED** that pursuant to the Bidding Procedures Order, Debtor may enter into a purchase agreement substantially in the form of the Proposed Purchase Agreement with a Stalking Horse (the "Stalking Horse Purchase Agreement") prior to the Auction, and subject to higher and better offers at the Auction, in accordance with the terms of the Bidding Procedures Order, the terms of which are set forth below, and pursuant to the terms and conditions of an Order approving the Sale.

**PLEASE BE FURTHER ADVISED** that concurrent with the process for the Sale provided for herein, the Debtors may pursue confirmation of a Plan of Reorganization, and the Bid Procedures Order is without prejudice to Debtors' rights to seek confirmation of such a Plan of Reorganization.  An ***Auction for the Sale has been scheduled for August 11, 2015 at 9:00 a.m. EST*** (the "Auction") at the offices of McDonald Hopkins PLC, 39533 Woodward Avenue, Suite 318, Bloomfield Hills, Michigan 48304 and a ***hearing before the Court to approve the Sale has been scheduled for August __, 2015 at _____,*** (the "Sale Hearing") on the 18th Floor in the U.S. Bankruptcy Court for the Eastern District of Michigan, located at:  211 W. Fort Street, Detroit, Michigan.  Any and all parties desiring to participate in the Auction must comply with the procedures established pursuant to the Bidding Procedures Order.

**PLEASE BE FURTHER ADVISED** that a complete copy of the Sale Motion, the Proposed Purchase Agreement, the Stalking Horse Purchase Agreement, if any, and the Bidding Procedures Order can be obtained by request to Debtors' counsel as identified below.

In order to qualify to be the Stalking Horse, an offeror must be Qualified Bidder, as defined below, and submit a purchase agreement substantially in the form of the Proposed Purchase Agreement, and containing the following pertinent provisions (the "Stalking Horse

Purchase Agreement"), which are generally acceptable to Debtors, after consultation with the Official Committee of Unsecured Creditors ("UCC", and The Huntington National Bank "Lender"):

1. A cash purchase price for the Purchased Assets, including a cash payment for substantially all of Debtors' inventory, payable in full at closing and the assumption of certain contracts and leases and the assumption of certain liabilities.

2. The Stalking Horse Purchase Agreement must be accompanied by an earnest money deposit equal to ten percent (10%) of the proposed cash purchase price for the Purchased Assets to be held by Debtors' counsel pursuant to a mutually acceptable escrow agreement. The deposit will be applied against the purchase price if the Stalking Horse is the successful purchaser of the Purchased Assets. If the sale is not consummated on account of the Stalking Horse's failure to perform any of its obligations under the Stalking Horse Purchase Agreement, Debtors will retain the earnest money deposit. If the Stalking Horse is not in breach of the Stalking Horse Purchase Agreement, it will be entitled to return of the deposit if (i) the Purchased Assets are sold to another purchaser and the sale closes; (ii) the sale is not consummated on account of Debtors' failure to perform under the Stalking Horse Purchase Agreement, or (iii) the sale is not consummated because certain contingencies to closing in the Stalking Horse Purchase Agreement were not timely satisfied by Debtors or deemed waived.

3. The Purchased Assets will include all tangible and intangible assets, personal property, and real property owned by Debtors that is used to operate and conduct the Debtors' business operations as a whole or, alternatively, may

consist of the assets used to operate and conduct Debtors' business operations from the Romulus Facility, or the Wyoming Facility individually, as well as assets located at the Debtors' leased offices in Novi Michigan. Excluded assets will include certain executory contracts and unexpired leases that are not assumed and assigned to the Purchaser under section 365 of the Code; claims and causes of action against third parties arising under chapter 5 of the Code, bank accounts, cash, tax refunds; and life insurance policies, as well as the proceeds of all of the foregoing excluded assets.

4.  Closing will occur and conclude on or before August 28, 2015.

5.  The Stalking Horse will not assume any employee benefit programs, except, to the extent, if any, mandated by Lee Steel's collective bargaining agreement.

