**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| **LEE STEEL CORPORATION.** *et al.*[1] | ) **Case No. 15-45784-mbm** |
| | ) |
| Debtors. | ) |
| | ) **Judge Marci B. McIvor** |
| _____ | ) |

**NOTICE OF FILING OF STALKING HORSE PURCHASE AGREEMENT**
**FOR ROMULUS FACILITY AND**
**NOTICE OF HEARING ON MOTION TO APPROVE SALE**

TO:     All Interested Parties

**PLEASE BE ADVISED** that on May 1, 2015, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed *Debtors' Motion For Entry of an Order Pursuant to 11 U.S.C. §§ 363 and 365, Bankruptcy Rules 2002 and 6004, and Local Rules 6004 and 9014 (a) Establishing Bidding procedures for the Auction Sale of Substantially all of Debtors' Assets Free and Clear of Liens, Claims and Encumbrances and Transferring Liens to Proceeds; (b) Scheduling an Auction and a Sale Hearing to Consider Approval of Sale; (c) Establishing Procedures for the Assumption and Assignment of Executory Contracts; (d) Approving the Form of Asset Purchase Agreement, Form and Manner of the Auction Notice, the Form of the Notice to Non-debtor Co-parties to Executory Contracts, and the Notice of the Sale Hearing*, at Docket # 85  (the "Bid Procedures Motion").

**PLEASE BE FURTHER ADVISED** that all capitalized terms herein shall have the meanings set forth in the Bid Procedures Motion unless indicated otherwise herein;

**PLEASE BE FURTHER ADVISED** that pursuant to the Bid Procedures Motion, the Court entered an Order at Docket # 175 (the "Bidding Procedures Order") establishing

---

1 Debtors include Lee Steel Corporation, Case No. 15-45784-mbm; Taylor Industrial Properties, L.L.C., Case No. 15-45785-mbm, and 4L Ventures, LLC, Case No. 15-45788-mbm.

procedures for Debtor to sell, subject to approval by the Court at the Sale Hearing, substantially all of its assets, either as a whole or on a facility by facility basis, free and clear of all liens, interests and encumbrances (the "Sale"), pursuant to certain procedures and approved a proposed form of Purchase Agreement filed at Docket # 173 (the "Proposed Purchase Agreement");

**PLEASE BE FURTHER ADVISED** that pursuant to the Bidding Procedures Order, Debtors, after consultation with The Huntington National Bank ("Lender") and the Official Committee of Unsecured Creditors ("Committee") intend to enter into a purchase agreement with a Stalking Horse for Debtors' real estate and equipment (excluding working capital assets) related to its facility in Romulus, Michigan (substantially in the form attached hereto as Exhibit 1, the "Stalking Horse Purchase Agreement") prior to the Auction and the Lender supports the payment of the break-up fee to the Stalking Horse as set forth in the Stalking Horse Purchase Agreement, which will remain subject to higher and better offers at the Auction, in accordance with the terms of the Bidding Procedures Order, and pursuant to the terms and conditions of an Order approving the Sale.

**PLEASE BE FURTHER ADVISED** that an *Auction for the Sale has been scheduled for August 11, 2015 at 9:00 a.m. EST* (the "Auction") at the offices of Dickinson Wright, PLLC, 500 Woodward Ave., Suite 4000, Detroit, Michigan, 48226 and a *hearing before the Court to approve the Sale has been scheduled for August 12, 2015 at 9:30 a.m. EST,* (the "Sale Hearing") on the 18th Floor in the U.S. Bankruptcy Court for the Eastern District of Michigan, located at: 211 W. Fort Street, Detroit, Michigan. Any and all parties desiring to participate in the Auction must comply with the procedures established pursuant to the Bidding Procedures Order.

**PLEASE BE FURTHER ADVISED** that a complete copy of the *Motion Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 6004 for Entry of an Order (i) Authorizing Debtors to Enter Into Agreement for Sale of Substantially all of Debtors'*

*Assets with Successful Bidder at Auction (ii) Authorizing the Sale of Substantially all of Debtors' Assets in Connection Therewith Free and Clear of all Liens, Claims, Encumbrances and Interests and Transferring Liens to Proceeds; and (iii) Granting Related Relief* (filed at Docket No. 255, the "Sale Motion"), the Bid Procedures Motion, the Proposed Purchase Agreement, the Stalking Horse Purchase Agreement, if any, and the Bidding Procedures Order can be obtained by request to Debtors' counsel identified below.

**PLEASE BE FURTHER ADVISED** that if one or more Qualified Bids (other than that of the Stalking Horse, if any) have been received by the Bid Deadline, then Debtors shall conduct the Auction on the date and time established above. In the event Debtors do not receive a Qualified Bid from a Qualified Bidder by the Bid Deadline, Debtors shall proceed with the Sale to the Stalking Horse, if any, subject to approval of the Court at the Sale Hearing, and shall not conduct the Auction.

**PLEASE TAKE FURTHER NOTICE THAT ANY OBJECTION TO THE SALE MOTION MUST BE FILED WITH THE BANKRUPTCY COURT NO LATER THAN 4:00 P.M. EST AUGUST 11, 2015 (THE "OBJECTION DEADLINE").**

**PLEASE BE FURTHER ADVISED THAT PURSUANT TO FED. R. BANK. P. 9014, OBJECTIONS (IF ANY) MUST: (A) BE IN WRITING; (B) SET FORTH THE NATURE OF THE OBJECTOR'S CLAIMS AGAINST OR INTERESTS IN DEBTORS ESTATES AND THE BASIS FOR THE OBJECTION AND THE SPECIFIC GROUNDS THEREFORE; (C) COMPLY WITH THE BANKRUPTCY RULES AND THE LOCAL BANKRUPTCY RULES AND ORDERS OF THIS COURT; (D) BE FILED WITH THE CLERK OF THE BANKRUPTCY COURT ON OR BEFORE THE OBJECTION DEADLINE; AND (E) BE SERVED AND ACTUALLY RECEIVED BY ALL PARTIES LISTED ON THE ATTACHED SERVICE LIST NO LATER THAN THE OBJECTION DEADLINE.**

PLEASE TAKE FURTHER NOTICE THAT UNLESS YOU FILE AN OBJECTION TO THE SALE OF THE ASSETS WITH THE COURT AS DESCRIBED ABOVE, OR UNLESS THE BANKRUPTCY COURT DIRECTS OTHERWISE, WITHIN THE TIME SET FORTH ABOVE, YOU WILL BE DEEMED TO HAVE CONSENTED FOR ALL PURPOSES TO THE RELIEF REQUESTED IN THE BID PROCEDURES MOTION AND THE SALE MOTION.

PLEASE TAKE FURTHER NOTICE THAT TIMELY FILED OBJECTIONS, IF ANY, WILL BE HEARD AT THE SALE HEARING.

COPIES OF THE SALE MOTION, THE BID PROCEDURES MOTION, THE PROPOSED PURCHASE AGREEMENT, THE STALKING HORSE PURCHASE AGREEMENT, IF ANY, AND THE BIDDING PROCEDURES ORDER ARE AVAILABLE FROM DEBTORS COUNSEL, STEPHEN M. GROSS, ESQ., MCDONALD HOPKINS PLC, 393533 WOODWARD AVE., STE. 318, BLOOMFIELD HILLS, MI 48304, (248) 646-5070, E-MAIL: SGROSS@MCDONALDHOPKINS.COM.

[Space Intentionally Blank]

Dated August 4, 2015                    Respectfully submitted,


                                        /s/ Jayson B. Ruff
                                        Stephen M. Gross (P35410)
                                        Jayson B. Ruff  (P69893)
                                        Joshua A. Gadharf (P76860)
                                        McDONALD HOPKINS PLC
                                        39533 Woodward Avenue
                                        Suite 318
                                        Bloomfield Hills, MI  48304
                                        Telephone: (248) 646-5070
                                        Facsimile:  (248) 646-5075
                                        E-mail: sgross@mcdonaldhopkins.com
                                               jruff@mcdonaldhopkins.com
                                               jgadharf@mcdonaldhopkins.com

                                        and

                                        Manju Gupta (0076452)
                                        McDONALD HOPKINS LLC
                                        600 Superior Avenue, E., Suite 2100
                                        Cleveland, OH 44114
                                        Telephone:     (216) 348-5400
                                        Facsimile:     (216) 348-5474
                                        E-mail:mgupta@mcdonaldhopkins.com


                          **SERVICE LIST**

Stephen M. Gross, Esq.
 McDonald Hopkins PLC
Attorney for Debtor
39533 Woodward Ave., Ste. 318
Bloomfield Hills, MI  48304
sgross@mcdonaldhopkins.com

Steven G. Howell
Dickinson Wright, PLLC
Attorney for The Huntington National Bank
500 Woodward Ave., Ste. 4000
Detroit, MI 48226
showell@dickinsonwright.com

Scott Wolfson, Esq.
Attorney for the Official Committee of Unsecured Creditors
Wolfson Bolton PLLC
3150 Livernois Rd Ste 275

Troy, MI 48083
Phone: (248) 247-7103
Fax: (248) 247-7099
Email: swolfson@wolfsonbolton.com

Office of the U.S. Trustee
Leslie Berg, Esq.
211 W. Fort Street, Ste. 700
Detroit, MI 48226
leslie.berg@usdoj.gov

Mr. Zachary Taylor
c/o David Dragich, Esq.
Harrington Dragich PLLC
21043 Mack Ave
Grosse Pointe Woods, MI 48236
ddragich@harringtondragich.com

.