6.  Subject to Bankruptcy Court approval, Debtors may be obligated to pay a "break-up fee" of up to $500,000.00 to the Stalking Horse to compensate it for its documented reasonable out-of-pocket expenses in conjunction conducting due diligence and pursuing the purchase of Debtors' assets through the Auction the proposed sale (the "Break-up Fee").

7.  The Stalking Horse must agree to be a Stand-By Bidder as set forth in paragraph 21 of the Bidding Procedures Order, unless this provision is waived by Debtors, after consultation with the UCC and Lender, in which case the requirements of paragraph 21 of the Bidding Procedures Order shall be waived for all Qualified Bidders.

8.  The Stalking Horse's obligations under the Stalking Horse Purchase Agreement may be subject only to limited contingencies, including (i) environmental due diligence, and (ii) financial due diligence, provided;

however, these contingencies will be deemed waived if not exercised in writing within ten calendar (10) days prior to the Auction.

**The Bidding Procedures Order contains the following essential provisions:**

1.  Bidders desiring to bid (the "Potential Bidders") must execute a confidentiality agreement;

2.  Debtor will only consider "Qualified Bids" from "Qualified Bidders", as those terms are defined in the Bidding Procedures Order;

3.  Qualified Bids must be received by Debtors' counsel no later than August 3, 2015 at 5:00 p.m. EST (the "Bid Deadline");

4.  Qualified Bids must be accompanied by an earnest money cash deposit at least equal to ten percent (10%) of the proposed cash purchase price for the Purchased Assets, which deposit shall not be subject to any liens or encumbrances created in favor of any person or entity, and which shall be applied to the purchase price if the Qualified Bidder becomes a Successful Bidder

5.  If there is a Stalking Horse (a) Qualified Bids for the assets of all Debtor's facilities must be for an aggregate purchase price at least equal to the purchase price reflected Stalking Horse Purchase Agreement, plus $600,000.00; and (b) then the first overbid made up of combined Qualified Bids for the Debtors' facilities on a facility by facility basis must aggregate to $600,000.00 more than the bid in the Stalking Horse Purchase Agreement.

6.  Qualified Bids must be substantially in the form as the Proposed Purchase Agreement and be accompanied by a duly executed asset purchase agreement that is marked to reflect variations from either the Stalking Horse Purchase Agreement, if any, or the Proposed Purchase Agreement.

7. Qualified Bids must be accompanied by (a) a letter stating that the bidder's offer is irrevocable until the conclusion of the Sale Hearing and acknowledging and agreeing to be bound by all terms of the Bidding Procedures Order including Stand-by Provision as set forth in paragraph 21 of the Bidding Procedures Order

8. Qualified Bids must be accompanied by written evidence of such bidder's commitment for financing for the full amount of the purchase price (without contingencies) or other evidence of such bidder's ability to consummate the transaction satisfactory to the Debtors, after consultation with Lender and the UCC.

**PLEASE BE FURTHER ADVISED** that if one or more Qualified Bids (other than that of the Stalking Horse, if any) have been received by the Bid Deadline, then Debtors shall conduct the Auction on the date and time established above. In the event Debtors do not receive a Qualified Bid from a Qualified Bidder by the Bid Deadline, Debtors shall proceed with the Sale to the Stalking Horse, if any, subject to approval of the Court at the Sale Hearing, and shall not conduct the Auction.

**PLEASE TAKE FURTHER NOTICE THAT THE BANKRUPTCY COURT HAS ORDERED THAT ANY OBJECTION TO THE SALE MOTION MUST BE FILED WITH THE BANKRUPTCY COURT NO LATER THAN AUGUST __, 2015 (THE "<u>OBJECTION DEADLINE</u>").**

**PLEASE BE FURTHER ADVISED THAT PURSUANT TO FED. R. BANK. P. 9014, OBJECTIONS (IF ANY) MUST: (A) BE IN WRITING; (B) SET FORTH THE NATURE OF THE OBJECTOR'S CLAIMS AGAINST OR INTERESTS IN DEBTORS ESTATES AND THE BASIS FOR THE OBJECTION AND THE SPECIFIC GROUNDS THEREFORE; (C) COMPLY WITH THE BANKRUPTCY RULES AND THE LOCAL**