# __Exhibit 1__

Stalking Horse Purchase Agreement for Romulus Facility

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made as of August 4, 2015, by and among Hilco Industrial, LLC ("HI") and Hilco Real Estate, LLC ("HRE", and collectively with HI, "Hilco") on behalf of itself and one or more entities to be designated by Hilco to acquire the assets as set forth herein ("Buyer"); Lee Steel Corporation, a Michigan corporation ("Lee Steel"), Taylor Industrial Properties, LLC ("Taylor"), and 4L Ventures, LLC ("4L" and collectively with Taylor, the "Real Estate Sellers") (Lee Steel and the "Real Estate Sellers" are sometimes collectively referred to herein as the "Sellers").

## WITNESSETH:

WHEREAS, Lee Steel is engaged in the business of providing a full range of flat rolled steel products, including hot and cold rolled steel and exposed coated products, as well as steel pickling services, from a facility in Romulus, Michigan leased from 4L (the "Romulus Facility") and a facility in Wyoming, Michigan leased from Taylor (the "Wyoming Facility" and together with the Romulus Facility, "Facilities") and operates its offices from a leased facility in Novi, Michigan.

WHEREAS, Lee Steel has filed a voluntary petition for relief in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"), commencing a case under chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 *et seq.* (the "Bankruptcy Code"), case number 15-45784 (the "Case");

WHEREAS, Sellers desire to sell, and Buyer desires to purchase, certain of the assets and rights of Sellers at the Romulus Facility as set forth in this Agreement and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, in connection with the Case, Sellers have filed a motion with the Bankruptcy Court seeking the approval of the sale of Sellers' assets free and clear of all interests, liens, claims and encumbrances and the assumption and assignment of certain contracts and leases pursuant to the Bankruptcy Code; and

WHEREAS, Sellers and Buyer contemplate a closing of the transactions described above following the entry of the Sale Order (as defined herein), which Sale Order shall not be subject to any stay, temporary restraining order or injunction as of the Closing Date (as defined herein).

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

# ARTICLE I

## PURCHASE AND SALE OF ASSETS

1.1     <u>Acquired Assets.</u>  Upon the terms and subject to the conditions set forth in this Agreement, Sellers shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase and acquire from Sellers, all Sellers' right, title and interest in, to and under all of the Acquired Assets (as hereinafter defined), free and clear of all liens, pledges, mortgages, security interests, Claims (as defined in Section 101(5) of the Bankruptcy Code), interests and encumbrances of any nature whatsoever (collectively, "<u>Liens</u>"), and those expressly assumed by Buyer pursuant to this Agreement, at the Closing on the Closing Date (as such terms are defined in Section 5).  The term "<u>Acquired Assets</u>" means all of Sellers' rights, title and interests in, to the machinery and equipment, and real property at the Romulus Facility as set forth below, excluding only the Excluded Assets (as defined in Section 1.2), including, without limitation, the following:

      (a)     all real property ownership interests, including title to the real estate comprising the Romulus Facility set forth on Schedule 1.1(a), together with all tenements, hereditaments, easements, rights of way, privileges and appurtenances to those interests and improvements on or to those interests, including the right to make divisions, if any (collectively, the "<u>Real Estate</u>");

      (b)     all *(i)* tangible personal property, including, without limitation, all equipment, and machinery in all of its forms, located at the Romulus Facility, including, without limitation, all accessions, additions, appurtenances and improvements to, parts, products and replacements of and documents and substitutes for the foregoing (collectively, the "<u>Equipment</u>") as specifically set forth on Schedule 1.1(b); and *(ii)* to the extent not covered by the definition of Equipment or Real Estate, all fixtures located at or appurtenant to the Real Estate in all of their forms, wherever located, now or hereafter existing, including, without limitation, all accessions, additions, appurtenances and improvements to, parts, products and replacements of and documents and substitutes for the foregoing (collectively, the "<u>Fixtures</u>"); but excluding all finished goods, work in process, raw materials, goods in transit, goods at customer sites and other inventory, wherever located, now or hereafter existing (collectively, the "<u>Inventory</u>");

1.2     <u>Excluded Assets.</u>  Sellers will retain (and the Acquired Assets will not include) the following (collectively, the "<u>Excluded Assets</u>"):

      (a)     the Purchase Price payable to Sellers pursuant to Section 2.1;

-2-

(b)      the certificate of incorporation, minute books, stock books and other corporate records of Sellers having exclusively to do with the corporate organization and capitalization of Sellers, and the Seller's rights under this Agreement and all related agreements ("Sale Documents");

(c)      all cash, security deposits, professional retainers, refunds, deposits and prepaid expenses of the Sellers and all vendor rebate accounts and prospective rebates, whether soft dollar or hard dollar, and all securities in which any of the Sellers have an interest, and for the avoidance of doubt, all accounts receivable arising from the Sellers' business, including from products produced at the Romulus Facility using the Equipment;

(d)      all chapter 5 Avoidance Action(s) (as defined in the Bidding Procedures Order), any Objection(s) (as defined in the Bidding Procedures Order) brought by the Unsecured Creditors Committee, as well as any state law fraudulent transfer and similar causes of action, claims, or demands against Sellers' equity owners, officers, directors, members, employees, agents, representatives or professionals, and those claims and causes of action listed and set forth on Schedule 1.2 attached hereto, as well as any proceeds thereof;

(e)      all Inventory as defined in section 1.1(b) above;

(f)      any assets of Sellers not specifically included in the Acquired Assets;

1.3      Conveyance of Acquired Assets. The sale, transfer, conveyance, assignment and delivery of the Acquired Assets provided for in this Article 1 shall be made by the documentation described on Schedule 1.3 attached hereto which shall include all good and sufficient instruments of conveyance and transfer as shall be necessary to vest in Buyer as of the Closing Date title to the Acquired Assets being sold, transferred, conveyed, assigned and delivered hereunder in the condition required by this Agreement.

1.4      Assumed Liabilities and Excluded Liabilities. Buyer will not assume or become liable for the payment, performance or discharge of any liabilities or obligations of Sellers, except that upon the terms and subject to the conditions of this Agreement.

## ARTICLE 2

## PURCHASE PRICE

2.1      Purchase Price. Subject to the adjustments provided in Section 2.4, the purchase price (the "Purchase Price") for the Acquired Assets shall be Fourteen Million Dollars ($14,000,000.00). The Purchase Price shall be allocated for tax purposes between Buyer and

-3-

Seller among the Acquired Assets in accordance with Schedule 2.1 attached hereto (the "Memorandum of Allocation").

2.2     Earnest Money Deposit.  Immediately upon execution of this Agreement, Buyer shall pay into escrow with Sellers' counsel or other independent party mutually satisfactory to Buyer and Sellers (the "Escrow Agent") an earnest money deposit in the amount equal to One Million Dollars (($1,000,000.00) (together with interest earned thereon, the "Earnest Money Deposit"), which deposit will be held and disbursed by the Escrow Agent pursuant to the terms of a Deposit and Inventory Escrow Agreement in a form reasonably satisfactory to Buyer and Sellers (the "Deposit and Inventory Escrow Agreement").  The parties agree that the Earnest Money Deposit shall be held in escrow and shall not become, or be considered, part of the bankruptcy estate of Sellers until it is released or forfeited pursuant to this Agreement.  Upon consummation of the Closing, the Earnest Money Deposit shall be paid to Lender to be credited as partial payment of the Purchase Price. If (i) the conditions of Closing set forth in Article 10 are satisfied, (ii) Sellers shall have duly performed and complied with all of its obligations under the Sale Documents, and (iii) the transactions contemplated by the Sale Documents would otherwise have been consummated on or prior August 28, 2015 (as such date may extended as set forth herein) but for the breach by Buyer of any of their material obligations under this Agreement, but the Closing is not consummated as a result of Buyer's failure to perform its obligations hereunder, then the Earnest Money Deposit shall be forfeited and immediately paid to Lender for the account of Sellers or Sellers' estates.  If (x) the Bankruptcy Court does not enter the Sale Order by August 27, 2015, (y) Sellers sell or agree to sell any of the Acquired Assets to any person or entity other than Buyer pursuant to the provisions of Article IV hereof or such other provisions as may be determined by the Bankruptcy Court, or (z) the Closing is not consummated as a result of Sellers' failure to perform any of its material obligations hereunder or due to the failure to satisfy any of the conditions precedent set forth in Article 10 hereof, then the Earnest Money Deposit shall be immediately returned to Buyer and, if clause (x) is applicable, this Agreement shall terminate.

2.3     Payment of Cash Purchase Price.  The Purchase Price shall be payable as follows:

2.3.1     On the Closing Date, the Earnest Money Deposit shall be paid by the Escrow Agent to Lender and credited as partial payment of the Purchase Price.

2.3.2     On the Closing Date, Buyer shall pay an amount equal to the difference between the Purchase Price and the Earnest Money Deposit to Lender for the account of Sellers by wire transfer of immediately available funds.

# ARTICLE 3

# ASSUMPTION OF CERTAIN LIABILITIES

3.1     Assumption of Certain Liabilities.  Effective as of the Closing, Buyer shall assume and hereby agrees to perform and discharge only those of Sellers' liabilities set forth on Schedule 3.1. (the "Assumed Liabilities").

3.2  No Assumption of Other Liabilities.  Except for the Assumed Liabilities expressly identified in Section 3.1, Buyer does not assume and shall not in any manner become responsible or liable for, and Sellers shall retain, all other debts, obligations or liabilities of Sellers of any nature whatsoever, whether known or unknown, fixed, contingent or otherwise, including, without limitation, any debts, obligations, or other liabilities directly or indirectly arising out of, or resulting from Sellers' ownership or use of the Acquired Assets prior to the Closing Date (collectively, the "Excluded Liabilities.

3.3  Sellers to Perform Excluded Liabilities.  Sellers will remain responsible for all Excluded Liabilities, subject to Sellers' rights under the Bankruptcy Code and other available defenses.