BANKRUPTCY RULES AND ORDERS OF THIS COURT; (D) BE FILED WITH THE CLERK OF THE BANKRUPTCY COURT ON OR BEFORE THE OBJECTION DEADLINE; AND (E) BE SERVED AND ACTUALLY RECEIVED BY ALL PARTIES LISTED ON THE ATTACHED SERVICE LIST NO LATER THAN THE OBJECTION DEADLINE.

PLEASE TAKE FURTHER NOTICE THAT UNLESS YOU FILE AN OBJECTION TO THE SALE OF THE ASSETS WITH THE COURT AS DESCRIBED ABOVE, OR UNLESS THE BANKRUPTCY COURT DIRECTS OTHERWISE, WITHIN THE TIME SET FORTH ABOVE, YOU WILL BE DEEMED TO HAVE CONSENTED FOR ALL PURPOSES TO THE RELIEF REQUESTED IN THE SALE MOTION.

PLEASE TAKE FURTHER NOTICE THAT TIMELY FILED OBJECTIONS, IF ANY, WILL BE HEARD AT THE SALE HEARING.

COPIES OF THE SALE MOTION, THE PROPOSED PURCHASE AGREEMENT, THE STALKING HORSE PURCHASE AGREEMENT, IF ANY, AND THE BIDDING PROCEDURES ORDER ARE AVAILABLE FROM DEBTORS COUNSEL, STEPHEN M. GROSS, ESQ., MCDONALD HOPKINS PLC, 393533 WOODWARD AVE., STE. 318, BLOOMFIELD HILLS, MI 48304, (248) 646-5070, E-MAIL: SGROSS@MCDONALDHOPKINS.COM.

Respectfully submitted,

_____
Stephen M. Gross (P35410)
Jayson B. Ruff  (P69893)
Joshua A. Gadharf (P76860)
McDONALD HOPKINS PLC
39533 Woodward Avenue
Suite 318
Bloomfield Hills, MI  48304
Telephone: (248) 646-5070
Facsimile:  (248) 646-5075
E-mail: sgross@mcdonaldhopkins.com
          jruff@mcdonaldhopkins.com
          jgadharf@mcdonaldhopkins.com

and

Manju Gupta (0076452)
McDONALD HOPKINS LLC
600 Superior Avenue, E., Suite 2100
Cleveland, OH 44114
Telephone:    (216) 348-5400
Facsimile:    (216) 348-5474
E-mail: mgupta@mcdonaldhopkins.com

## SERVICE LIST

Stephen M. Gross, Esq.
 McDonald Hopkins PLC
Attorney for Debtor
39533 Woodward Ave., Ste. 318
Bloomfield Hills, MI  48304
sgross@mcdonaldhopkins.com

Steven G. Howell
Dickinson Wright, PLLC
Attorney for The Huntington National Bank
500 Woodward Ave., Ste. 4000
Detroit, MI 48226
showell@dickinsonwright.com

Scott Wolfson, Esq.
Attorney for the Official Committee of Unsecured Creditors
Wolfson Bolton PLLC
3150 Livernois Rd Ste 275
Troy, MI 48083
Phone: (248) 247-7103
Fax: (248) 247-7099
Email: swolfson@wolfsonbolton.com

Office of the U.S. Trustee
Leslie Berg, Esq.
211 W. Fort Street, Ste. 700
Detroit, MI 48226
leslie.berg@usdoj.gov

Mr. Zachary Taylor
c/o David Dragich, Esq.
Harrington Dragich PLLC
21043 Mack Ave
Grosse Pointe Woods, MI 48236
ddragich@harringtondragich.com

.