## ARTICLE 4

## ADDITIONAL COVENANTS OF PARTIES

4.1  Bankruptcy Actions.

4.1.1  Buyer and Sellers acknowledge that this Agreement is the result of negotiations for a transaction with Buyer who is prepared to pay the fair value of the Acquired Assets.  The parties also acknowledge that, under the Bankruptcy Code, Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest and best price possible of the Acquired Assets, including, but not limited to, giving notice of the transaction contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the business of Sellers to responsible bidders subject to appropriate confidentiality agreements, entertaining higher and better offers from responsible bidders, and if necessary, conducting an auction.

4.1.2  To facilitate the foregoing, Sellers filed with the Bankruptcy Court a motion for entry of an order (the "Bidding Procedures Order"), which has been entered with the terms set forth in Section 4.1.3 below.  Sellers have or will file with the Bankruptcy Court a motion for entry of an order (the "Sale Order"), which shall provide as set forth in Section 4.1.4 below.

4.1.3  Sellers agree to implement the terms of the Bidding Procedures Order and consummate the sale transaction described therein and pursuant to this Agreement as follows:

(a)  the time, date and location of the hearing to approve the sale (the "Sale Hearing") shall be no later than three (3) business days following the Auction described below;

(b)        the time and date of the Auction, to be held at the offices of Sellers' counsel in Bloomfield Hills, Michigan, or such other location as Sellers may designate, for consideration of qualifying higher or better offers that may be presented to Sellers (the "Auction"), shall be no later than August 18, 2015;

(c)        the Break-Up Fee (as defined in Article 12) shall be in the amount defined in Article 12 and paid to Buyer in accordance with the terms of the Bidding Procedures Order and this Agreement;

(d)    the Sellers shall not entertain or accept any bid from another party at the Auction unless such bid:

(i)    is submitted to Sellers on or prior to the Bid Deadline (as defined in the Bidding Procedures Order and to be set by Sellers, but in no case to occur later than 5:00 p.m. prevailing eastern time on August 11, 2015), with a copy received by Buyer promptly thereafter,

(ii)    is accompanied (A) by a cash deposit equal to ten percent (10%) of the cash portion of the Purchase Price, which deposit shall not be subject to any liens or encumbrances created in favor of any Person, and (B) by a duly executed acquisition agreement that is marked to reflect variations from this Agreement,

(iii)    contains no covenant or representation or warranty that is less favorable or more burdensome or conditional to Sellers than as may be set forth in this Agreement in the reasonable opinion of Sellers, Lender, and the Sellers' Unsecured Creditors Committee,

(iv)    contains no contingency relating to due diligence or financing, or any condition precedent to the bidder's obligation to close that is not otherwise contained in this Agreement,

(v)    designates the executory Contracts and unexpired leases that the bidder may request Sellers to assume and assign to the bidder and any other assets of Sellers that are subject to the bid,

(vi)    is made by one or more bidders, each of which can demonstrate to the satisfaction of Sellers, and that, individually or in the aggregate, it is (or they are) financially able to consummate the transaction contemplated by such bid(s) on the terms contemplated therein, and

(vii)    is for an aggregate purchase price at least equal to the Purchase Price plus US $175,000.00 (which amount is amount of the Break-Up Fee plus a minimum overbid of US $25,000.00).

(a bid which meets the foregoing requirements (i)—(vii) is hereinafter referred to as a "Qualified Bid" and the person making a Qualified Bid as a "Qualified Bidder");

(e)     Sellers agree and acknowledge that the transactions contemplated by this Agreement constitute a Qualified Bid of Buyer and that Buyer shall be deemed to be a Qualified Bidder and need not take any further steps to comply with the Bidding Procedures to become a Qualified Bidder and may participate in the Auction;

(f)     Sellers agree that if (i) Sellers do not receive a Qualified Bid (other than this Agreement) and (ii) Buyer is not in breach hereof, Sellers will report the same to the Bankruptcy Court and will proceed with the Sale Hearing as soon as practicable, but in no event later than August 28, 2015 to sell the Acquired Assets to Buyer as provided hereunder;

(g)     Sellers agree that if, and only if, Sellers receive a Qualified Bid in addition to Buyer's Qualified Bid, Buyer is not in breach hereof and all contingencies to closing have been satisfied or waived, the Auction will occur at or prior to August 18, 2015 and such Auction shall be conducted in such a manner as to maximize the return to Sellers' estates (consistent with the Bidding Procedures), and Sellers shall establish reasonable procedures consistent with the Bidding Procedures ("Auction Procedures") at the commencement of the Auction for the conduct of the Auction so as to accomplish such goal, provided that the Auction Procedures shall, in any event, provide that: (A) at the commencement of the Auction, Sellers will determine based on the nature of the Qualified Bids (the "Baseline Bid") the bid to serve as the lead bid in the Auction, which bid will at the commencement of the Auction be announced to all Qualified Bidders participating at the Auction; (B) participating bidders (including Buyer to the extent Buyer so chooses) will be permitted to increase their bids and to agree to modifications to their bids (consistent with the provisions of this Section 4.1.3(g)) in order to make their bids more favorable to Sellers, provided that, subject to the following clause (C), each bid for all the Acquired Assets shall exceed the preceding bid by US $25,000.00; (C) solely for purposes of determining the successful bid, any overbid submitted by Buyer shall be deemed to include the full amount of the Break-Up Fee potentially payable; and (D) Sellers shall submit the successful bid to the Bankruptcy Court for approval;

(h)     Sellers agree that, if Buyer is not the proponent of the successful bid, Buyer's offer to purchase the Acquired Assets pursuant to this Agreement (without any modifications by Buyer at the Auction other than those modifications Buyer, in its sole discretion, elects to have apply) shall remain open until the later of the periods provided for in the Bid Procedures Order; or until either *(i)* Buyer notifies Sellers anytime after the Auction that it terminates its offer or *(ii)* 10 days after the date set for Closing, whichever occurs earlier, and thereupon in such case, Buyer's offer shall be deemed terminated without further action on the part of Sellers or Buyer, and, provided that Buyer is not in breach hereof, Sellers shall immediately return the Earnest Money Deposit and pay the Break-Up Fee to Buyer to the extent provided for in the Bid Procedures Order.

4.1.4    The Sale Order shall be an order by the Bankruptcy Court in form and substance reasonably satisfactory to Buyer, Sellers and Lender, providing for, among other things, *(i)* the approval of this Agreement and the transactions contemplated by this Agreement, *(ii)* the approval of the sale of the Acquired Assets to Buyer pursuant to Section 363(b) and (f) of the Bankruptcy Code free and clear of all Liens and does not require any consent, approval, authorization or order of, notice to or registration or filing with any governmental authority or other person (each, a "Consent"), *(iii)* findings that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code, *(iv)* the assumption by Sellers and assignment to Buyer pursuant to Section 365 of the Bankruptcy Code of the Assumed Contracts and Leases, notwithstanding any provisions that restrict the assignability of the Assumed Contracts and Leases, *(v)* that Sellers will be authorized and directed to execute, upon request by Buyer, one or more assignments in form, substance, and number reasonably acceptable to Buyer, as may be necessary to evidence the conveyance of the Acquired Assets to Buyer; and *(vii)* waiver of the ten (10) day stay periods in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

4.1.5    Following entry of the Bid Procedures Order, Sellers gave notice of the transactions contemplated by this Agreement and of the auction procedure described in the Bidding Procedures Order to, among others, all persons and entities to whom Sellers sent notice of the fact that Sellers was seeking to sell some or all of its assets and to such other persons or entities and in such manner as the Bankruptcy Court shall direct or Sellers may otherwise reasonably deem necessary.  Sellers may provide potential bidders with a copy of this executed Agreement.

4.1.6    Sellers will provide Buyer and Buyer's counsel with copies of all motions, applications, and supporting papers prepared by Sellers (including forms of orders and notices to interested parties) relating in any way to Buyer or the transactions contemplated by this Agreement in advance of the service and filing thereof.  Sellers shall promptly give appropriate notice in accordance with Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure and any order of the Bankruptcy Court, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, order, hearings, or other proceedings relating to this Agreement or the transactions contemplated hereby.

4.2    Access Period.  From the date of this Agreement until the earlier of the Closing Date and the date on which this Agreement is terminated (the "Access Period"), Sellers shall:

(a)    provide Buyer and its representatives, lawyers, lenders, and consultants with reasonable access upon reasonable notice during normal business hours to the Acquired Assets, to senior management, operations and plant employees, and to financial information, books, business records and other information relating to the Acquired Assets and the Assumed Liabilities, as well as reasonable access during regular business hours to all plants, offices, facilities, properties, books, Contracts, commitments and records (including accountant's work papers) of or relating to the Acquired Assets;

(b)    permit Buyer's representatives to inspect, test and survey the Acquired Assets and to make investigations of the Acquired Assets that Buyer deems necessary or appropriate, including but not limited to any engineering, structural, building system, and environmental tests (including subsurface environmental sampling);

(c)    provide all necessary authorizations or consents reasonably required by Buyer to perform its governmental inquiries with respect to the Acquired Assets and the Assumed Liabilities; and

Buyer and its designees shall not damage the Acquired Assets, reasonable wear and tear resulting from ordinary use excepted, or any other property and at all times shall use reasonable care in connection with the foregoing activities. Buyer agrees to, and does hereby, hold Sellers and their officers, directors, shareholders, employees, agents and representatives harmless from and against any and all liabilities, claims, losses, obligations and/or damages arising from or relating to the acts or omissions of Buyer or its designees in connection with the foregoing activities. Notwithstanding any provision in this Agreement to the contrary, the obligations of Buyer under this Section 4.2 shall survive the closing of the sale of the Acquired Assets and/or the termination of this Agreement.