# Exhibit D

Assumption and Assignment Notice

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LEE STEEL CORPORATION. *et al.*[1] | ) | Case No. 15-45784-mbm |
| | ) | |
| | ) | |
| Debtors. | ) | Judge  Marci B. McIvor |
| | ) | |

## NOTICE OF OPPORTUNITY TO OBJECT TO ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

TO:    All Interested Parties

**PLEASE BE ADVISED** that on May __, 2015, the Court entered its *Order Pursuant to 11 U.S.C. §§ 363 and 365, Bankruptcy Rules 2002 and 6004, and Local Rules 6004 and 9014 (a) Establishing Bidding procedures for the Auction Sale of Substantially all of Debtors' Assets Free and Clear of Liens, Claims and Encumbrances and Transferring Liens to Proceeds; (b) Scheduling an Auction and a Sale Hearing to Consider Approval of Sale; (c) Establishing Procedures for the Assumption and Assignment of Executory Contracts; (d) Approving the Form of Asset Purchase Agreement, Form and Manner of the Auction Notice, the Form of the Notice to Non-debtor Co-parties to Executory Contracts, and the Notice of the Sale Hearing*, entered at Docket # _____ (the "Bidding Procedures Order").

**PLEASE BE FURTHER ADVISED** that the Debtors are seeking authority from the Court to sell substantially all of their assets, free and clear of all liens, interests and encumbrances (the "Sale").  A hearing on the Sale has been scheduled for August __, 2015, at _____ (the "Sale Hearing").

**PLEASE BE FURTHER ADVISED** that in conjunction with the Sale, the Debtors may assume some or all of the executory contracts and/or unexpired leases that are outlined on the attached Cure

Schedule.  The assumed contracts and leases shall be assigned to the Purchaser of the Debtors' assets at the closing of the Sale.

**PLEASE BE FURTHER ADVISED** that pursuant §365 of the Bankruptcy Code, the Debtors propose to pay the cure amounts outlined on the Cure Schedule to the counterparty to each contract or lease that is assumed  (the "Pre-Petition Cure Amount");

**PLEASE BE FURTHER ADVISED** that the Debtors shall make cure payments within thirty (30) days of the closing of the Sale.

**PLEASE TAKE NOTICE** that, pursuant to the Bidding Procedures Order, after receiving a Qualified Bid for its Assets, the Debtors shall promptly notify, by electronic, overnight mail and/or facsimile, each counter-party to a contract or lease that is to be assigned to the maker of such Qualified Bid, and shall supply such counter party with the Adequate Assurance of future performance proposed by the Qualified Bidder for each contract and lease that the Qualified Bidder is to be assigned.

**PLEASE TAKE FURTHER NOTICE THAT THE BANKRUPTCY COURT HAS ORDERED THAT ANY OBJECTION TO THE PROPOSED CURE AMOUNT OR THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS AND ASSUMED LEASES OR THE PRE-PETITION CURE AMOUNT MUST BE FILED WITH THE CLERK OF THE BANKRUPTCY COURT NO LATER THAN THREE (3) DAYS BEFORE THE SALE HEARING (THE "OBJECTION DEADLINE").  IN THE CASE OF THE PROPOSED ASSUMPTION AND ASSIGNMENT CONTAINED IN A SUPPLEMENTAL LIST OF CONTRACTS, THE OBJECTION DEADLINE SHALL BE FIVE (5) DAYS AFTER SERVICE OF THE SUPPLEMENTAL LIST.**

**PLEASE BE FURTHER ADVISED** that for each Assumed Contract and Assumed Lease for which an objection is timely received, a hearing will be held at the Sale Hearing or such other date as

---

[1] Debtors include Lee Steel Corporation, Case No. 15-45784-mbm; Taylor Industrial Properties, L.L.C., Case No. 15-

the Court may designate upon twenty-four (24) hours' telephonic, electronic or facsimile notice to the objecting party.