4.3    Conduct Pending Closing. Sellers agree that from the date of this Agreement through the earlier to occur of *(i)* the Closing Date, and *(ii)* the date on which this Agreement is terminated, Sellers will:

(a)    Conduct of Business. Use commercially reasonable efforts to maintain the Acquired Assets in a manner consistent with the past practices of Sellers and Sellers will not engage in any transactions out of the ordinary course of business, in each and every case subject to Sellers' rights and responsibilities as debtors-in-possession under the Bankruptcy Code;

(b)    Representations and Warranties; Conditions. Subject to Sellers' rights and responsibilities as debtor in possession under the Bankruptcy Code, use commercially reasonable efforts, consistent with their fiduciary duties under the Bankruptcy Code in connection with the Case, not to engage in any practice, take any action, fail to take any action or enter into any transaction that could reasonably be expected to *(i)* cause any of the representations and warranties of Sellers contained in this Agreement or any documents related thereto to be untrue, inaccurate or incorrect at any time, or *(ii)* result in any of the conditions set forth in Articles 10 and 11 not being satisfied on or prior to the due termination of this Agreement;

(c)    Sale of Assets; Liens. Not *(i)* transfer any of the Acquired Assets, except Inventory sold in the ordinary course of business consistent with past practice, *(ii)* dispose of, or trade in, any of the Equipment or Fixtures, or *(iii)* create, incur, assume, or suffer to exist any Lien upon or with respect to any of the

-9-

Acquired Assets other than any Lien granted in connection with Sellers' Credit facility with Lender or liens rising in the ordinary course of Sellers' businesses;

# ARTICLE 5

## CLOSING

5.1  <u>The Closing.</u>  The consummation of the transactions contemplated in this Agreement (the "Closing") shall take place on or before August 28, 2015, subject to extension as provided herein (the "Closing Date") in the offices of Sellers' counsel in Bloomfield Hills, Michigan or on such other date at such other location as is mutually agreed by the parties; *provided, however,* that in no event unless otherwise agreed in writing by the Parties, shall the Closing take place later than the date which is the first business day which is more than thirty (30) days after entry of the Sale Order.

5.2  <u>Closing</u>. The parties hereto agree that the Closing shall be deemed effective as of 12:01 a.m. on the Closing Date.

# ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers represent and warrant to Buyer as follows, which representations and warranties shall be true and correct as of the date hereof and true and correct as of the Closing but which shall not survive the Closing:

6.1  <u>Organization and Standing of Sellers.</u>  Lee Steel is a corporation duly organized and validly existing and in good standing under the laws of the State of Michigan, with full corporate power and authority to own its assets and to conduct its business.  Taylor and 4L are each limited liability companies duly organized and validly existing and in good standing under the laws of the State of Michigan, with full power and authority to won its assets and to conduct its business.  Upon the expiration of any applicable appeal period following the entry of the Sale Order, this Agreement will have been duly executed and delivered by each of the Sellers and shall constitute the legal, valid and binding obligations of each of the Sellers enforceable in accordance with its terms.  Upon expiration of any applicable appeal period following the entry of the Sale Order, Sellers will have full power and authority, corporate or otherwise, to enter into and deliver this Agreement and to execute and deliver all contemplated agreements and documents provided in this Agreement and perform the transactions contemplated herein.

6.2  <u>Acquired Assets.</u>  At the Closing, Sellers shall transfer to Buyer good and marketable title to all of the Acquired Assets, free and clear of all Liens.  Upon the expiration of any applicable appeal period following the entry of the Sale Order, Sellers shall have the right to freely assign all of its rights and interests in the Acquired Assets to Buyer free and clear of all Liens.

-10-

6.3    Authorization; Binding Effect.  The execution and delivery by Sellers of each of the Sale Documents to which a Seller is a party, the performance by Sellers of their obligations under such Sale Documents and the consummation of the transactions contemplated by the Sale Documents by Sellers have been duly authorized by all necessary corporate action on the part of each Seller.  No other proceedings on the part of any Seller are necessary to approve and adopt the Sale Documents or to approve the consummation of the transactions contemplated by the Sale Documents, except for the approval of the Bankruptcy Court.  Each of the Sale Documents to which a Seller is or may become a party is, or, when executed and delivered in accordance with this Agreement will be, a legal, valid and binding obligation of such Sellers enforceable against such Sellers in accordance with its terms, except that such enforcement *(i)* may be limited by bankruptcy, insolvency, moratorium or similar laws affecting creditors' rights generally and *(ii)* is subject to the availability of equitable remedies, as determined in the discretion of the court before which such a proceeding may be brought.

6.4    Contravention.  Other than the entry of the Sale Order by the Bankruptcy Court, neither the execution, delivery and performance of the Sale Documents by Sellers nor the consummation of the transactions contemplated by the Sale Documents by Sellers will (with or without notice or lapse of time or both) (a) conflict with, violate or breach any provision of Lee Steel's articles of incorporation or the articles of organization and Operating Agreements of the Real Estate Sellers;, (b) assuming the receipt of all required third-party consents and the Sale Order prior to the Closing, conflict with, violate or breach any law by which Sellers or any of the Acquired Assets may be bound or affected, (c) assuming the receipt of all of required third-party consents and the Sale Order prior to the Closing, conflict with, breach or result in a default under, result in the acceleration of, or give rise to a change in the terms of or a right of termination, cancellation, modification or acceleration or require any notice under, any Contract, (d) result in or require the creation or imposition of any Lien on any of the Acquired Assets or (e) otherwise result in a material adverse effect upon the condition, value or prospects of the Acquired Assets.

6.5    Consents.  Except for the Sale Order and the third-party consents set forth on Schedule 6.5 attached hereto ("Required Consents"), no consents are required on behalf of Sellers in connection with (a) the due execution and delivery by Sellers of the Sale Documents and the performance of Sellers' obligations thereunder, (b) the consummation of the transactions contemplated by the Sale Documents by Sellers, (c) the exercise by Buyer of its rights and remedies under the Sale Documents, and (d) the ownership or use of the Acquired Assets, by Buyer immediately following the Closing Date.  As of the Closing Date, all of the Required Consents will have been obtained and will be in full force and effect.

6.6    Insurance.  All of the Acquired Assets are covered by valid and currently effective insurance policies or binders of insurance, including, without limitation, general liability insurance, property insurance, workers' compensation insurance and business interruption insurance, issued in favor of Sellers with reputable insurance companies and in such types and amounts and covering such risks as are consistent with customary practices and standards of companies engaged in business and operations substantially similar to those of Seller.  Sellers are not in default with respect to its obligations under any insurance policy maintained by any of

-11-

them, and all premiums thereunder will be timely paid in full for all periods up to and through the Closing.

6.7 <u>Environmental Matters</u>. Except as set forth on Schedule 6.7, to the knowledge of Sellers:

      (a)    <u>No Environmental Liability</u>.

           (i)    Sellers have no any actual, alleged or contingent liability or obligation: (A) relating to the violation, or alleged violation, of any Environmental Law (defined below) or Permit; (B) with respect to, or relating to, the generation, presence, disposal, Release (defined below), threatened Release, handling, transportation, treatment, storage, Cleanup (defined below) or contamination of or by any Hazardous Material (defined below) at the Romulus Facility; or (C) with respect to, or relating to, the Cleanup of the Romulus Facility (any such liability or obligation referred to in clauses (A), (B) and (C) being an "<u>Environmental Liability</u>").

           (ii)    There are no Environmental Liabilities arising out of conditions or occurrences existing or occurring on or prior to the Closing for which Buyer, Sellers or one of its Affiliates will or may be responsible or liable.

      (b)    <u>Basis for Environmental Claims</u>.

           (i)    Sellers have not been identified or listed as a potentially responsible party or a responsible party under the federal Comprehensive Environmental Response, Compensation and Liability Act or any other Environmental Law, nor have Sellers received any information request from a governmental authority under any Environmental Law. The Romulus Facility is not listed or is proposed for listing on the federal National Priorities List or any other similar Law.

           (ii)    There are no underground storage tanks, storing or previously storing Hazardous Materials at the Romulus Facility.

      (c)    <u>Notices</u>. Sellers have not received any written communication from a governmental authority, third party or any citizens' group, employee or otherwise within the past five years, alleging *(i)* that Sellers have violated or is in violation of any Environmental Law or is liable for any Cleanup of Hazardous Materials or *(ii)* that Sellers have any Environmental Liability.

      (d)    <u>Environmental Reports</u>. Sellers have delivered to Buyer or Buyer's representatives copies of all environmental reports prepared by third-party environmental engineers or consultants within the past five years on behalf of Sellers or any of their affiliates or which is in the possession or control of Sellers or any of their affiliates.

-12-

(e)    Filing of Reports.  Sellers have timely filed all material reports, obtained all material consents and Permits and generated and maintained, and currently generates and maintains, all material consents, Permits, data, documentation and records required under applicable Environmental Laws.

(f)    Definitions.  For purposes of this Section, Sellers shall refer to Sellers as well as any of its existing or former subsidiaries and affiliates, and the following terms shall have the definitions as follows:

(i)    "Cleanup" means all actions required to (a) cleanup, remove, treat or otherwise remediate Hazardous Materials present in the indoor or outdoor environment, (b) prevent, pursuant to Law, the Release of Hazardous Materials so that they do not enter the environment, migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) perform pre-remedial studies and investigations and post-remedial monitoring and care, or (d) respond to any government directives, orders, requests for information or other documents in any way relating to cleanup, removal, treatment or remediation or potential cleanup, removal, treatment or remediation of Hazardous Materials in the indoor or outdoor environment.