**PLEASE BE FURTHER ADVISED THAT OBJECTIONS (IF ANY), MUST: (A) BE IN WRITING; (B) SET FORTH THE WITH DETAIL THE GROUNDS FOR THE OBJECTION, AND THE BASIS FOR THE CALCULATION OF ANY ALTERNATIVE CURE AMOUNT; (C) COMPLY WITH THE BANKRUPTCY RULES AND THE LOCAL BANKRUPTCY RULES AND ORDERS OF THIS COURT; (D) BE FILED WITH THE CLERK OF THE BANKRUPTCY COURT ON OR BEFORE THE OBJECTION DEADLINE; AND (E) BE ACTUALLY SERVED AND RECEIVED BY THE PARTIES ON THE ATTACHED SERVICE LIST BY THE OBJECTION DEADLINE.**

**PLEASE TAKE FURTHER NOTICE THAT UNLESS YOU FILE WITH THE COURT AN OBJECTION TO THE ASSUMPTION AND/OR ASSIGNMENT, OR TO THE PRE-PETITION CURE AMOUNT AS DESCRIBED ABOVE, OR UNLESS THE BANKRUPTCY COURT DIRECTS OTHERWISE, YOU WILL BE FOREVER BARRED FROM OBJECTING TO THE CURE AMOUNT OR THE ASSUMPTION AND ASSIGNMENT OF ANY EXECUTORY CONTRACT OR LEASE.**

**PLEASE BE FURTHER ADVISED** that counterparties to contracts or leases that are assumed and assigned will be notified of the assumption and assignment promptly after the closing of the Sale.

**PLEASE BE FURTHER ADVISED** that contracts and leases not assumed and assigned will be rejected after separate notice and opportunity for hearing..

**COPIES OF THE ASSIGNMENT MOTION ARE AVAILABLE FROM DEBTOR'S COUNSEL, STEPHEN M. GROSS, ESQ., MCDONALD HOPKINS PLC, 39533 WOODWARD AVE., STE. 318, BLOOMFIELD HILLS, MI 48304, (248) 646-5070, E-MAIL: SGROSS@MCDONALDHOPKINS.COM.**

45785-mbm, and 4L Ventures, LLC, Case No. 15-45788-mbm.

Respectfully submitted,

_____
Stephen M. Gross (P35410)
Jayson B. Ruff  (P69893)
Joshua A. Gadharf (P76860)
McDONALD HOPKINS PLC
39533 Woodward Avenue
Suite 318
Bloomfield Hills, MI  48304
Telephone: (248) 646-5070
Facsimile:  (248) 646-5075
E-mail: sgross@mcdonaldhopkins.com
        jruff@mcdonaldhopkins.com
        jgadharf@mcdonaldhopkins.com

and

Manju Gupta (0076452)
McDONALD HOPKINS LLC
600 Superior Avenue, E., Suite 2100
Cleveland, OH 44114
Telephone:    (216) 348-5400
Facsimile:    (216) 348-5474
E-mail:mgupta@mcdonaldhopkins.com

## SERVICE LIST

Stephen M. Gross, Esq.
McDonald Hopkins PLC
Attorney for Debtor
39533 Woodward Ave., Ste. 318
Bloomfield Hills, MI  48304
Email:  sgross@mcdonaldhopkins.com

Steven G. Howell
Dickinson Wright, PLLC
Attorney for The Huntington National Bank
500 Woodward Ave., Ste. 4000
Detroit, MI 48226
Email:  showell@dickinsonwright.com

Scott Wolfson, Esq.
Attorney for the Official Committee of Unsecured Creditors
Wolfson Bolton PLLC
3150 Livernois Rd Ste 275
Troy, MI 48083
Phone: (248) 247-7103
Fax: (248) 247-7099
Email: swolfson@wolfsonbolton.com

Office of the U.S. Trustee
Leslie Berg, Esq.
211 W. Fort Street, Ste. 700
Detroit, MI 48226
Email: leslie.berg@usdoj.gov

Mr. Zachary Taylor
c/o David Dragich, Esq.
Harrington Dragich PLLC
21043 Mack Ave
Grosse Pointe Woods, MI 48236
Email: ddragich@harringtondragich.com