(ii)    "Environmental Laws" means all applicable federal, state, local and foreign laws and regulations relating to pollution, human health, safety or protection of the environment, including, without limitation, laws relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, disposal, Cleanup, transport or handling of Hazardous Materials and all Laws with regard to record keeping, notification, disclosure and reporting requirements respecting Hazardous Materials and all similar laws and regulations.

(iii)    "Hazardous Materials" means any hazardous or toxic substance, waste, contaminant, pollutant, gas or material, including, without limitation, radioactive materials, oil, petroleum and petroleum products and constituents thereof, which are regulated under any Environmental Law, including, without limitation, any substance, waste or material which is (a) designated a "pollutant", "hazardous substance", "extremely hazardous substance" or "toxic chemical" under the Federal Water Pollution Control Act and/or the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, and/or the Emergency Planning and Community Right-To-Know Act, as amended, (b) designated or classified as a "hazardous waste" or "regulated substance" pursuant to the Resource Conservation Recovery Act (a/k/a Solid Waste Disposal Act), (c) designated or classified as a "hazardous material" under the Hazardous Material Transportation Act, as amended, (d) designated or classified as a "toxic substance" under the Toxic

-13-

Substances Control Act, or (e) regulated in any way under the Environmental Laws of any jurisdiction for the business conducted by Sellers at the Romulus Facility.

(iv) "Release" means (a) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, dispersing, emitting, leaching or migrating into the indoor or outdoor environment, including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata, or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater, surface or subsurface strata or property and (b) the abandonment or discarding of barrels, tanks, containers or receptacles, whether or not sealed or closed, containing, or which formerly contained, Hazardous Materials.

6.8    No Material Misstatements or Omissions.    No representation or warranty contained in the Sale Documents or certificate or schedule furnished by Sellers in connection therewith, contained or will contain, as the case may be, any material misstatement of fact or omitted or will omit, as the case may be, to state a material fact or any fact necessary to make the statement contained therein not materially misleading.

## ARTICLE 7

## REPRESENTATIONS AND WARRANTIES OF BUYER

Hilco represents and warrants to Sellers as follows, which representations and warranties shall be true and correct as of the date hereof and true and correct as of the Closing:

7.1    As of the Closing Date Buyer will be duly organized and validly existing.  Buyer will have full power and authority to own and lease the Acquired Assets as such Acquired Assets are now owned and leased.  As of the Closing Date, Buyer will be duly qualified as a foreign company in all jurisdictions where such qualification is required where the absence of such qualification would have an expected material adverse effect upon Buyer's ability to consummate the transactions contemplated hereby.

7.2    This Agreement has been duly executed and delivered by Hilco on behalf of Buyer and constitutes the legal, valid and binding obligations of Hilco and Buyer enforceable in accordance with its terms.  Hilco has full power and authority, or otherwise, to enter into and deliver this Agreement and to execute and deliver all contemplated agreements and documents provided in Agreement and perform the transactions contemplated therein.  Hilco is not required (and Buyer will not be required) to obtain the consent, approval or waiver of any person not a party to this Agreement to consummate the transactions contemplated hereby.

-14-

7.3     Hilco has adequate financial resources, which it will provide to Buyer, to consummate the transactions contemplated hereby, including the payment of the Purchase Price.

7.4     There is no suit, action, litigation, investigation, claim, complaint or proceeding before any governmental authority in progress or, to the knowledge of Hilco, pending or threatened against or relating to Hilco or Buyer, which, if determined adversely to Hilco or Buyer, would, prevent Buyer from paying the Purchase Price to Sellers; enjoin, restrict or prohibit the transfer of all or any part of the Acquired Assets as contemplated by this Agreement; or prevent Buyer from fulfilling all of its obligations set out in this Agreement or arising from this Agreement, and Hilco has no knowledge of any existing ground on which any such action, suit, litigation or proceeding might be commenced with any reasonable likelihood of success.

7.5     Hilco has carried on all negotiations relating to this Agreement and the transactions contemplated in this Agreement directly and without the intervention on its behalf of any other party in such manner as to give rise to any valid claim for a brokerage commission, finder's fee or other like payment.

7.6     Hilco, on behalf of Buyer, acknowledges that Sellers have made no representations, warranties, statements or promises save and except as are contained herein with respect to the Acquired Assets, including as to title, description, fitness for purpose, merchantability, quantity, conditions or the quality of any matter or thing whatsoever, and any and all conditions and warranties expressed or implied by law do not apply to the sale of the Acquired Assets and are hereby waived by Buyer. Hilco, on behalf of Buyer, acknowledges that, except as qualified above, Buyer is purchasing the Acquired Assets on an "as is, where is" basis as of the Closing Date, and that Buyer will accept the Acquired Assets in their present state, condition and location.

# ARTICLE 8

## COVENANTS

8.1     <u>Further Actions.</u>  Upon the terms and subject to the conditions hereof, each of the parties hereto agrees to use its best efforts or take or cause to be taken all action and to do or cause to be done all things necessary, proper and advisable to consummate the transactions contemplated by this Agreement, the related agreements and other documents necessary to close this transaction, and shall use its best efforts to obtain all necessary waivers, consents and approvals and to effect all necessary registrations and filings.

8.2     <u>Press Releases.</u>  Except in connection with the Bidding Procedures Order or the Sales Order or as otherwise required by the Bankruptcy Court or permitted by this Agreement, no general public announcement or release as to any of the matters set forth herein may be made by Sellers or Buyer to any third party, including the news or other media, without consulting with each other and obtaining the prior written consent of each other (which consent shall not be unreasonably withheld) as to the identity of such third party and the timing and content of any such announcement or release.

8.3     Retention of Records.  Buyer hereby covenants that for a period of three (3) years following the Closing Date, Buyer will retain, at Buyer's sole expense, the books, records, and electronically stored information of Sellers relating to the Acquired Assets prior to the Closing Date.   During such period, Buyer will afford to Sellers, their successors and assigns, the Unsecured Creditors Committee, as well as their respective counsel and accountants, on prior written notice and during normal business hours, reasonable access to such books, records and other data.

8.4     Disclosure Schedules.

8.4.1     Updating of Disclosure Schedules.  Sellers agree that during the period from the date of this Agreement through the earlier to occur of (x) the Closing Date and (y) the date on which this Agreement is terminated in accordance with the provisions of Section 12.2 hereof, Sellers will promptly notify Buyer of *(i)* any and all information, facts, events, circumstances, issues or other matters that existed as of the date of this Agreement that should have been set forth or described in the schedules to this Agreement required or provided for under this Agreement as of the date of this Agreement, and *(ii)* any and all information, facts, events, circumstances, issues or other matters arising after the date of this Agreement which, if existing on the date of this Agreement, would have been required to be set forth or described in the schedules to this Agreement required or provided for under this Agreement, in each case, by delivery of appropriate updates to the Schedules attached to this Agreement setting forth such information, facts, events, circumstances, issues or other matters, in each case, no later than the earlier of (i) two business days prior to the scheduled Closing Date (any such updates to the Schedules, or Sellers' schedules of assets, liabilities and executory contracts and statement of financial affairs as they may file in the Case, being referred to herein as "Schedule Updates") and (ii) the later of (A) three business days after Buyer submits its bid and (B) the next business day after becoming aware of such matter.

8.4.2     Effect of Schedule Updates.  In the event that Sellers deliver any Schedule Updates to Buyer in accordance with the provisions of Section 8.4.1 above, then such Schedule Updates shall not be *(i)* deemed to be attached to this Agreement or become a part of this Agreement, or *(ii)* given effect for any purposes under this Agreement, unless such Schedule reflects the results of operation in the ordinary course consistent with past practice relating to such Schedule, or such Schedule Updates shall be accepted by Buyer in its reasonable discretion. In the event that the Schedule Updates are accepted by Buyer, then upon such acceptance, *(i)* such Schedule Updates shall be deemed to be attached to this Agreement and become a part of this Agreement, *(ii)* all references to the Schedules in this Agreement shall refer to the Schedules as updated by such Schedule Updates, and *(iii)* such Schedule Updates shall be given effect for all purposes under this Agreement, including, without limitation, for determining whether the conditions to Closing set forth in this Agreement have been satisfied.  In the event Buyer does not accept any Schedule Update pursuant to this Section 8.4.2, Buyer shall notify Sellers in writing of such non-acceptance within two (2) business days after the delivery of such Schedule Update which notification shall be deemed a notice of termination hereunder, subject to any right to cure pursuant thereto.

-16-

# ARTICLE 9

## CLOSING DELIVERIES

At the Closing on the Closing Date:

9.1     Sellers and Buyer, as applicable, shall execute and deliver the conveyance documents described in Section 1.3 hereof and the Memorandum of Allocation.

9.2     Buyer shall pay the Cash Purchase Price as set forth in Section 2.3 of this Agreement.

9.3     Sellers and Buyer shall execute and deliver any and all other documents, agreements, instruments and other writings and have taken all actions necessary to carry out the transactions contemplated in this Agreement, including (without limitation), as to Sellers, all actions set forth in and required by Article 10 hereof.

# ARTICLE 10

## BUYER'S CONDITIONS

The obligation of Buyer to purchase and pay for the Acquired Assets and consummate the transactions contemplated by the Sale Documents at Closing shall be subject to the satisfaction, prior to or concurrently with the Closing Date, of each of the following express conditions precedent, unless waived by Buyer in writing at or before the Closing, except where the conditions are expressly deemed to have been waived by the passage of time without Buyer giving notice to Sellers that such contingencies have not been satisfied as set forth below:

10.1     Bankruptcy Order.  The Sale Order shall have been entered by the Bankruptcy Court approving the sale of the Acquired Assets free and clear of all Liens by Sellers to Buyer in form and substance reasonably satisfactory to Buyer, which Sale Order complies in all material respects with the terms and provisions of Section 4.1.4 hereof.  Such Sale Order shall be in full force and effect as of the Closing Date without modification and shall not be subject to any stay, temporary restraining order or injunction.

10.2     Accuracy of Representations and Performance of Obligations.  Each of the representations and warranties of Sellers set forth in the Sale Documents shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date unless otherwise specified in such representation, and Sellers shall have complied in all material respects with all of the covenants set forth in the Sale Documents.

10.3     Closing Documents Delivered.  Sellers shall have executed and delivered the documents, certificates, instruments and agreements and done the acts required of Sellers in connection with the Closing as described in this Agreement.

10.4 <u>Due Diligence.</u> Buyer is reasonably satisfied with the results of its due diligence regarding title to and condition of the Acquired Assets, including that (a) Sellers have not violated in any material respects any Environmental Laws or that any Hazardous Substances have been or are currently located at, in, under or about the Acquired Assets in a manner which (i) violates in any material respect any applicable Environmental Laws, or (ii) may require response, remedial, corrective action or cleanup of any kind under any applicable Environmental Laws, (b) Buyer has a commitment for issuance of an owner's title policy at Closing insuring Buyer's title to the Real Estate in a condition satisfactory to Buyer, (c) Buyer has received a satisfactory survey of the Real Estate, and (d) the structural and other condition of the building(s) and systems located on the Real Estate is satisfactory to Buyer.

10.5 <u>Closing Date.</u> In the event that the Closing does not occur by the date of August 28, 2015 (the "<u>Non-Fulfillment Date</u>") as a result of the non-fulfillment of one or more of the foregoing conditions in this Article 10, Buyer may, upon two (2) days' written notice to Sellers at any time after the Non-Fulfillment Date, terminate this Agreement without any further liability on the part of either of the parties; provided that if the Closing does not occur as a result of non-fulfillment of the conditions set forth in Section 10.4, Buyer may extend the Closing Date and the Non-Fulfillment Date to a date that is not more than thirty (30) days after entry of the Sale Order.

10.7 <u>No Material Adverse Change.</u> As of the Closing Date, no Material Adverse Change in the Acquired Assets shall have occurred from and after the date that is ten calendar (10) days before the Auction. As used herein, "Material Adverse Change" shall be limited to changes in the Acquired Assets that materially impair the value of the Acquired Assets prior to Closing, but shall not include changes in the overall steel market or economy, or decreases in prices of steel, prices of equipment, nor any price reduction or concessions requested by Buyers' customers.

## ARTICLE 11

## SELLERS' CONDITIONS

The obligation of Sellers to sell and convey the Acquired Assets at the Closing shall be subject to the satisfaction, prior to or concurrently with the Closing Date, of each of the following express conditions precedent, unless waived by Sellers:

11.1 <u>Bankruptcy Order.</u> The Sale Order shall have been entered by the Bankruptcy Court.

11.2 <u>Accuracy of Representations and Performance of Obligations.</u> The representations and warranties of Buyer shall be true and correct in all material respects at the Closing Date, and Buyer shall have complied in all material respects with all of its covenants set forth in this Agreement.

11.3   Closing Documents Delivered.   Buyer shall have executed and delivered the documents, certificates, instruments and agreements and done the acts required of Buyer in connection with the Closing, as described in this Agreement.

11.4   No Prohibition.   No order, statute, rule, regulation, executive order, injunction, stay, decree or restraining order, shall have been enacted, entered, promulgated or enforced by any court or competent jurisdiction or governmental or regulatory authority or instrumentality that prohibits the consummation of the transactions contemplated hereby.

11.5   Closing Date.   In the event that the Closing does not occur by the Non-Fulfillment Date (as such date may be extended as provided in Article 10) as a result of the non-fulfillment of one or more of the foregoing conditions in this Article 11, Sellers may, upon written notice to Buyer at any time after the Non-Fulfillment Date, terminate this Agreement without any further liability on the part of either of the parties unless the non-fulfillment is caused by Buyer's breach of this Agreement in which case such termination shall not operate to release Buyer from claims for breach hereof.


# ARTICLE 12

# BREAK-UP FEE AND TERMINATION

12.1   Break-Up Fee.   Sellers shall pay to Buyer a Break-up Fee equal to $150,000. Sellers and Buyer acknowledge and agree that *(i)* the Break-up Fee shall be Buyer's liquidated damages and Buyer's sole and exclusive right and remedy; *(ii)* the full extent of Buyer's damages in the event the transactions contemplated by this Agreement are not consummated cannot be accurately anticipated or determined, *(iii)* the amount of liquidated damages does not constitute a penalty, and *(iv)* the agreements contained in this Section 12.1 are an integral part of the transactions contemplated by this Agreement and that, without these agreements, Buyer would not enter into this Agreement.

12.2   Termination.   The obligations of the parties to consummate the transactions contemplated by the Sale Documents may be terminated at any time prior to the Closing by:

(a)      the mutual written consent of Sellers and Buyer;

(b)      Sellers, if Buyer shall have breached in any material respect any of its representations, warranties, covenants or other agreements contained in the Sale Documents which breach is likely to have a material adverse effect on Sellers' rights and obligations under this Agreement.

(c)      Buyer, if *(i)* the Closing shall not have occurred on or prior to the Non-Fulfillment Date (as such date may be extended as provided herein), unless such

failure to consummate the transactions contemplated by this Agreement is the result of a material breach of any Sale Document by Buyer.

(d)     Buyer or Sellers if *(i)* any law shall have been enacted, adopted, issued or promulgated which prohibits the transactions contemplated by this Agreement, or *(ii)* any governmental authority shall have issued an order, decree or ruling or taken any other action, which permanently restrains, enjoins or otherwise prohibits the transactions contemplated by this Agreement, and such order, decree, ruling or other action shall have become final and non-appealable;

(e)     Buyer or Sellers in the event that the consummation of the transactions contemplated by the Sale Documents is challenged by the United States Department of Justice or the United States Federal Trade Commission or any other governmental authority, upon one party giving notice of termination to the other party;

(f)     Buyer if the Sale Order approving the transactions contemplated by this Agreement with Buyer, in form and substance satisfactory to Buyer, without modification, is not entered by the Bankruptcy Court on or prior to 5:00 pm Detroit Time on August 27, 2015, or the Sale Order is subject to a stay, temporary restraining order or injunction as of 5:00 pm Detroit time on August 28, 2015, *provided that* Buyer's right to terminate the Agreement under this Section shall expire and be deemed waived unless exercised by giving written notice thereof to Sellers within two (2) business days of the applicable date set forth in this Section;

(g)     Buyer, if Sellers *(i)* reject or file a motion to reject any of the Sale Documents in connection with the Case, *(ii)* convert or attempts to convert the Case into a chapter 7 proceeding or other liquidation proceeding prior to Closing, or *(iii)* file a plan of reorganization that excludes, prohibits or does not provide for the consummation of the transactions contemplated by this Agreement with Buyer; or

(h)     Buyer, if Buyer is not selected as the winning bidder in the Auction or Sellers select any bidder or bidders (other than Buyer) as the winning bidder in the Auction, subject to the provisions of the Bidding Procedures Order, including the standby provisions, to which Buyer acknowledges and is bound as a part of this Agreement.

(i)     Sellers, if the Closing shall not have occurred on or prior to the Non-Fulfillment Date (as such date may be extended as provided herein), unless such failure to consummate the transactions contemplated by the Agreement is the result of a material breach of any Sale Document by Sellers.

## ARTICLE 13

# MISCELLANEOUS

13.1    Waiver. Any party hereto may (a) agree to extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto or (c) waive compliance with any of the agreements or conditions contained herein. Any agreement on the part of the party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the authorized representative of such party.

13.2    Remedies Cumulative. In the event of a breach by a party of its obligations under this Agreement, the other party shall be entitled to all remedies provided herein, by law or in equity, including, without limitation, the right to obtain an injunction to specifically enforce this Agreement.    Except as herein expressly limited, the remedies provided herein shall be cumulative and shall not preclude the assertion by any party hereto of any other rights or the seeking of any other remedies against the other hereto.

13.3    Notices. Any notices or other communications required or permitted hereunder or otherwise in connection herewith shall be in writing and shall be deemed to have been duly given when delivered in person or transmitted by facsimile transmission or on receipt (or refusal to receipt) after dispatch by express, registered or certified mail, postage prepaid, or nationally recognized overnight delivery service, addressed as follows.

If to Sellers:

LEE STEEL CORPORATION
900 Wilshire Drive, Ste. 270
Troy, MI, 48084
Attn: Laura A. Marcero
Phone: (248) 244-2415
Email: lmarcero@huronconsultinggroup.com

and

Jamie Lisac
Senior Director
550 W. Van Buren Street
Chicago, Illinois 60607
Phone (312) 235-8625
Email: jlisac@huronconsultinggroup.com

with a copy, which shall not constitute notice, to:

MCDONALD HOPKINS PLC
39533 Woodward Ave., Ste. 318
Bloomfield Hills, MI  48304

-21-

#34929717 v3

Attention: Stephen M. Gross, Esq.
Tel No.: (248) 646-5070
Fax No.: (248) 646-5075
Email: sgross@mcdonaldhopkins.com

If to Buyer:

HILCO GLOBAL
5 Revere Drive, Suite 206
Northbrook, IL 60062
Attention: Ian S. Fredericks, Esq.
Tel No.: (847) 418-2075
Email: ifredericks@hilcoglobal.com


with a copy, which shall not constitute notice to:

PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Attention: Robert S. Hertzberg, Esq.
Tel No.: (248) 359-7333
Fax No.: (248) 359-7700
Email: hertzbergs@pepperlaw.com

or such other address as the person to whom notice is to be given has furnished in writing to the other parties.

13.4    Delivery of Notices.    After the Closing Date, each party shall promptly deliver to the other party any notices, correspondence and other documents relating to the Acquired Assets being conveyed hereunder which are, from time to time, received by that party.

13.5    Entire Agreement; Binding Effect.    This Agreement (together with the Exhibits and Schedules hereto, and the other agreements, documents and instruments executed at the Closing) sets forth the entire integrated understanding and agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements whether written or verbal.    This Agreement may not be modified, amended or terminated except in a writing signed by all of the parties hereto.

13.6    Assignment.    No party to this Agreement shall have the right to assign any of its rights and obligations hereunder without the prior written consent of the other parties hereto.    To the extent that any such assignment occurs in accordance with the terms hereof, this Agreement and all provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.    Notwithstanding the foregoing, Hilco has executed this Agreement on behalf the entities to be designated by it to purchase the Acquired Property, which

-22-

may include one or more entities to be formed. Upon Hilco's designation of an entity (or entities) as Buyer, Buyer shall have all of the rights and obligations of Buyer hereunder.

13.7   Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original instrument, but all such counterparts together shall constitute the same instrument.

13.8   Governing Law and Rules of Construction.  This Agreement is being made in and shall be governed by and construed and enforced in accordance with the laws of the State of Michigan.  Notwithstanding the foregoing, the parties hereto agree that both parties have equally participated in the drafting of this Agreement and that if any term, condition or provision of this Agreement is deemed or construed to be ambiguous or vague, such ambiguity or vagueness shall not be construed in favor of or against any party to this Agreement.

13.9   Jurisdiction.  The Parties agree that the Bankruptcy Court shall have exclusive jurisdiction and venue over any disputes regarding this Agreement until the Case shall have been dismissed or closed, after which controversies  shall be resolved in any Court of competent jurisdiction.

13.10   Severability.   Should any terms, provision or clause hereof or of any other agreement or document which is required by this Agreement, be held to be invalid, such invalidity shall not affect or render invalid any other provisions or clauses hereof or thereof the consideration or mutuality of which can be given effect without such invalid provision, and all of which shall remain in full force and effect.  If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable under applicable law.

13.11   Headings.   The headings to the sections of this Agreement are inserted for convenience and reference only and are not intended to define or limit the substance of any section.

13.12   Singular and Plural.  Singular terms in this Agreement may be deemed to include plural, and plural terms to include the singular.

13.13   Exhibits and Schedules.  The exhibits and schedules referenced in this Agreement and attached hereto shall be deemed to be a part of this Agreement and are incorporated herein by this reference.

13.14   No Third Party Rights.  This Agreement and the other agreements entered into at the Closing are solely for the benefit of the parties hereto.  No third person shall acquire any rights or claims by reason of or under this Agreement.

13.15   Amendment.  This Agreement may be amended only by a writing executed by the authorized representatives of Buyer and Sellers.

#34929717.v3

13.16 <u>Expenses.</u>  Except as otherwise expressly set forth herein, each of the parties hereto shall bear their own costs and expenses in connection with the transactions contemplated hereby.

*(balance of page intentionally left blank; signatures follow)*

#34929717 v3

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the date first above written.

SELLERS:

**.LEE STEEL CORPORATION**

By: ~~Laura Merceso~~

    Its: CRO

**TAYLOR INDUSTRIAL PROPERTIES, LLC**

By: ~~Laura Merceso~~

    Its: CRO

**4L VENTURES, LLC**

By: ~~Laura Merceso~~

    Its: CRO

BUYER:

.

**HILCO INDUSTRIAL, LLC**

By: ~~Benjamin L. Norman~~
Benjamin L. NORTMAN

    Its: Executive Vice President, Member

-25-

**HILCO REAL ESTATE, LLC**

By: _Benjamin L. Newton_

Benjamin L. Norman

Its: _Executive Vice President, Member_

## SCHEDULES

| Schedule: | Description |
|---|---|
| Schedule 1.1(a) | Real Estate |
| Schedule 1.1(b) | Equipment |
| Schedule 1.2 | Excluded Claims and Causes of Action* |
| Schedule 1.3 | Conveyance Documentation** |
| Schedule 2.1 | Memorandum of Allocation** |
| Schedule 3.1 | Assumed Liabilities |
| Schedule 6.5 | Required Consents* |
| Schedule 6.7 | Environmental Matters* |

* To be provided by Sellers
** To be agreed to by Sellers and Buyer

#34929717 v3

## Schedule 1.1(a)

**(Real Estate)**

**Fidelity National Title Insurance Company**

LEGAL DESCRIPTION
EXHIBIT "A"

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF WAYNE, STATE OF MICHIGAN, AND IS DESCRIBED AS FOLLOWS:

Land situated in the City of Romulus, County of Wayne and State of Michigan described as to-wit:

That part of the Southeast 1/4 of Section 29, Town 3 South, Range 9 East, City of Romulus, Wayne County, Michigan described as: Beginning at a point distant South 88 deg. 58' 00" East 9.33 feet along the South line of Section 29 and North 01 deg. 21' 16" West 1562.28 feet along the East line of the Chesapeake and Ohio Railroad from the South 1/4 corner of said Section 29; thence continuing North 01 deg. 21' 16" West along the said East line of Chesapeake and Ohio Railroad 1059.86 feet; thence South 89 deg. 09' 28" East along the East and West 1/4 line of said Section 29 1291.48 feet; thence along the following line denoting the Westerly right of way line of I-275 Expressway: South 02 deg. 25' 18" East 807.65 feet, South 01 deg. 37' 40" West 202.81 feet and South 11 deg. 58' 45" West 0.69 feet; thence South 88 deg. 39' 41" West 1294.86 feet to the point of beginning.

Parcel ID:

Street Address:  36320 Eureka, Romulus

## Schedule 1.1(b)

### (Equipment)

**Lee Steel Corporation, 36320 Eureka Road, Romulus, MI 48174**

| Ref # | Qty | Asset # | Manufacturer | Model | Capacity | Asset Type | Serial No. | Year | Description | Condition Codes |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | N |
| 1.00 | Lot | | Red Bud 72" x 70000-Lb Pit Mounted 275 FPM EPS Packing Line (New 2014), Consisting of: | | | | | | | |
| 1.01 | 1 | | Undefined Make | | 72" x 70,000-Lb | Uncoiler | | | with (3) Rail-Mounted L-Type Coil Cars | |
| 1.02 | 1 | | Red Bud | SH1B-250-72 | | Scale | M0968 | | 0572 375 Capacity | |
| 1.03 | 1 | | Alor | | Scale | Breaker | | | with Rinse System | |
| 1.04 | 1 | | Red Bud | SH24-500-72 | Crop | Shear | SHJ13-M0968 | | | |
| 1.05 | 1 | | Red Bud | | 4-Post | Leveler | | | Equipped with Light and Heavy Gauge Cassettes | |
| 1.06 | 1 | | Red Bud | | EPS Grit Slurry Picking Unit | | | | | |
| 1.07 | 1 | | Red Bud | | EPS Grit Slurry Picking Unit | | | | | |
| 1.08 | 1 | | Undefined Make | | Final Rinse | Station | | | | |
| 1.09 | 1 | | Undefined Make | | Squeegee | Roll | | | with Air Knives | |
| 1.10 | 1 | | Undefined Make | | Strobe QC Check | Machine Station | | | with Camera | |
| 1.11 | 1 | | Red Bud | SHJ3-500-72 | Crop | Shear | SHJ3-M0968 | | .057" x 375" Max. Thickness | |
| 1.12 | 1 | | Advanced Gauging Tech. | AGT800 | QC | Laser | | | | |
| 1.13 | 1 | | Undefined Make | | | Tensioner Stand | | | with Pinch Rollers | |
| 1.14 | 1 | | Peabody | | Electrode Static | Oiler | | | | |
| 1.15 | 1 | | Undefined Make | | 72" x 70,000-Lb | Power Recoiler | | | with Outboard Support and (3) Rail Mounted L-Type Coil Cars | |
| 1.16 | 1 | | Undefined Make | | | Control Panel | | | | |
| 1.17 | 2 | | Undefined Make | | 12 Pit Mounted Media Paper Filtration | Systems | | | with Carbon Steel Tank, (2) Grit Hoppers, with Magnetic Separators, Cooling Towers, Protec Model MA60K R/O System S/N 3484, Sodium Bicarbonate Water Softening System, Media Dry Filter with Magnetic Separator and 3-Section Tank, 250-HP Pumps and Motors | |
| 2.00 | 1 | | Yale | GLC120VX NGAV086 | 12,600-Lb. LP Gas | Forklift Truck | F618V01561K | 2012 | Equipped with Side Shift, Steel Overhead Guard and Solid Rubber Tires | VG |
| 3.00 | 1 | | Trackmobile | Hercules | | Rail Car Mover | LGN-993860813 | 2014 | 44,718 - 45,995 Lb. Max. Tractive Effort, Cummings QSB 6.7-Liter Turbo Charge Diesel Engine, Interlocking Lug Drive, Hydraulic Actuated Disc Brakes Please Note: 30-Hours at Time of Inspection. | N |
| 4.00 | 1 | | Zenar | | 35-Ton x 100' Double Girder Top Riding Cab/Radio Controlled | Bridge Crane | 8519 | 2013 | Equipped with Top Riding Carriage | E |
| 5.00 | 1 | | Zenar | | 35-Ton x 100' Double Girder Top Riding Cab/Radio Controlled | Bridge Crane | 8520 | 2013 | Equipped with Top Riding Carriage | E |
| 6.00 | 1 | | Zenar | | 35-Ton x 100' Double Girder Top Riding Cab/Radio Controlled | Bridge Crane | N/A | 2013 | Equipped with Top Riding Carriage | E |
| 7.00 | 1 | | Zenar | | 35-Ton x 100' Double Girder Top Riding Cab/Radio Controlled | Bridge Crane | N/A | 2013 | Equipped with Top Riding Carriage | E |
| 8.00 | 1 | | Zenar | | 35-Ton x 100' Double Girder Top Riding | Bridge Crane | | 2013 | Equipped with 35-Ton x 100' Bridge Crane, with Radio Control, S/N 8518, Top Riding Carriage | E |
| 9.00 | 1 | | Tennant | 120ECH20 | Sit Down Rider | Floor Scrubber | | 2013 | | E |
| 10.00 | 1 | | Tennant | 5686 | Electric Walk Behind | Floor Scrubber | | 2013 | | E |

## Lee Steel Corporation, 36320 Eureka Road, Romulus, MI 48174

| Ref # | Qty | Asset # | Manufacturer | Model | Capacity | Asset Type | Serial No. | Year | Description | Condition Codes |
|---|---|---|---|---|---|---|---|---|---|---|
| 11.00 | Lot | | Miller | Spectrum 875 | | Plasma Cutter | | | | G |
| 12.00 | Lot | | Braner 72" x 60,000-Lb (1,000 FPM) Slitting Line (New 2000) Consisting of: | | | | | | | VG |
| 12.01 | 1- | | Braner | | 72" x 60,000-Lb | Unwinder | | | Equipped with L-Type Coil Car | |
| 12.02 | 1- | | Undefined Make | | 4-Arm Entry | Turnstile | | | | |
| 12.03 | 1- | | Undefined Make | | Extending Type Peeler | Table | | | Equipped with Edge Guide | |
| 12.04 | 1- | | Braner | | Crop | Shear | | | | |
| 12.05 | 1- | | Advanced | HET400 | Thickness | Gage | | | | |
| 12.06 | 1- | | Undefined Make | | Turret Type Slitter | Head | | | with Retractable Pit Cross Over Table, 9" Arbors, Scrap Winders, Over Arm Separators | |
| 12.07 | 1- | | Undefined Make | | Cluster | Leveler | | | | |
| 12.08 | 1- | | Braner | | Exit Crop | Shear | | | | |
| 12.09 | 1- | | Undefined Make | | Peeler | Recoiler | | | with L-Type Coil Car and Scale Load Cells | |
| 12.10 | 1- | | Undefined Make | | 4-Arm | Turnstile | | | | |
| 12.11 | 1- | | Undefined Make | | Quick ID Pad | Unit | | | | |
| 13.00 | Lot | | Braner 72" x 60,000-Lb (1,000 FPM) Slitting Line (New 2002) Consisting of: | | | | | | | G |
| 13.01 | 1- | | Braner | | 72" x 60,000-Lb | Unwinder | | | Equipped with L-Type Coil Car | |
| 13.02 | 1- | | Undefined Make | | 4-Arm Entry | Turnstile | | | | |
| 13.03 | 1- | | Undefined Make | | Peeler | Table | | | | |
| 13.04 | 1- | | Braner | | Crop | Shear | | | | |
| 13.05 | 1- | | Advanced | HET400 | Thickness | Gage | | | | |
| 13.06 | 1- | | Undefined Make | | Turret Type Slitter | Head | | | with Retractable Pit Cross Over Table, 9.5" Arbors, Over Arm Separators | |
| 13.07 | 1- | | Undefined Make | | Cluster | Leveler | | | | |
| 13.08 | 1- | | Braner | | Exit Crop | Shear | | | | |
| 13.09 | 1- | | Undefined Make | | 4-Arm | Recoiler | | | with L-Type Coil Car and Scale Load Cells | |
| 13.10 | 1- | | Undefined Make | | 4-Arm | Turnstile | | | | |
| 13.11 | 1- | | Undefined Make | | Quick ID Pad | Unit | | | | |
| 13.12 | 1- | | Undefined Make | | Outboard Support | | | | | |
| 14.00 | Lot | | Braner 72" Automatic Banding Line, Consisting of: | | | | | | | G |
| 14.01 | 1- | | Braner | | 72" Coil Roller Loading | Table | | | | |
| 14.02 | 1- | | Undefined Make | | Rotary 90° Roller | Conveyor | | | | |
| 14.03 | 1- | | Undefined Make | | 40' x 72" Roller | Conveyor | | | | |
| 14.04 | 1- | | Allen Bradley | | Panelview 600 PLC | Control | | | | |
| 14.05 | 1- | | Amca | | Automatic | Bander | | | | |
| 14.06 | 1- | | Amca | | Gantry Type Roll | Handler | | | with Gorbel 250-Lb Jib Crane and 6-Station 24" Dia Table, Amca Push Arm with 6' Dia Rotary Table | |
| 15.00 | 1- | | Braner | | 72" | Upender | | | Equipped with 20' Exit Roller Conveyor | G |
| 16.00 | 1- | | Yale | GLC120VX NGAV086 | 12,000-Lb LP Gas | Forklift Truck | F818V011564K | 2012 | Equipped with Side Shift, Steel Overhead Guard, Solid Rubber Tires | VG |
| 17.00 | 2- | | Zenar | | 32.5-Ton Coil | Handlers | B1012 & N/A | | | G |
| 18.00 | 2- | | Bradely | | 32.5-Ton Coil | Handlers | | 2013 | | VG |
| 19.00 | 2- | | Manufacturer Unknown | | Rail Mounted | Coil Cars | | | | G |
| 20.00 | 1- | | Bradely | | 18,000-Lb Skid Lifting | Attachment | | | | G |

**Lee Steel Corporation, 36300 Eureka Road Romulus, MI 48174**

| Ref # | Qty | Asset # | Manufacturer | Model | Capacity | Asset Type | Serial No. | Year | Description | Condition Codes |
|---|---|---|---|---|---|---|---|---|---|---|
| 21.00 | 1 | | Polar Air | PR4804000 3 | 40-HP | Rotary Screw Air Compressor | 40332 | 2013 | Equipped with Variable Speed Drive | E |
| 22.00 | 1 | | Polar Air | PR4804000 3 | 40-HP | Rotary Screw Air Compressor | 40334 | 2013 | Equipped with Variable Speed Drive | VG |
| 23.00 | 1 | | Polar Air | PDR480002 0 | 280-CFM Refrigerated | Air Dryer | 04125A02353 | 2013 | Equipped with (2) Receiving Tanks | E |
| 24.00 | 1 | | Hurco | VM1 | 3-Axis | CNC Vertical Machining Center | VM1-0601305ABEA | 2004 | Travels: X = 660mm, Y = 356mm, Z = 457mm, 18-Position Automatic Tool Changer, 11-Kw Power Motor, 8,000-RPM Spindle Speed | G |
| 25.00 | 1 | | Instron | 5582 | | Tensile Tester | 1 | | Equipped with Pneumatic Wedge Grips | G |
| 26.00 | 1 | | Wilson Rockwell | 2000 | Digital | Hardness Tester | | | | G |
| 27.00 | 1 | | Applied Research | 2460 | | Spectrometer | N/A | 1994 | | F |
| **27.10** | | | **TRANSPORTATION** | | | | | | | |
| 28.00 | 1 | | Ford | F350 | | Pickup Truck | 1FTWW33P96EA5345 | 2006 | Please Note: Not Inspected by Appraiser | NA |
| 29.00 | 1 | | Ford | F150 | | Pickup Truck | 1FTFX1E7XDFA52348 | 2013 | Please Note: Not Inspected by Appraiser | NA |
| 30.00 | 1 | | Ford | F350 | Snow Plow | Truck | 1FT8X3B73EEA65276 | 2013 | Equipped with Smart Shield Snow Plow, 6.7 Power Stroke Diesel Engine | E |
| 31.00 | 1 | | Ford | Edge | | Sport Utility Vehicle | 2FMDK3JC9GBA44026 | 2013 | Please Note: (2,200 Miles at Time of Inspection) | E |
| 32.00 | 1 | | Peterbuilt | 387 | 6x4 Truck | Tractor | 1XP7DB9X78D768236 | 2008 | Please Note: Not Inspected by Appraiser | NA |
| 33.00 | 1 | | Thruway | | Flat Bed | Trailer | 2T9FA5087Y1011601 | 2000 | Please Note: Not Inspected by Appraiser | NA |
| 34.00 | 1 | | Ford | Edge | | Sport Utility Vehicle | 2FMDK4JC0EBA7786 | 2014 | Please Note: Not Inspected by Appraiser | NA |
| 35.00 | 1 | | Porsche | Cayenne | | Sport Utility Vehicle | WP1AC2A29ELA8610 8 | 2014 | Please Note: Not Inspected by Appraiser | NA |
| **35.10** | | | **MISCELLANEOUS** | | | | | | | |
| 36.00 | Lot | | Undefined Make | | | | | | Miscellaneous Throughout Production Consisting of Coil Chocks, Ladders, Nardan Model 50 Radial Arm Drill, Pipe Threader, Various Welders, Humidit Shaker, Disc / Belt Sander, EZ Go Golf Cart, Coil Cable Crimper, Chairs, Screw Hangers, Etc. | G |
| 37.00 | Lot | | Undefined Make | | | | | | Miscellaneous Office Equipment and Furniture, Consisting of Tables, Chairs, Computers, Laptop Computers, Routers, Reception Furniture, Cafeteria Furniture, Executive Furniture, Cubicles, Phone System, Printers, Etc. | G |

## Schedule 3.1

**(Assumed Liabilities)**

NONE